# 26-1097

# United States Court of Appeals for the Second Circuit

STATE OF NEW YORK, NEW YORK STATE DEPARTMENT OF MOTOR VEHICLES,

*Petitioners,*

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION, SEAN DUFFY, in his official capacity as Secretary of the Department of Transportation, FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION, DEREK BARRS, in his official capacity as Administrator of the Federal Motor Carrier Safety Administration,

*Respondents.*

On Petition for Review of a Final Determination of the Federal Motor Carrier Safety Administration

## BRIEF AND APPENDIX FOR PETITIONERS

BARBARA D. UNDERWOOD
  *Solicitor General*
ESTER MURDUKHAYEVA
  *Deputy Solicitor General*
ANTHONY R. RADUAZO
  *Assistant Solicitor General*
    *of Counsel*

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Petitioners
28 Liberty Street
New York, New York 10005
(212) 416-6159

Dated: July 6, 2026

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES...................................................................iii

PRELIMINARY STATEMENT.............................................................. 1

JURISDICTION AND VENUE............................................................. 4

STANDING ........................................................................................ 5

ISSUE PRESENTED .......................................................................... 7

STATEMENT OF THE CASE .............................................................. 7

     A.   Legal Background ................................................................ 7

          1.   Federal law governing commercial driver's licenses and permits.......................................................................... 7

          2.   Federal oversight of state commercial driver's license programs ............................................................. 10

          3.   Recent amendments to federal regulation of commercial driver's license programs ............................ 12

     B.   Factual Background................................................................ 14

          1.   New York's commercial driver's license program ........... 14

          2.   The Federal Motor Carrier Safety Administration's (FMCSA) annual review of New York's commercial driver's license program .................................................. 17

     C.   The Final Agency Determination ............................................ 21

STANDARD OF REVIEW...................................................................... 22

SUMMARY OF ARGUMENT................................................................. 23

**Page**

ARGUMENT

THE FINAL DETERMINATION SHOULD BE SET ASIDE ............................ 26

    A.   The Final Determination Is Contrary to Law. ........................ 26

        1.   Federal regulations expressly permitted States to issue commercial driver's licenses for eight-year terms. ................................................................................ 27

        2.   Regulatory history and practice support the issuance of commercial driver's licenses for eight-year terms. ................................................................ 31

        3.   In any event, the record does not support a finding of substantial noncompliance. ......................................... 35

    B.   The Final Determination Is Arbitrary and Capricious. ......... 38

CONCLUSION .................................................................................. 44

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Art & Antique Dealers League of Am., Inc. v. Seggos,*
121 F.4th 423 (2d Cir. 2024).......................................................................37

*Biden v. Nebraska,*
600 U.S. 477 (2023)........................................................................................6

*Blassingame v. Secretary of the Navy,*
866 F.2d 556 (2d Cir. 1989) ......................................................................23

*Bria Health Servs., LLC v. Eagleson,*
950 F.3d 378 (7th Cir. 2020).....................................................................28

*Christopher v. SmithKline Beecham Corp.,*
567 U.S. 142 (2012).......................................................................................33

*Department of Homeland Sec. v. Regents of the Univ. of Cal.,*
591 U.S. 1 (2020)............................................................................. 25, 40, 43

*Encino Motorcars, LLC v. Navarro,*
579 U.S. 211 (2016)......................................................................................40

*Federal Commc'ns Comm'n v. Fox Television Stations,*
556 U.S. 502 (2009)......................................................................................40

*Federal Election Comm'n v. Akins,*
524 U.S. 11 (1998).......................................................................................23

*Forest Watch v. United States Forest Serv.,*
410 F.3d 115 (2d Cir. 2005) ....................................................................27

*Green v. Brennan,*
578 U.S. 547 (2016)......................................................................................28

*Hecker v. Deere & Co.,*
496 F. Supp. 2d 967 (W.D. Wis. 2007)................................................34

| **Cases** | **Page(s)** |
|---|---|

*Jeff D. v. Otter,*
  643 F.3d 278 (9th Cir. 2011)...............................................................35

*Jones v. Hendrix,*
  599 U.S. 465 (2023)............................................................................30

*Kisor v. Wilkie,*
  588 U.S. 558 (2019)........................................................................28-29

*Lal v. Immigration & Naturalization Serv.,*
  255 F.3d 998 (9th Cir. 2001)...............................................................33

*Landor v. Louisiana Dep't of Corr. & Pub. Safety,*
  609 U.S. --, 2026 WL 1791277 (2026)................................................29

*Lujan v. Federal Motor Carrier Safety Admin.,*
  No. 25-1215, 2025 WL 3182504 (D.C. Cir. Nov. 13, 2025)........... 13, 39

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v.
  State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983)............................................................. 22, 34, 39

*Ohio, Dep't of Hum. Servs. v. Sullivan,*
  789 F. Supp. 1395 (S.D. Ohio 1992) ...................................................38

*Rotkiske v. Klemm,*
  589 U.S. 8 (2019)................................................................................28

*San Luis Obispo Coastkeeper v. Santa Maria Valley Water
  Conservation Dist.,*
  49 F.4th 1242 (9th Cir. 2022) ............................................................35

*Sierra Club v. Environmental Prot. Agency,*
  719 F.2d 436 (D.C. Cir. 1983) ............................................................30

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016)..............................................................................5

iv

**Cases** **Page(s)**

*Team Kennedy v. Berger,*
  748 F. Supp. 3d 200 (S.D.N.Y. 2024)................................................35

*United States Customs Serv., Region II v. Federal Lab. Rels. Auth.,*
  739 F.2d 829 (2d Cir. 1984) ..............................................................23

*United States v. Greene,*
  No. 1:23-cr-52, 2025 WL 310128 (E.D. Va. Jan. 27, 2025)................34

**Federal Statutes**

5 U.S.C.
  § 702 ...................................................................................................4
  § 704 ...................................................................................................4
  § 706(2)(A) .......................................................................................22

23 U.S.C. § 104(b)(1)-(2) ........................................................................5

28 U.S.C.
  § 2342(3)(A) .......................................................................................4
  § 2343 .................................................................................................4

49 U.S.C.
  § 113(f).................................................................................................8
  § 31301(3)-(4) .....................................................................................7
  § 31302 ...............................................................................................7
  § 31305(a) ...........................................................................................8
  § 31308 .........................................................................................8, 13
  § 31311(a) ......................................................................... 4, 8, 10, 36
  § 31311(a)(12)(B)......................................................................8, 26, 34
  § 31311(a)(17).............................................................................26, 34
  § 31311(a)(20).............................................................................26, 34
  § 31312(a) ...........................................................................................8
  § 31313(a)(2).......................................................................................8
  § 31314(a) ................................................... 4, 10-11, 25-26, 34-35
  § 31314(b) ..........................................................................................11
  § 31314(c) ..........................................................................................11
  § 31314(d)..........................................................................................11

## State Statutes

**Page(s)**

N.Y. Vehicle and Traffic Law
    § 201 ............................................................................ 14
    § 501(1).......................................................................... 14

## Federal Administrative Sources

6 C.F.R. § 37.21(b)(1)................................................................ 28

49 C.F.R. (2024)
    § 1.87(e)(1)....................................................................... 8
    § 349.307(e) ...................................................................... 6
    § 383.5 ............................................................................. 8
    § 383.23(b) ............................................................. 8, 27, 36
    § 383.71(c) ...................................................................... 36
    § 383.71(f) .................................................................. 27, 36
    § 383.71(f)(2)(i) ................................................................. 9
    § 383.73(a)(3).............................................................. 10, 29
    § 383.73(b)(9) .................................................................. 30
    § 383.73(c)(9) ............................................................. 10, 27
    § 383.73(f) .................................................................. 27, 36
    § 383.73(f)(2) ........................................................... 9, 27, 30
    § 383.73(m)..................................................................... 36
    § 383.153(a)(7)............................................................. 9, 27
    §§ 384.201-384.236......................................................... 8, 36
    § 384.212 ........................................................................ 27
    § 384.301(a) .................................................................... 33
    § 384.305 ........................................................................ 10
    § 384.307(a) ............................................................... 10, 33
    § 384.307(b) .................................................................... 10
    § 384.307(c) .................................................................... 11
    § 384.307(d) ................................................................. 4, 11
    § 384.307(e) ................................................................. 4, 22
    § 384.309 ........................................................................ 33
    § 384.309(a)(2).................................................................. 4
    § 384.309(b) .................................................................... 34
    § 384.401(a) .................................................................... 11

**Federal Administrative Sources** **Page(s)**

49 C.F.R. (2024)
  § 384.401(b) ................................................................................... 11
  § 384.403 ........................................................................................ 11

49 C.F.R. § 383.73(f) (2025) ............................................................. 12

Commercial Driver's License Testing and Commercial
  Learner's Permit Standards, 76 Fed. Reg. 26854
  (May 9, 2011) ............................................................... 9-10, 24, 31-32

Restoring Integrity to the Issuance of Non-Domiciled Commer-
  cial Drivers Licenses, 90 Fed. Reg. 46509 (Sept. 29, 2025) .............. 12

Restoring Integrity to the Issuance of Non-Domiciled
  Commercial Drivers Licenses, 91 Fed. Reg. 7044
  (Feb. 13, 2026) ............................................................. 13, 24, 33-34, 42

Exec. Order No. 14,286, 90 Fed. Reg. 18759 (Apr. 28, 2025) ................ 17

**State Administrative Sources**

15 N.Y.C.R.R. §§ 3.4-3.6 ................................................................... 15

**Miscellaneous Authorities**

*Black's Law Dictionary* (12th ed. 2024) (Westlaw) ................................. 35

Emily Barnes, *Why CDL Stoppage Could Lead to Even Worse
  Bus Driver Shortage in NY*, PressConnects (Feb. 25, 2026),
  https://www.pressconnects.com/story/news/2026/02/25/new-
  dmv-limitations-may-lead-to-even-worse-bus-driver-
  shortage-in-ny/88854549007/ ........................................................ 43

Federal Motor Carrier Safety Admin., *Commercial Driver's
  License Program: States* (last updated Feb. 4, 2026),
  https://www.fmcsa.dot.gov/registration/commercial-drivers-
  license/states ................................................................................ 36

**Miscellaneous Authorities** **Page(s)**

Federal Motor Carrier Safety Admin., *Crash Statistics* (data
   through May 15, 2026),
   https://ai.fmcsa.dot.gov/CrashStatistics?tab=Summary&type
   =&report_id=1&crash_type_id=1&datasource_id=1&time_pe
   riod_id=2&report_date=0&vehicle_type=1&state=NY&domic
   ile=ALL&measure_id=1&operation_id=null ...................................... 37

Federal Motor Carrier Safety Admin., *State Data* (data through
   May 15, 2026), https://ai.fmcsa.dot.gov/DataQuality/
   StateOverall.aspx?state=NY&sn=New%20York .............................. 37

Jessica Gould et al., *Immigrant New Yorkers Denied
   Commercial Driver Licenses Following Trump Funding
   Threat*, Gothamist (Feb. 19, 2026),
   https://gothamist.com/news/immigrant-new-yorkers-denied-
   commercial-driver-licenses-following-trump-funding-threat ............ 43

Melissa Krull, *Many New York School Districts Still Seeking
   Bus Drivers*, Spectrum News 1 (Sept. 26, 2025),
   https://spectrumlocalnews.com/nys/central-ny/news/2025/09/
   26/many-school-districts-seeking-bus-drivers ................................... 42

New York Dep't of Motor Vehicles, *Commercial Driver Licenses
   (CDL)* (n.d.), https://dmv.ny.gov/driver-license/commercial-
   driver-license .................................................................................... 14

New York Dep't of Motor Vehicles, *New York State Commercial
   Driver's License (CDL) Manual* (n.d.),
   https://dmv.ny.gov/driver-license/commercial-drivers/new-
   york-state-commercial-drivers-manual ......................................... 15-16

U.S. Citizenship & Immigr. Servs., *Automatic Employment
   Authorization Document (EAD) Extension* (Oct. 29, 2025),
   https://www.uscis.gov/archive/automatic-employment-
   authorization-document-ead-extension ............................................ 32

U.S. Citizenship & Immigr. Servs., *Policy Manual* vol. 10 (June
   26, 2026), https://www.uscis.gov/policy-manual/volume-10-
   part-a-chapter-4 ................................................................................ 32

## PRELIMINARY STATEMENT

The Commercial Motor Vehicle Safety Act authorizes states to issue commercial driver's licenses (CDLs) subject to rules promulgated by the Federal Motor Carrier Safety Administrator (FMCSA). Under those rules, States have long been permitted to issue CDLs to nondomiciled individuals—i.e., noncitizens living in the United States on a temporary basis—so long as those drivers demonstrate their lawful presence through approved forms of documentation and meet all of the safety, training, and testing standards required of any other applicant.

In April 2026, FMCSA found petitioner State of New York in substantial noncompliance with federal licensing requirements for the first time in the history of the State's CDL program. As the sole basis for that finding, FMCSA claimed that the State, in some instances, issued nondomiciled CDLs for a term exceeding the expiration of the driver's lawful-presence documentation presented at the time of license issuance—despite identifying no statutory or regulatory provision prohibiting such a practice. As a penalty for this supposed noncompliance, FMCSA withheld approximately $73.5 million in federal highway funds allocated to the State, beginning in fiscal year 2027, and prohibited those

funds from being apportioned to the State in future years. FMCSA further directed the State to take certain "corrective actions" upon penalty of additional withholdings or decertification of New York's CDL program. Among the "corrective actions" directed by FMCSA is the cancellation of thousands of lawfully issued CDLs currently held by New York drivers.

This Court should set aside FMCSA's determination of substantial noncompliance as arbitrary, capricious, and contrary to law. During the relevant time period, New York issued CDLs—to both domiciled and nondomiciled drivers alike—with expiration dates up to eight years post issuance, which is the maximum expiration period permitted under federal law for CDLs generally. FMCSA's position that nondomiciled CDLs should have been issued with an expiration date tethered to the driver's lawful-presence documentation cannot be reconciled with the plain text of the agency's applicable regulations, which imposed no special expiration rule for nondomiciled CDLs during the time period at issue here, and instead mandated that States issue nondomiciled licenses following procedures "identical" to those pertaining to any other CDL.

Nor can FMCSA's position be squared with the agency's regulatory history with respect to nondomiciled licenses. In promulgating the CDL

2

regulations that applied during the relevant time period, FMCSA specifically considered and rejected public comments that federal requirements should mandate a shorter expiration period for nondomiciled licenses. FMCSA's determination is further belied by its recent rulemaking, which expressly adopts an expiration rule specific to nondomiciled CDLs as a prospective change to the agency's preexisting regulations.

In any event, FMCSA's determination of substantial noncompliance would be unreasonable even if the State had issued some CDLs with incorrect expiration dates. Such a narrow and discrete violation cannot support a determination that New York's CDL program, as a whole, was "substantially" noncompliant. In finding otherwise, FMCSA held the State to an erroneously stringent standard that is incompatible with the statutory metric for determining noncompliance and withholding federal funds. FMCSA's related claim that the State's practice with respect to nondomiciled licenses presents an unacceptable safety risk is unexplained and wholly without support in the administrative record. And the determination further ignores significant reliance interests—of the State, its communities, and its drivers—that the agency's change in position upends.

3

## JURISDICTION AND VENUE

Petitioners are the State of New York and the New York State Department of Motor Vehicles. Petitioners seek review of FMCSA's April 2026 determination that the State of New York is not in substantial compliance with federal CDL standards. That determination is a final agency action, *see* 49 C.F.R. §§ 384.307(d), 384.309(a)(2), and is subject to judicial review under the Administrative Procedure Act, *see* 5 U.S.C. §§ 702, 704; 49 C.F.R. § 384.307(e).

This Court has jurisdiction to review FMCSA's determination because 28 U.S.C. § 2342(3)(A) grants "exclusive jurisdiction" to the U.S. Courts of Appeals "to enjoin, set aside, suspend (in whole or in part), or to determine the validity of" any final order issued by the Secretary of Transportation under 49 U.S.C. ch. 313—which includes a final determination to withhold federal highway funds based on a finding of substantial noncompliance, *see* 49 U.S.C. §§ 31311(a), 31314(a).

Venue is proper in this Court under 28 U.S.C. § 2343.

## STANDING

To demonstrate standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Petitioners have satisfied those elements here.

FMCSA issued a final determination, finding New York in substantial noncompliance with federal licensing standards and with-holding approximately $73.5 million in National Highway Performance Program and Surface Transportation Block Grant Program funds begin-ning in Fiscal Year 2027. The final determination provides that funding will be withheld as of October 1, 2026. If not for FMCSA's determination, those monies would be distributed to the State under 23 U.S.C. § 104(b)(1)-(2) in the normal course. (*See* App. 66-71.)

In addition, the final determination indicates that additional federal highway funds, amounting to approximately $147 million annually, will be withheld in future years if the State does not immediately undertake certain "corrective actions" identified by FMCSA—including, among other things, (1) pausing the issuance or renewal of any nondomiciled

5

CDLs; (2) conducting an audit to identify all unexpired nondomiciled licenses with supposedly noncompliant expiration dates; and (3) cancelling all such licenses and reissuing those licenses in accordance with FMCSA's newly promulgated regulations. Undertaking these "corrective actions" would involve substantial administrative costs and burdens, and would substantially undermine the State's sovereign and pecuniary interests. (*See* App. 61.)

A favorable decision by this Court would redress these injuries by making the withheld funds available to the State in the fiscal year that begins on October 1, 2026, by removing obstacles to the allocation and disbursement of federal funds in future fiscal years, and by invalidating any purported obligation to undertake the aforementioned "corrective actions." *See, e.g.*, *Biden v. Nebraska*, 600 U.S. 477, 490 (2023) (standing based on loss of federal funding attributable to agency action); *see also* 49 C.F.R. § 349.307(e) ("Any State aggrieved by an adverse decision under this section may seek judicial review under 5 U.S.C. Chapter 7.").

6

## ISSUE PRESENTED

Whether FMCSA acted arbitrarily, capriciously, and contrary to law in issuing a determination of substantial noncompliance and withholding federal highway funds based solely on New York's issuance of nondomiciled CDLs for a period of up to eight years rather than with individualized expiration dates based on the driver's lawful-presence documentation, when the federal CDL standards applicable here did not require States to tether expiration dates to a driver's proof of lawful presence.

## STATEMENT OF THE CASE

### A. Legal Background

#### 1. Federal law governing commercial driver's licenses and permits

Under the Commercial Motor Vehicle Safety Act, a driver of a commercial motor vehicle must have a commercial driver's license. *See* 49 U.S.C. §§ 31302, 31301(3)-(4). States may issue CDLs and commercial learner's permits (CLPs) subject to "minimum uniform standards" designed to ensure that drivers of commercial motor vehicles have the requisite knowledge, skills, and training necessary to operate those

7

vehicles safely. *Id.* § 31308; *see id.* §§ 31305(a), 31311(a), 31312(a), 31313(a)(2); 49 C.F.R. §§ 384.201-384.236 (2024).[1] The Federal Motor Carrier Safety Administrator, a division of the U.S. Department of Transportation, is charged with promulgating regulations prescribing these minimum standards. *See* 49 U.S.C. §§ 113(f), 31308; 49 C.F.R. § 1.87(e)(1).

The Act permits States to issue CDLs or CLPs to drivers who are noncitizens lawfully residing in the United States—including Deferred Action for Childhood Arrivals recipients, individuals visiting on a temporary work visa or with temporary protected status, and persons who have been granted asylum or refugee status—so long as those drivers meet all federal and state requirements. *See* 49 U.S.C. § 31311(a)(12)(B); *see also* 49 C.F.R. §§ 383.5, 383.23(b) (allowing persons domiciled in a foreign country to obtain a nondomiciled CDL or CLP).

---

[1] Unless otherwise specified, all citations to FMCSA's regulations herein refer to those provisions that were in effect prior to September 2025. In September 2025 and February 2026, FMCSA promulgated regulations that revised the eligibility criteria for CDLs and CLPs, but as explained *infra* (at 12-13, 33-34), none of those changes apply retroactively and are therefore irrelevant to the determination at issue in this case.

In 2011, FMCSA issued regulations specifically pertaining to CDLs issued to these so-called "nondomiciled" individuals. In that rulemaking, FMCSA specified that an applicant for a "nondomiciled" license generally must meet all the same safety, testing, and fitness standards required of all other applicants for a CDL or CLP. *See* 49 C.F.R. § 383.71(f)(2)(i). In lieu of providing proof of citizenship or legal residence, a driver applying for a nondomiciled CDL or CLP must present:

> an unexpired employment authorization document (EAD) issued by [U.S. Citizenship and Immigration Services] or an unexpired foreign passport accompanied by an approved I-94 form documenting the applicant's most recent admittance into the United States.

*Id.* § 383.71(f)(2)(i) (2024).

As FMCSA explained at the time of adoption, this requirement was intended to "set[] forth the updated list of documents that are acceptable to show legal status for a Non-domiciled CDL or CLP." Commercial Driver's License Testing and Commercial Learner's Permit Standards, 76 Fed. Reg. 26854, 26871 (May 9, 2011). In all other respects (aside from three exceptions not relevant here), "state procedures" for the issuance of nondomiciled licenses must "be identical to those pertaining to any other CLP or CDL." 49 C.F.R. § 383.73(f)(2). As for expiration dates, the regula-

9

tion directed state licensing agencies to (1) list the dates of issuance and expiration on every CDL and CLP, *id.* § 383.153(a)(7); (2) issue CDLs with an expiration date no greater than eight years from the date of issuance, *id.* § 383.73(c)(9); and (3) issue CLPs with an expiration date no greater than one year from the date of issuance, *id.* § 383.73(a)(3). FMCSA further specified that while "8 years is the maximum" expiration period for any CDL, "States are free to set shorter validity periods." 76 Fed. Reg. at 26861.

### 2. Federal oversight of state commercial driver's license programs

States with a CDL program are required to certify that they meet the applicable federal requirements on an annual basis. *See* 49 C.F.R. § 384.305. In addition, each State's CDL program is subject to an annual audit by FMCSA—referred to as an "annual program review"—to determine whether the program substantially complies with federal requirements. *See id.* § 384.307(a); *see also* 49 U.S.C. §§ 31311(a), 31314(a).

If, after conducting an annual program review, FMCSA makes a preliminary determination that a State is not in substantial compliance

10

with federal standards, the State is informed of that finding. 49 C.F.R. § 384.307(b). The State then has thirty days to respond by either (1) stating the corrective actions that it intends to take to address the deficiencies cited in the preliminary determination, or (2) explaining why FMCSA's preliminary determination is wrong. In addition, the State may request an informal conference with FMCSA. *Id.* § 384.307(c). After considering the State's response and any corrective actions implemented or planned, FMCSA then must render a final determination. *Id.* § 384.307(d). FMCSA may issue a negative determination only upon a finding that the "State does not comply *substantially* with" the federal licensing standards set out in 49 U.S.C. § 31311(a) and FMCSA's implementing regulations. *See* 49 U.S.C. § 31314(a) (emphasis added).

Following such a determination, FMCSA may withhold up to four percent of the federal National Highway Performance Program and Surface Transportation Block Grant Program funds allocated to the State for the fiscal year immediately following the State's first year of noncompliance. *See id.* § 31314(c); 49 C.F.R. § 384.401(a). Withheld funds are no longer available for reapportionment to the noncompliant State in future years. *See* 49 U.S.C. § 31314(d); 49 C.F.R. § 384.403. This withholding

11

increases to eight percent of apportioned funds in all subsequent years of noncompliance. *See* 49 U.S.C. § 31314(b); 49 C.F.R. § 384.401(b).

### 3. Recent amendments to federal regulation of commercial driver's license programs

In late September 2025, FMCSA issued an Interim Final Rule (IFR) announcing significant changes to the rules governing nondomiciled CDLs and CLPs. *See* Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses, 90 Fed. Reg. 46509 (Sept. 29, 2025).

Among the changes made by the IFR was a new expiration-date rule specific to nondomiciled CDLs and CDPs. Specifically, FMCSA amended 49 C.F.R. § 383.73 to add subsection (f)(2)(iv) as a new exception to the general requirement that "state procedures" for the issuance of nondomiciled licenses be "identical to those pertaining to any other CLP or CDL." *See* 49 C.F.R. § 383.73(f)(2)(iv) (2025). This new exception provides, in relevant part:

> For applicants domiciled in a foreign jurisdiction, the State must ensure that the period of validity of the non-domiciled CLP or CDL does not exceed the Admit Until Date or expiration date on the applicant's I-94/A or 1 year, whichever is sooner.

12

*Id.* The IFR specified that this amendment reflects a substantive "change[]," 90 Fed. Reg. at 46510, that would require States "to amend their existing procedures" for issuing CDLs and CLPs, *id.* at 46522.

In November 2025, the U.S. Court of Appeals for the D.C. Circuit stayed the IFR based, in part, on FMCSA's failure to comply with a statutory requirement that it consult with States before promulgating new standards for CDLs and CLPs. *See Lujan v. Federal Motor Carrier Safety Admin.*, No. 25-1215, 2025 WL 3182504 (D.C. Cir. Nov. 13, 2025); *see also* 49 U.S.C. § 31308.

In February 2026, following a notice-and-comment period, FMCSA issued a final rule implementing the same substantive changes set out in the IFR, including the new expiration-date exception in § 383.73(f)(2)(iv). *See* Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses, 91 Fed. Reg. 7044 (Feb. 13, 2026). The final rule specifies that these changes are intended "to be prospective." *Id.* at 7061.

13

The final rule took effect in March 2026, *id.* at 7044, and was not in effect during the time period relevant to this case.[2]

## B. Factual Background

### 1. New York's commercial driver's license program

The state agency tasked with driver licensing in New York is the New York State Department of Motor Vehicles (DMV). *See* N.Y. Vehicle and Traffic Law § 501(1); *see id.* § 201. As of October 2025, there were approximately 476,100 active CDLs in New York, including more than 32,600 CDLs and CLPs held by nondomiciled drivers. (*See* App. 51, 53.) In New York, a CDL is required to operate any large or heavy commercial vehicle.[3] CDL holders perform a range of critical services across the

---

[2] In February 2026, several drivers and labor groups challenged the final rule as arbitrary and capricious because, among other reasons, the agency lacked evidence to support its claims that the rule would improve driver safety or was needed to address administrability concerns. *See* Pet. for Review, *Lujan v. Federal Motor Carrier Safety Admin.*, No. 26-1032 (D.C. Cir. Feb. 12, 2026), Doc. 2158853. A group of States, including New York, filed an amicus brief supporting vacatur of the rule because it is legally erroneous. *See* Br. of Massachusetts et al. as Amici Curiae in Supp. of Pet'rs, *Lujan*, No. 26-1032 (D.C. Cir. June 22, 2026), Doc. 2179896.

[3] *See* New York Dep't of Motor Vehicles, *Commercial Driver Licenses (CDL)* (n.d.). (All websites were last visited July 6, 2026. Full URLs appear in the Table of Authorities.)

State, such as operating sanitation vehicles, snowplows, tractors for construction and agricultural work, commercial-shipping and delivery trucks, and school and city buses. (*See* App. 59-60.) See *infra* at 42-43. In line with federal requirements, DMV imposes rigorous knowledge and skills testing requirements and other eligibility criteria on all applicants for a commercial license or permit, including nondomiciled CDLs and CLPs. *See* 15 N.Y.C.R.R. §§ 3.4-3.6 (summarizing knowledge- and skills-testing requirements, and procedures for the issuance of CDLs). (*See* App. 48.)

To be eligible for a commercial license in New York, an applicant must be a resident of the State and at least eighteen years old. In addition, the applicant must first possess a conventional New York state driver's license or a valid CDL from another State and, for certain classes of CDLs, undergo a medical examination. To obtain a CLP, the applicant must first pass a written knowledge test of materials contained in the *New York State Commercial Driver's License Manual.*[4] To then obtain a CDL, the applicant must complete an entry-level driver training course

---

[4] *See* New York Dep't of Motor Vehicles, *New York State Commercial Driver's License (CDL) Manual* (n.d.).

15

and pass a skills test. In addition, drivers must be able to understand and respond to verbal instructions in English. (*See* App. 48-49.)

As part of the application process, individuals who are U.S. citizens or lawful permanent residents must provide proof of citizenship or unrestricted lawful permanent residency. Individuals domiciled in a foreign jurisdiction must demonstrate their lawful presence and employment authorization in the United States by presenting an unexpired employment authorization document or an unexpired foreign passport accompanied by an approved I-94 form. This proof of lawful presence must be shown every time a commercial license is issued or renewed.[5] The processes for obtaining a nondomiciled and a domiciled license are otherwise identical. (*See* App. 49-50.)

During the relevant time period, DMV issued all CDLs with a default expiration date of five years after the initial license issuance. Upon renewal, CDLs were issued with a default expiration date of eight years post issuance. Both domiciled and nondomiciled CLPs were issued

---

[5] *See* App. 62 (*Manual* § 1.3.1: "Applicants from a foreign jurisdiction must provide proof of your legal presence at a DMV office *for every transaction*." (emphasis added)).

with an expiration date of one year following issuance. Prior to the 2025 annual program review, FMCSA had never found New York's CDL program to be noncompliant with federal requirements. (*See* App. 50.)

### 2. The Federal Motor Carrier Safety Administration's (FMCSA) annual review of New York's commercial driver's license program

In July 2025, FMCSA commenced its annual program review of New York's CDL program. (*See* App. 1, 3.) Following a site visit at DMV later that same month, FMCSA sent several information requests to DMV that it had not made in previous audits. For instance, FMCSA requested that DMV produce a complete list of all nondomiciled CDL and CLP holders in New York, along with checklists and statistics related to DMV's issuance of nondomiciled licenses.[6] DMV provided the requested information and identified more than 32,600 active, nondomiciled CDLs and CLPs in the State. (*See* App. 52-53.)

In September 2025, FMCSA requested that DMV produce licensing records from a randomly selected sample of twenty nondomiciled

---

[6] Shortly before FMCSA began its 2025 annual program review, President Trump issued Executive Order 14,286. *See* Exec. Order No. 14,286, 90 Fed. Reg. 18759 (Apr. 28, 2025). Among other things, that

(*continued on the next page*)

17

licenses. One week later, FMCSA requested to review, in-person, the licensing records from a larger sample of 200 nondomiciled licenses. DMV again complied and, in late October 2025, representatives from FMCSA visited DMV to review the requested records. (*See* App. 53.)

In December 2025, FMCSA issued a preliminary determination of substantial noncompliance, asserting that the annual review had "uncovered evidence of systemic policy, procedural, and programming errors" among the New York licenses sampled during the October 2025 onsite visit. (*See* App. 4.) In particular, FMCSA observed that 101 of those licenses included expiration dates that exceeded the period of validity shown on the drivers' lawful presence documents presented at the time of license issuance. (*See* App. 4-16.) Citing no authority, FMCSA asserted that DMV was required to "make the period of validity of the non-domiciled CLP or CDL less than or equal to the period of validity of the driver's lawful presence document(s)."[7] (App. 3; *see* App. 16-18.)

---

order directed FMCSA to "review non-domiciled commercial driver's licenses" to look for "unusual patterns" or "other irregularities." *Id.* at 18760. (*See also* Admin. R. (A.R.) 002064 (Doc. 13).)

[7] The preliminary determination also claimed that six records sampled showed that DMV issued nondomiciled CDLs without proper

(*continued on the next page*)

18

The determination directed the State to take certain "corrective actions" to address this supposed deficiency. Among other things, FMCSA ordered DMV to (1) immediately "pause" the issuance or renewal of all nondomiciled CLPs and CDLs; (2) conduct an audit and identify all nondomiciled licenses issued with supposedly noncompliant expiration dates; (3) take "immediate action" to cancel all such licenses; and (4) resume issuing nondomiciled CLPs and CDLs only after FMCSA provides written approval. (*See* App. 18.) The determination further instructed the State to respond within thirty calendar days, and warned that DMV's failure to take "corrective actions" could result in the permanent withholding of certain federal highway funds or decertification of the State's CDL program. (App. 1; *see also* App. 19.)

In January 2026, DMV responded to the preliminary determination in writing. (*See* App. 21-26.) DMV explained that its review of the record "did not corroborate FMCSA's preliminary determination" and instead confirmed that all of the sampled licenses were issued in compliance with federal requirements. (App. 24.) The response explained that DMV was

---

verification of lawful presence. (Add. 16-18.) FMCSA later acknowledged that this finding was erroneous. (*See* Add. 33, 42.)

19

unaware of any federal licensing standard that required States to issue nondomiciled licenses in a manner consistent with FMCSA's position, and noted that FMCSA's regulations allowed States to issue nondomiciled licenses with the same maximum expiration dates that apply to CDLs and CLPs generally. (*See* App. 23 (citing 49 C.F.R. §§ 383.25(c), 383.73(a)(3), (b)(9)). See *supra* at 9-10. The response further noted that FMCSA had never previously found New York's CDL program noncompliant with expiration-date requirements. (*See* Add 24.) Finally, DMV explained that FMCSA's direction that the State unilaterally cancel thousands of nondomiciled CDLs and CLPs to avoid a final determination of substantial noncompliance would cause significant harm to New York drivers and communities across the State and raised serious due process concerns. (App. 26.)

In February 2026, staff and leadership from DMV met with representatives from FMCSA. (*See* App. 27.) Following that meeting, FMCSA sent a letter to DMV, in which the agency acknowledged that a "literal reading" of its regulations did not require States to tether expiration dates to the lawful-presence paperwork submitted by drivers with their license applications. (App. 31 (quotation marks omitted).) Neverthe-

less, FMCSA opined that "[t]he regulatory universe" of CDL regulations "is premised on the basic notion that a non-domiciled driver's commercial motor vehicle driving privileges cannot extend beyond that driver's lawful presence in the United States." (App. 30.) FMCSA's letter then directed DMV to take additional "corrective actions" (*see* App. 33-35), and warned that any "undue delay" in implementing such changes would result in the withholding of federal highway funds (*see* App. 28).

In March 2026, DMV responded to FMCSA, reiterating the State's view that no corrective action was warranted because FMCSA's preliminary determination was not grounded in any statutory or regulatory requirement. (*See* App. 37-38.)

## C. The Final Agency Determination

In April 2026, FMCSA issued a final determination of substantial noncompliance. (*See* App. 39-46.) The determination rehashed, nearly verbatim, the same rationales that FMCSA previously proffered in the agency's preliminary determination and March 2026 letter. (*See* App. 42-45.) The determination further asserted, without elaboration or support, that New York's practice with respect to nondomiciled CDLs presented an "unacceptable and significant safety risk." (*See* App. 45.) It otherwise

failed to identify any previous instance where FMCSA took the position that its preexisting regulations contain an expiration rule specific to nondomiciled CDLs. Nor did it address the substantial reliance interests that the State identified in its letter responses.

As a penalty for the supposed noncompliance, FMCSA indicated that approximately $73.5 million in funds previously apportioned to the State would be withheld in fiscal year 2027, and that those funds would no longer be available for apportionment to the State in future years. In addition, the determination warned that additional annual withholdings in the amount of $147 million would follow, and the State's CDL program may be subject to decertification if New York failed to take the specified "corrective actions." (*See* App. 45-46.)

## STANDARD OF REVIEW

This Court must set aside an agency determination if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see* 49 C.F.R. § 384.307(e) (FMCSA program-review decisions subject to Administrative Procedure Act review). Under this standard, an agency can rely only upon "relevant data," must articulate a "satisfactory explanation" in reaching its decision, and needs to

22

demonstrate a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted).

"It is axiomatic that an agency of the government must scrupulously observe its own rules, regulations, and procedures." *Blassingame v. Secretary of the Navy*, 866 F.2d 556, 560 (2d Cir. 1989). "If the underlying standard upon which the [agency] relied is not in accordance with law," the agency's "order cannot stand." *United States Customs Serv., Region II v. Federal Lab. Rels. Auth.*, 739 F.2d 829, 831 (2d Cir. 1984); *see also Federal Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998) ("If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action . . . .").

## SUMMARY OF ARGUMENT

This Court should set aside FMCSA's final determination of substantial noncompliance.

*First*, FMCSA's final determination is contrary to law. At all relevant times, the State complied with federal requirements pertaining to the issuance of nondomiciled CDLs. FMCSA's finding to the contrary is premised on its erroneous view that "the regulatory universe" of its

23

preexisting standards required New York to issue nondomiciled CDLs with expiration dates matching those provided on drivers' lawful-presence paperwork provided with their CDL applications. But the plain meaning of the applicable federal regulations is controlling, and no regulatory provision expressly imposed such a requirement during the relevant time period, as FMCSA admits. Instead, those regulations directed States to issue nondomiciled CDLs following the same procedures applicable to all CDLs generally, a directive that necessarily includes the eight-year maximum expiration period.

The regulatory history further supports the State's position. In 2011, FMCSA expressly considered and rejected the position that a maximum expiration period of less than eight years should apply for nondomiciled CDLs, and declined to incorporate REAL ID requirements that tether expiration dates to a license holder's lawful-presence documentation. *See* 76 Fed. Reg. at 26861. Prior to the 2025 annual review, FMCSA had never found New York (or any other State that issues CDLs for an eight-year term) to be noncompliant. And FMCSA's recent regulatory amendment, which imposes a specific expiration-date rule for nondomi-

24

ciled CDLs for the first time, all but confirms that no such requirement existed previously. *See* 91 Fed. Reg. 7044.

In any event, even if the State had issued some nondomiciled CDLs with noncompliant expiration dates, the final determination would still be contrary to law because that discrete violation does not support a finding of "substantial" noncompliance as is necessary to withhold federal funds. *See* 49 U.S.C. § 31314(a). Nondomiciled licenses constitute a mere seven percent of all licenses issued under New York's CDL program, and FMCSA does not dispute that the State fully complied with the panoply of safety, testing, and inspection standards that apply to domiciled and domiciled licenses alike.

*Second*, FMCSA's determination is arbitrary and capricious. To the extent the final determination rests on the FMCSA's claim that the State's practice with respect to nondomiciled licenses presents an unacceptable safety risk, FMCSA failed to explain or support that finding. Insofar as FMCSA's determination reflects a substantive change in agency position, the agency failed to consider the "potential reliance interests" that such a change would upend. *See Department of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020); *see also id.* at 32. Indeed, the

25

agency utterly failed to address any of the substantial harms that would flow from the withholding of funds at issue or the implementation of the "corrective actions" that it directed the State to take.

## ARGUMENT

### THE FINAL DETERMINATION SHOULD BE SET ASIDE

### A.    The Final Determination Is Contrary to Law.

Under the Commercial Motor Vehicle Safety Act, FMCSA may withhold federal highway funding only upon a finding that the "State does not comply substantially" with the federal licensing requirements provided in 49 U.S.C. § 31311(a) or FMCSA's implementing regulations. *See* 49 U.S.C. § 31314(a); *see also id.* § 31311(a)(12)(B), (17), (20). New York fully complied with federal standards regarding expiration dates and all other requirements for CDL programs. FMCSA's assertion that New York was not in substantial compliance because DMV issued nondomiciled CDLs and CLPs that exceeded the expiration dates of the drivers' lawful presence documents cannot be reconciled with the plain text of the regulations applicable during the relevant time period, or with FMCSA's own longstanding regulatory practice with respect to nondomiciled licenses.

26

### 1. Federal regulations expressly permitted States to issue commercial driver's licenses for eight-year terms.

When interpreting a regulatory provision, "[t]he plain meaning of language in a regulation governs." *Forest Watch v. United States Forest Serv.*, 410 F.3d 115, 117 (2d Cir. 2005) (quotation marks omitted). During the relevant time period, federal law imposed only two requirements with respect to expiration dates for domiciled and nondomiciled CDLs alike. Specifically, States were required to (1) list the dates of issuance and expiration on each CDL issued by the State, and (2) provide an expiration date of no greater than eight years from the date of issuance. *See* 49 C.F.R. §§ 383.73(c)(9), (f)(2), 383.153(a)(7).

FMCSA points to no regulatory text that affirmatively required the State to match license expiration dates with the lawful-presence documentation provided with drivers' CDL applications. The principal provision that FMCSA relies upon—49 C.F.R. § 384.212—does not address expiration dates. Nor does any other regulatory provision incorporated therein. *See* 49 C.F.R. §§ 383.23(b), 383.71(f), 383.73(f). Indeed, FMCSA readily acknowledges that a "literal reading" of its regulations does not contain any such expiration-matching requirement. (*See* App. 31.)

27

FMCSA's admission is fatal. "It is a fundamental principle of statutory interpretation that 'absent provision[s] cannot be supplied by the courts.'" *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019) (quoting A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 94 (2012)); *see Bria Health Servs., LLC v. Eagleson*, 950 F.3d 378, 382 (7th Cir. 2020) ("The same basic rules that apply to statutory interpretation apply to regulatory interpretation.").[8] That principle has particular force here because the federal government knows full well "how to adopt the omitted language." *Rotkiske*, 589 U.S. at 14. For example, since 2008, federal regulations applicable to the issuance of REAL ID driver's licenses have expressly required States not to issue a driver's license "[f]or a time period longer than the expiration of the applicant's authorized stay in the United States." 6 C.F.R. § 37.21(b)(1). Likewise, FMCSA's recent CDL amendments, which do not retroactively apply here, for the first time also tie expiration dates to a license holder's lawful-presence documentation.

---

[8] *See also Kisor v. Wilkie*, 588 U.S. 558, 575 (2019) (directing courts to exhaust "traditional tools" of construction when interpreting a regulation); *Green v. Brennan*, 578 U.S. 547, 554 (2016) (applying traditional statutory canon in interpreting regulation).

See *supra* at 12-13. Had FMCSA intended to impose a similar rule under its preexisting regulations, it would have done so explicitly.[9]

FMCSA nevertheless claims that this supposed expiration-matching rule was implicit in its prior regulations because a contrary interpretation would render "meaningless" and "inconsequential" the regulatory provisions that require CDL and CLP applicants to verify their lawful presence at the time of license issuance. (*See* App. 31 (citing 49 C.F.R. §§ 383.71(f)(2)(i), 383.73(f)(3)); *see also* App. 42.) That argument fails at the outset. As the Supreme Court has made plain, when conditions are imposed on States as a prerequisite for the receipt of federal funding, those conditions must be stated *clearly*. *See Landor v. Louisiana Dep't of Corr. & Pub. Safety*, 609 U.S. -- , 2026 WL 1791277, at *7 (2026); *see also Kisor*, 588 U.S. at 579 (agency interpretation not owed deference where it would impose "retroactive liability on parties for longstanding conduct that the agency had never before addressed").

---

[9] FMCSA's decision to mandate a maximum expiration period of one year post issuance for CLPs further demonstrates that the agency well understood how to adopt a shorter expiration period when it intended to do so. *See* 49 C.F.R. § 383.73(a)(3).

Moreover, the agency's position cannot be reconciled with the plain text of 49 C.F.R. § 383.73(f)(2), which directly speaks to the expiration-date issue. As discussed (see *supra* at 9-10), § 383.73(f)(2) mandates that "state procedures" for the issuance of nondomiciled licenses "be *identical* to those pertaining to any other CLP or CDL" (emphasis added). Notably, the requirement that a State make each "CDL valid for no more than 8 years from the date of issuance" is specifically enumerated as one such "state procedure" that presumptively applies to *both* nondomiciled and domiciled licenses alike. *See* 49 C.F.R. § 383.73(b)(9). And while § 383.73(f)(2) lists several exceptions to the general requirement that procedures for nondomiciled and domiciled licenses be "identical," none of those exceptions references expiration dates. *See Jones v. Hendrix*, 599 U.S. 465, 477-78 (2023) (explaining that a list of exceptions gives rise to a "negative inference" that the regulation was intended to provide *only* those exceptions).[10]

---

[10] *See also Sierra Club v. Environmental Prot. Agency*, 719 F.2d 436, 453 (D.C. Cir. 1983) (where a regulatory provision "lists several specific exceptions . . . , others should not be implied").

In any event, FMCSA is wrong that applying an eight-year expiration period to nondomiciled CDLs would nullify the verification requirements set out in §§ 383.71(f)(2)(i) and 383.73(f)(3). The purpose of these verification requirements is to "strengthen[] the legal presence requirements and increase[] the documentation required for CLP and CDL applications to demonstrate their legal presence in the United States" at the time of license issuance. *See* 76 Fed. Reg. at 26856. Indeed, nondomiciled drivers must provide that verification documentation at every license issuance *and* renewal. See *supra* at 16. The mere fact that licenses are valid for a specific term does not mean that the verification procedures applied during licensing or renewal are nugatory.

**2. Regulatory history and practice support the issuance of commercial driver's licenses for eight-year terms.**

FMCSA's position is also belied by its longstanding regulatory history with respect to CDLs generally, and nondomiciled CDLs in particular. In 2011, for example, the agency expressly rejected a shorter validity period for CDLs and refused to incorporate REAL ID requirements (including with respect to expiration dates) to nondomiciled CDLs. *See* 76 Fed. Reg. at 26861. Instead, FMCSA determined that States could

31

issue CDLs for a maximum expiration period of eight years, or adopt "shorter validity periods." The agency further specified that this change would "affect only a small number of States that currently permit validity periods longer than 8 years." *Id.*

And there were good reasons to give States this flexibility. Many categories of employment authorization held by nondomiciled individuals are issued for relatively short durations but are frequently renewed or extended.[11] In fact, until recently, many categories of employment authorization were subject to automatic extension.[12] By allowing States to opt for a longer default expiration period, States could reduce the number of license renewals needed to be processed and thereby avoid the administrative burdens and costs associated with those renewals. (*See* App. 50.)

Prior to 2025, FMCSA had never found New York (or any other State that issues CDLs for an eight-year term) to be noncompliant with federal licensing requirements, despite the fact that FMCSA was required to ensure state compliance with "each and every" CDL standard on an

---

[11] 10 U.S. Citizenship & Immigr. Servs., *Policy Manual* pt. A, ch. 4, § C.1 (June 26, 2026).

[12] U.S. Citizenship & Immigr. Servs., *Automatic Employment Authorization Document (EAD) Extension* (Oct. 29, 2025).

annual basis. *See* 49 C.F.R. § 384.301(a); *see also id.* §§ 384.307(a), 384.309. (*See* App. 51.) Notably, when DMV asked FMCSA to identify *any* instance in which it previously enforced its supposed expiration-matching requirement, the agency was unable to do so. (*Compare* App. 23, *with* App. 37, 41-43.) This "very lengthy period of conspicuous inaction" strongly implies that FMCSA "did not think [the State's] practice was unlawful." *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158 (2012).[13]

Indeed, FMCSA's recent regulatory amendments all but confirm that the regulations applicable during the relevant time period did not contain such a requirement. As noted (see *supra* at 12-13), the revised CDL rules include a new expiration-date requirement for nondomiciled licenses as an exception to the general rule that "state procedures" be identical for nondomiciled and domiciled licenses. In the final rule, FMCSA observed that this revision, among others, reflects a substantive "change[]" to the CDL program, 91 Fed. Reg. at 7047, that is "written to

---

[13] *See also Lal v. Immigration & Naturalization Serv.*, 255 F.3d 998, 1,006-07 (9th Cir. 2001) (declining to follow Board of Immigration Appeals interpretation of regulation that was inconsistent with the agency's past adjudications applying the same regulation).

33

be prospective," *id.* 7061. There would have been no need for FMCSA to undertake this "change" through notice-and-comment rulemaking if its preexisting regulations already contained an expiration requirement specific to nondomiciled CDLs.[14] *See, e.g.*, *United States v. Greene*, No. 1:23-cr-52, 2025 WL 310128, at \*5 (E.D. Va. Jan. 27, 2025) ("[T]hat the regulation has now been amended to include more specific language suggests to the Court that the Agency recognized that the plain language of the prior regulation . . . did *not* include" the new substantive requirement.).[15]

---

[14] In addition to being contrary to law, FMCSA's determination was arbitrary and capricious for the related reason that the agency "relied on factors which Congress has not intended it to consider." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43. Indeed, a finding of substantial noncompliance *must* rest on a determination that a State has failed to meet federal licensing requirements provided by statute or FMCSA's implementing regulations. *See* 49 U.S.C. §§ 31314(a), 31311(a)(12)(B), (17), (20); *see also* 49 C.F.R. § 384.309(b) (indicating that "[a] State *shall* be in substantial compliance" for any fiscal year in which federal licensing standards are met (emphasis added)).

[15] *See also Hecker v. Deere & Co.*, 496 F. Supp. 2d 967, 973 (W.D. Wis. 2007) ("[R]ecent proposals to amend the regulations . . . to require [a new rule] make it apparent that present regulations do not require it."), *aff'd*, 556 F.3d 575 (7th Cir. 2009).

34

### 3. In any event, the record does not support a finding of substantial noncompliance.

As noted above (at 10, 26), FMCSA may withhold federal highway funds only if the "State does not comply *substantially* with" federal licensing requirements. *See* 49 U.S.C. § 31314(a) (emphasis added). Substantial compliance requires "something less than a strict and literal compliance." *Jeff D. v. Otter*, 643 F.3d 278, 284 (9th Cir. 2011) (quotation marks omitted).[16] Under this standard, if an "attempt to perform does not precisely meet . . . statutory requirements, the performance will still be considered complete if the essential purpose is accomplished." *See Black's Law Dictionary*, "substantial-performance doctrine" (12th ed. 2024) (Westlaw); *San Luis Obispo Coastkeeper v. Santa Maria Valley Water Conservation Dist.*, 49 F.4th 1242, 1247 (9th Cir. 2022) (permitting deviations in dam flow rate based on "[t]he statutory requirement of substantial compliance—rather than strict compliance—with" recommendations of the Secretary of Interior).

---

[16] *See also Team Kennedy v. Berger*, 748 F. Supp. 3d 200, 218 (S.D.N.Y. 2024) (contrasting statutory requirements mandating "strict compliance" with those requiring "substantial compliance").

Applying the appropriate standard here, New York amply met the requirements for substantial compliance even if the State issued some nondomiciled CDLs with noncompliant expiration dates, as FMCSA contends. Nondomiciled CDLs and CLPs constitute a mere seven percent of all commercial licenses issued under New York's CDL program. (*See* App. 51, 59.) And *dozens* of individual requirements bear on the issuance of those licenses. *See, e.g.*, 49 U.S.C. § 31311(a); 49 C.F.R. §§ 384.201-384.236, 383.23(b), 383.71(c), (f), 383.73(f), (m).[17]

The sole basis for FMCSA's determination of substantial noncompliance is New York's failure to abide by the supposed expiration-matching requirement; the agency does not dispute that the State has otherwise complied with all of the safety, testing, inspection, and record-keeping standards required by federal law. Nor has FMCSA identified any decline in the State's safety record or performance that might indicate a systemic failure in its CDL program. To the contrary, by all objective metrics, New York's CDL program is operating well. For example, the

---

[17] *See also* Federal Motor Carrier Safety Admin., *Commercial Driver's License Program: States* (last updated Feb. 4, 2026) (providing overview of state CDL requirements).

number of fatal and nonfatal crashes involving trucks and buses in New York has steadily decreased from 2022 to 2025.[18] In addition, New York's CDL program has received the highest ratings category possible with respect to its safety reporting and recordkeeping practices.[19] (*See* A. 51-52.)

Accordingly, the record cannot sustain a finding of *substantial* noncompliance as a matter of law. In justifying its decision to the contrary, FMCSA observed that "*any* departure" from *any* of its CDL regulations is grounds "for determining the State is in substantial noncompliance." (App. 42 (emphasis added).) But that position fails to account for the significant differences in the agency's many distinct licensing requirements and instead requires strict rather than substantial compliance.

In the post-*Chevron* era, "it is the court, and not the administrative agency, that determines [the] meaning" of a statutory term. *Art & Antique*

---

[18] *See* Federal Motor Carrier Safety Admin., *Crash Statistics* (data through May 15, 2026) (Select Report: select "Summary"; Report Focus: select "New York"; select "All Crashes").

[19] *See* Federal Motor Carrier Safety Admin., *State Data* (data through May 15, 2026) (Select State: select "New York").

37

*Dealers League of Am., Inc. v. Seggos*, 121 F.4th 423, 435 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 2732 (2025). "In its usual and customary meaning," the term "substantial" "means being largely, but *not wholly*, that which is specified." *Ohio, Dep't of Hum. Servs. v. Sullivan*, 789 F. Supp. 1395, 1410 (S.D. Ohio 1992) (emphasis added). The record offers no basis for FMCSA to conclude that the supposed expiration-matching requirement is so integral to the CDL program as to render any noncompliance to be "substantial" per se, or that the handful of licenses identified in the 2025 annual program review as recalcitrant on this basis render the program as a whole substantially noncompliant.

## B.    The Final Determination Is Arbitrary and Capricious.

While the erroneous legal foundations on which the final determination stands provide sufficient grounds to set aside that decision, FMCSA's determination should also be rejected as arbitrary and capricious for several, independent reasons.

First, to the extent the determination rests on the claim that New York's practice with respect to nondomiciled CDLs and CLPs presents "a significant safety risk" (A. 45), that claim is both unreasoned and wholly without support in the administrative record. FMCSA never explained

38

how driver safety is undermined in any way when expiration dates for nondomiciled licenses do not precisely match a driver's lawful-presence paperwork at the time of license issuance. That claim is not intuitive either, when nondomiciled drivers are subject to exactly the same safety, training, and testing standards required of all other CDL holders, and DMV verifies a driver's lawful presence in the United States *every time* a license is issued or renewed. See *supra* at 16.

Nor does the administrative record include any evidence correlating expiration dates for commercial licenses or a licensee's nondomiciled status with unsafe driving. To the contrary, as the D.C. Circuit recently recognized, FMCSA's own data indicates that nondomiciled CDL holders "are involved in fatal crashes at a lower rate than CDL holders" generally. *Lujan*, 2025 WL 3182504 at *2; *see also* Br. of Massachusetts et al. as Amici Curiae in Supp. of Pet'rs at 26, *Lujan* (describing recent analysis by California DMV demonstrating that nondomiciled CDL holders were involved in crashes at a 20% lower rate than domiciled CDL holders). In these respects, FMCSA failed to offer a "satisfactory explanation" for the determination. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43.

Moreover, when, as here, an agency changes course on a policy or legal issue, the agency must, at minimum, "display awareness that it is changing position" and "show that there are good reasons for the new policy." *See Federal Commc'ns Comm'n v. Fox Television Stations*, 556 U.S. 502, 515 (2009). In addition, the agency also "must be cognizant that longstanding policies may have engendered serious reliance interests." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quotation marks omitted). In those circumstances, the agency must consider "potential reliance interests," *Regents of the Univ. of Cal.*, 591 U.S. at 30—including those of States—and offer a reasoned explanation as to why "other interests and policy concerns outweigh" those interests, *id.* at 32.

As explained (see *supra* at 12-13, 33-34), FMCSA's final determination reflects a substantive change in agency position with respect to expiration dates for nondomiciled CDLs. FMCSA's decision to go through noticeand-comment rulemaking to codify this change prospectively all but confirms that fact. Yet the final determination here does not acknowledge this change in any manner with respect to New York. (*See* App. 42.)

40

Nor does the determination attempt to address the substantial reliance interests that this change in position upends. These interests include the permanent loss of apportioned federal highway funds, which will severely impact the completion of critical safety and infrastructure projects across the State. These monies are used for replacing, repairing, and maintaining bridges, culverts, and other essential components of highway infrastructure. The sudden and unplanned loss of these funds will delay these critical projects, which will contribute to the deterioration of New York's roadways and make them less safe. The shroud of uncertainty caused by FMCSA's threat of additional withholdings in future years also impedes the State's ability to plan and allocate appropriate funds for future projects. (*See* App. 69-70.)

In addition, FMCSA's directive that the State immediately cancel all supposedly noncompliant nondomiciled CDLs and CLPs also poses severe harm to drivers and communities across the State, along with significant administrative burdens for DMV. (*See* App. 60-61.) There are approximately 32,600 nondomiciled licensees in New York. (*See* App. 51, 60.) These individuals and their families depend on the licenses for their livelihoods, and they would suffer greatly if their CDLs were summarily

41

voided or rescinded. Importantly, most of these drivers—including Deferred Action for Childhood Arrivals recipients and asylees—would not be eligible to reapply for a license under FMCSA's newly promulgated regulations, which restrict the categories of noncitizens that can obtain a nondomiciled CDL. *See* 91 Fed. Reg. at 7044-45 (limiting eligibility to H-2A, H-2B, and E-2 visa holders). (*See* App. 60.)

Removing these drivers from the workforce would also create immediate disruptions to communities across the State. Nondomiciled CDL holders perform a range of critical services, including commercial trucking, sanitation, snow removal, agriculture, public transportation, and other key functions in the State. These drivers have played a particularly important role in meeting a critical shortage in school-bus operators.[20] Currently, approximately 1,600 nondomiciled drivers operate commercial vehicles for New York school districts. These districts rely on experienced CDL holders to safely transport more than 7,300 children to and from school each day, including students with Individualized Education Programs with federally mandated transportation services. (*See* App.

---

[20] *See, e.g.*, Melissa Krull, *Many New York School Districts Still Seeking Bus Drivers*, Spectrum News 1 (Sept. 26, 2025).

38, 60-61.) FMCSA's directive that New York indefinitely "pause" all renewals of nondomiciled CDLs has already strained resources in these communities.[21] The need for school-bus operators will become even more acute if the State is forced to cancel nondomiciled CDLs, and these needs cannot presently be met with New York's remaining pool of CDL holders. (*See* App. at 60-61.)

At minimum, FMCSA was required to assess these considerable reliance interests, which the State raised to FMCSA throughout the administrative process (*see* App. 26, 38). *See Regents of the Univ. of Cal.*, 591 U.S. at 32. The agency's failure to assess these interests demands that its determination be set aside.

---

[21] *See, e.g.*, Emily Barnes, *Why CDL Stoppage Could Lead to Even Worse Bus Driver Shortage in NY*, PressConnects (Feb. 25, 2026); Jessica Gould et al., *Immigrant New Yorkers Denied Commercial Driver Licenses Following Trump Funding Threat*, Gothamist (Feb. 19, 2026).

## CONCLUSION

For the foregoing reasons, the petition should be granted, and the final determination should be set aside.

Dated:   New York, New York
         July 6, 2026

                                    Respectfully submitted,

                                    LETITIA JAMES
                                      *Attorney General*
                                      *State of New York*
                                    Attorney for Petitioners


                              By:   */s/ Anthony R. Raduazo*
                                    ANTHONY R. RADUAZO
                                    Assistant Solicitor General

BARBARA D. UNDERWOOD              28 Liberty Street
  *Solicitor General*            New York, NY 10005
ESTER MURDUKHAYEVA               (212) 416-6159
  *Deputy Solicitor General*
ANTHONY R. RADUAZO
  *Assistant Solicitor General*
      *of Counsel*

44

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Oren L. Zeve, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 8,149 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

_/s/ Oren L. Zeve_

# APPENDIX

# TABLE OF CONTENTS

**Page**

*Documents from Administrative Record*

#21  Federal Motor Carrier Safety Administration (FMCSA) Preliminary
     Determination of Noncompliance issued to New York Department of
     Motor Vehicles (DMV), dated December 12, 2025...........................................A1

#24  DMV Response to Preliminary Determination (attachments omitted),
     dated January 9, 2026 ...................................................................................A21

#25  FMCSA Response to DMV's January 9, 2026 Response,
     dated March 13, 2026.....................................................................................A27

#26  DMV Response to FMCSA's March 13, 2026 Letter,
     dated March 23, 2026.....................................................................................A37

#31  Notice of Final Determination of Substantial Noncompliance issued to
     New York DMV, dated April 16, 2026...........................................................A39

*Declarations in Support of Petition*

Declaration of Jasen Catalfamo, Director of Compliance, Vehicle
Safety and Driver Licensing, N.Y. Department of Motor Vehicles,
dated July 6, 2026.........................................................................................................A47

    Ex. A -  N.Y. State Department of Motor Vehicles, *Commercial Driver
           Manual* § 1.3.1 (Nov. 2025).................................................................A62

    Ex. B -  Email from J. Catalfamo, N.Y. DMV, to L. Dillon, FMCSA, dated
           August 12, 2025 .................................................................................A64

Declaration of Janet Ho, Assistant Commissioner for Finance and Integrated
Modal Services, N.Y. Department of Transportation, dated July 6, 2026 ..............A66

*Selected Statutes and Regulations*

49 U.S.C.
    § 31311(a)......................................................................................................A72
    § 31314 ..........................................................................................................A76

49 C.F.R. (2024)
    § 383.23(b).....................................................................................................A77
    § 383.71(f) .....................................................................................................A78
    § 383.73(a)(3), (c)(9), (f) ...............................................................................A79
    § 384.212 .......................................................................................................A81



**U.S. Department
of Transportation**

**Federal Motor Carrier
Safety Administration**

**1200 New Jersey Ave, S.E.
Washington, D.C. 20590**

December 12, 2025

<u>Via Electronic Mail and UPS</u>
The Honorable Kathy Hochul
Governor of New York State
NYS State Capitol Building
Albany, NY 12224

Mark J.F. Schroeder, Commissioner
New York Department of Motor Vehicles
6 Empire State Plaza
Albany, NY 12220

Dear Governor Hochul and Commissioner Schroeder:

The U.S. Department of Transportation's Federal Motor Carrier Safety Administration (FMCSA or Agency) is required by statute to ensure that all States comply with the commercial driver's license (CDL) regulations.[1] In July 2025, FMCSA initiated an Annual Program Review (APR) of the New York Department of Motor Vehicles' (DMV) CDL program in accordance with 49 U.S.C. § 31311 and 49 CFR § 384.307. During the 2025 APR, FMCSA obtained evidence of systemic policy and procedural errors in New York's issuance of non-domiciled commercial learner's permits (CLPs) and CDLs—that is, CLPs and CDLs issued to drivers who are not domiciled within New York. In this regard, FMCSA found that DMV issued non-domiciled CDLs that extend beyond the expiration of drivers' lawful presence in the United States and issued non-domiciled CDLs to drivers without providing evidence that it verified the driver's lawful presence in the United States under the standards set forth in 49 CFR Part 383. Therefore, in accordance with 49 CFR § 384.307(b), this letter constitutes FMCSA's preliminary determination that New York has failed to meet the requirement for substantial compliance with the standards for issuing non-domiciled CLPs and CDLs. New York must take immediate corrective action, as set forth in section IV below, to address the deficiencies identified in this letter. The State's failure to do so may result in FMCSA initiating the withholding of certain Federal-aid highway funds and decertifying the State's CDL program.

---

[1] 49 U.S.C. § 31311; *see also* 49 CFR Part 384, Subparts B and C.

**A1**

### I.    Background

The Commercial Motor Vehicle Safety Act of 1986,[2] as amended, established performance standards with which State CDL programs must comply to avoid having amounts withheld from Highway Trust Fund apportionment under 49 U.S.C. § 31314 and to avoid CDL program decertification under 49 U.S.C. § 31312.[3] In this regard, States are required to be in substantial compliance with the requirements of 49 U.S.C. § 31311(a) and its implementing regulations in 49 CFR Part 383 and Part 384, Subpart B. Under 49 CFR § 384.301(a), to be in substantial compliance with 49 U.S.C. § 31311(a), a State must meet each and every standard of Part 384, Subpart B by means of "the demonstrable combined effect of its statutes, regulations, administrative procedures and practices, organizational structures, internal control mechanisms, resource assignments (facilities, equipment, and personnel), and enforcement practices."

As part of its oversight, FMCSA conducts comprehensive APRs of State CDL programs, in accordance with 49 CFR § 384.307, to verify that States are in substantial compliance. During an APR, FMCSA evaluates all aspects of the State's CDL program, including knowledge and skills testing procedures, CDL issuance processes, procedures to report convictions and withdrawals, compliance with FMCSA's physical qualification and Drug and Alcohol Clearinghouse programs, issuance of non-domiciled CDLs, and other areas.

At the conclusion of the APR, if FMCSA makes a preliminary determination that a State does not meet one or more of the minimum standards for substantial compliance under Part 384, Subpart B, FMCSA will notify the State accordingly.[4] As explained more fully in section V below, the State will have 30 calendar days to respond to the preliminary determination explaining the State's corrective action or, alternatively, why FMCSA's preliminary determination is incorrect.[5] If FMCSA makes a final determination of substantial noncompliance, FMCSA may initiate the withholding of certain Federal-aid highway funds and may decertify the State's CDL program.[6]

As part of the 2025 comprehensive APRs, FMCSA conducted an in-depth review of State procedures and policies in issuing non-domiciled CLPs and CDLs. FMCSA's focus on State non-domiciled CDL issuance practices during the 2025 APR was consistent with Executive Order 14286, "Enforcing Commonsense Rules of the Road for America's Truck Drivers."[7] The Executive Order directed FMCSA to "review non-domiciled [ ] CDLs issued by relevant State agencies to identify any unusual patterns or numbers or other irregularities" and "to take appropriate actions to improve the effectiveness of current protocols…."[8] Accordingly, FMCSA

---

[2] 49 U.S.C. § 31301 *et seq*.

[3] 49 U.S.C. § 31311(a).

[4] 49 CFR § 384.307(b). A preliminary determination of noncompliance is also known as a "finding."

[5] *Id*. at § 384.307(c).

[6] 49 U.S.C. §§ 31314(c), 31312; *see also infra* at section VI; 49 CFR § 384.307(d), 49 CFR Part 384, Subpart D.

[7] 90 Fed. Reg. 18759 (Apr. 28, 2025).

[8] *Id*. at 18759-60.

**A2**

conducted a thorough audit of DMV's procedures and policies in issuing non-domiciled CLPs and CDLs as part of the 2025 APR.

## II.     Statutory and Regulatory Requirements for Issuing Non-Domiciled CLPs and CDLs

Under 49 CFR §§ 383.71 and 383.73, States must issue regular CLPs and CDLs to drivers who are U.S. citizens or lawful permanent residents. Under 49 U.S.C. § 31311(a)(12)(B)(ii), States are authorized to issue non-domiciled CDLs, but they must do so in accordance with regulations prescribed by FMCSA. The Agency's regulations in effect at the time of the 2025 APR[9] provided that States that issue non-domiciled CLPs and CDLs may only accept as valid proof of lawful presence (i) an unexpired employment authorization document (EAD) issued by the United States Customs and Immigration Service (USCIS) or (ii) an unexpired foreign passport accompanied by an approved I-94 form documenting the driver's most recent admittance into the United States.[10] In addition, State procedures for issuing, renewing, or upgrading a non-domiciled CLP and CDL must, at a minimum, be identical to those pertaining to any other CLP or CDL.[11]

Regulations in effect prior to September 29, 2025, required that States accept as valid only *unexpired* lawful presence documents, which also meant that the State must make the period of validity of the non-domiciled CLP or CDL less than or equal to the period of validity of the driver's lawful presence document(s). In other words, because FMCSA's regulations considered only unexpired lawful presence documents to be valid, DMV was required to ensure that the non-domiciled CLP or CDL period of validity *did not exceed* the expiration of the driver's lawful presence documents. Therefore, State driver's licensing agencies were required to ensure that the validity of non-domiciled CLPs or CDLs did not exceed the expiration date of drivers' lawful presence documents.

## III.     2025 Annual Program Review

FMCSA initiated New York's 2025 APR in July 2025 in accordance with 49 U.S.C. § 31311 and 49 CFR § 384.307. DMV informed FMCSA that its records reflect that New York has issued 32,606 non-domiciled CLPs or CDLs that remain unexpired. During the 2025 APR, FMCSA sampled 200 records of drivers issued a non-domiciled CDL by DMV. As explained in greater detail in section III below, of the 200 driver records sampled, FMCSA found 107 records—approximately 53 percent— that failed to comply with requirements in 49 CFR Parts 383 and 384.

---

[9] On September 29, 2025, FMCSA issued an interim final rule (IFR) amending Federal regulations in 49 CFR Parts 383 and 384 applicable to State Driver's Licensing Agencies' (SDLAs) issuance of non-domiciled CLPs and CDLs. *See* Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses, 90 Fed. Reg. 46509 (Sept. 29, 2025). On November 13, 2025, the U.S. Court of Appeals for the District of Columbia Circuit issued an Order in *Lujan v. FMCSA*, Case No. 25-1215, staying the effective date of the IFR pending court review. Because the transactions at issue occurred prior to publication of the IFR, the regulations cited in this preliminary determination of noncompliance reflect the pre-IFR text of Parts 383 and 384, specifically the 2024 edition of Title 49 of the Code of Federal Regulations, which is currently in effect.

[10] 49 CFR §§ 383.71(f)(2)(i), 383.73(f)(3), 384.201, 384.212.

[11] *Id*. at § 383.73(f)(2).

3

**A3**

The 2025 APR uncovered evidence of systemic policy, procedural, and programming errors. In this regard, FMCSA found 101 driver records where DMV issued non-domiciled CLPs and CDLs that exceeded the expiration date of the driver's lawful presence documents. FMCSA learned through discussions with DMV staff during the 2025 APR that this error occurs because DMV only ensures that the expiration date of non-domiciled CLPs and CDLs does not exceed the drivers' legal presence documents, as confirmed in USCIS's online verification service, Systematic Alien Verification for Entitlements[12] (SAVE), if the licenses are REAL ID compliant. However, DMV staff stated that, during issuance of non-domiciled CDLs that are *not* REAL ID compliant, DMV's electronic records system, Common Portal to Search Services (COMPASS), will default to an expiration date that is 8 years from the date of initial issuance.[13]

As explained in greater detail in section III(b) below, of the driver records sampled, FMCSA found six transactions where DMV issued non-domiciled CDLs but could not provide any evidence that it verified the drivers' lawful presence with an unexpired EAD or unexpired foreign passport and Form I-94 documenting the driver's most recent admittance into the United States prior to issuance, as required under 49 CFR §§ 383.71(f)(2)(i) and 383.73(f)(3).

During the 2025 APR, FMCSA discovered that DMV failed to program its systems to ensure that the expiration date of non-REAL ID compliant non-domiciled CLPs and CDLs does not exceed drivers' legal presence. The errors discovered during the 2025 APR indicate a systemic breakdown in DMV's issuance process for non-domiciled CLPs and CDLs. The transactions illustrating these compliance issues are discussed in greater detail below. FMCSA will provide electronic documentation for each through the State Compliance Records Enterprise (SCORE) system.

   a.  **Finding: 49 CFR § 384.212—The New York DMV Issued Non-Domiciled CLPs or CDLs With an Expiration Date that Exceeded the Expiration of the Driver's Lawful Presence Documents.**

During the 2025 APR, FMCSA discovered that 101 of the driver records sampled showed that DMV issued a non-domiciled CDL for a period of validity that exceeded the driver's lawful presence document(s). These transactions are described below.

   1.  On July 8, 2024, DMV issued a non-domiciled CDL with an expiration date of September 24, 2027 to a driver with the initials "DS." At the time the transaction occurred, DS's EAD credential showed an expiration date of July 5, 2025. However,

---

[12] "SAVE is a service by USCIS that helps Federal, State, and local benefit-issuing agencies, institutions, and licensing agencies determine the immigration status of benefit applicants, so only those entitled to benefits receive them." U.S. CITIZENSHIP AND IMMIGR. SERVS., *Guide to Understanding SAVE Verification Responses* (April 2022), https://www.uscis.gov/sites/default/files/document/guides/SAVE-Guide%20to%20Understanding%20SAVE%20Verification%20Responses.pdf.

[13] For example, if DMV issues a class D non-commercial driver's license to a driver with an eight-year expiration and the driver later obtains a CDL, the CDL's expiration date will be the remainder of the eight-year period of validity. If the license is within one year of renewal, DMV will extend the pervious expiration date by eight years.

4

**A4**

DMV issued a non-domiciled CDL with an expiration date of September 24, 2027, more than two years after the EAD's expiration date.

2. On July 8, 2024, DMV issued a non-domiciled CDL with an expiration date of September 24, 2027 to a driver with the initials "AB." At the time the transaction occurred, AB's EAD credential showed an expiration date of April 6, 2025. However, DMV issued a non-domiciled CDL with an expiration date of September 24, 2027, more than two years after the EAD's expiration date.

3. On October 4, 2024, DMV issued a non-domiciled CDL with an expiration date of May 22, 2029 to a driver with the initials "CS." At the time the transaction occurred, CS's EAD credential showed an expiration date of May 10, 2029. However, DMV issued a non-domiciled CDL with an expiration date of May 22, 2029, more than 10 days after the EAD's expiration date.

4. On February 7, 2025, DMV issued a non-domiciled CDL with an expiration date of May 7, 2032 to a driver with the initials "JM." At the time the transaction occurred, JM's EAD credential showed an expiration date of May 22, 2025. However, DMV issued a non-domiciled CDL with an expiration date of May 7, 2032, more than six years after the EAD's expiration date.

5. On October 17, 2023, DMV issued a non-domiciled CDL with an expiration date of January 12, 2027 to a driver with the initials "KS." At the time the transaction occurred, KS's EAD credential showed an expiration date of November 8, 2024. However, DMV issued a non-domiciled CDL with an expiration date of January 12, 2027, more than two years after the EAD's expiration date.

6. On May 16, 2023, DMV issued a non-domiciled CDL with an expiration date of February 15, 2030 to a driver with the initials "JA." At the time the transaction occurred, JA's EAD credential showed an expiration date of June 30, 2024. However, DMV issued a non-domiciled CDL with an expiration date of February 15, 2030, more than five years after the EAD's expiration date.

7. On September 25, 2024, DMV issued a non-domiciled CDL with an expiration date of October 6, 2030 to a driver with the initials "BS." At the time the transaction occurred, BS's EAD credential showed an expiration date of May 19, 2029. However, DMV issued a non-domiciled CDL with an expiration date of October 6, 2030, more than one year after the EAD's expiration date.

8. On September 16, 2020, DMV issued a non-domiciled CDL with an expiration date of February 7, 2033 to a driver with the initials "BS." At the time the transaction occurred, BS's EAD credential showed an expiration date of July 25, 2021. However, DMV issued a non-domiciled CDL with an expiration date of February 7, 2033, more than 11 years after the EAD's expiration date.

9. On February 24, 2025, DMV issued a non-domiciled CDL with an expiration date of February 25, 2029 to a driver with the initials "SK." At the time the transaction occurred, SK's EAD credential showed an expiration date of January 24, 2029. However, DMV issued a non-domiciled CDL with an expiration date of February 25, 2029, more than one month after the EAD's expiration date.

5

**A5**

10. On September 17, 2024, DMV issued a non-domiciled CDL with an expiration date of January 5, 2033 to a driver with the initials "PJ." At the time the transaction occurred, PJ's EAD credential showed an expiration date of March 8, 2029. However, DMV issued a non-domiciled CDL with an expiration date of January 5, 2033, more than three years after the EAD's expiration date.

11. On June 16, 2023, DMV issued a non-domiciled CDL with an expiration date of April 25, 2030 to a driver with the initials "JM." At the time the transaction occurred, JM's EAD credential showed an expiration date of June 30, 2024. However, DMV issued a non-domiciled CDL with an expiration date of April 25, 2030, more than five years after the EAD's expiration date.

12. On May 9, 2022, DMV issued a non-domiciled CDL with an expiration date of May 14, 2030 to a driver with the initials "SS." At the time the transaction occurred, SS's EAD credential showed an expiration date of December 26, 2023. However, DMV issued a non-domiciled CDL with an expiration date of May 14, 2030, more than six years after the EAD's expiration date.

13. On November 26, 2021, DMV issued a non-domiciled CDL with an expiration date of December 31, 2029 to a driver with the initials "SR." At the time the transaction occurred, SR's EAD credential showed an expiration date of December 31, 2022. However, DMV issued a non-domiciled CDL with an expiration date of December 31, 2029, more than seven years after the EAD's expiration date.

14. On February 26, 2024, DMV issued a non-domiciled CDL with an expiration date of February 12, 2026 to a driver with the initials "HS." At the time the transaction occurred, HS's EAD credential showed an expiration date of June 25, 2025. However, DMV issued a non-domiciled CDL with an expiration date of February 12, 2026, more than seven months after the EAD's expiration date.

15. On August 22, 2019, DMV issued a non-domiciled CDL with an expiration date of November 10, 2027 to a driver with the initials "OM." At the time the transaction occurred, OM's EAD credential showed an expiration date of September 9, 2019. However, DMV issued a non-domiciled CDL with an expiration date of November 10, 2027, more than eight years after the EAD's expiration date.

16. On October 18, 2023, DMV issued a non-domiciled CDL with an expiration date of April 4, 2027 to a driver with the initials "LA." At the time the transaction occurred, LA's EAD credential showed an expiration date of September 25, 2025. However, DMV issued a non-domiciled CDL with an expiration date of April 4, 2027, more than one year after the EAD's expiration date.

17. On December 28, 2023, DMV issued a non-domiciled CDL with an expiration date of September 5, 2028 to a driver with the initials "MS." At the time the transaction occurred, MS's EAD credential showed an expiration date of October 18, 2024. However, DMV issued a non-domiciled CDL with an expiration date of September 5, 2028, more than three years after the EAD's expiration date.

18. On January 31, 2025, DMV issued a non-domiciled CDL with an expiration date of April 15, 2029 to a driver with the initials "AO." At the time the transaction occurred, AO's EAD credential showed an expiration date of April 28, 2026. However, DMV

6

**A6**

issued a non-domiciled CDL with an expiration date of April 15, 2029, more than two years after the EAD's expiration date.

19. On March 24, 2023, DMV issued a non-domiciled CDL with an expiration date of October 18, 2030 to a driver with the initials "LS." At the time the transaction occurred, LS's EAD credential showed an expiration date of June 30, 2024. However, DMV issued a non-domiciled CDL with an expiration date of October 18, 2030, more than six years after the EAD's expiration date.

20. On July 10, 2023, DMV issued a non-domiciled CDL with an expiration date of August 17, 2027 to a driver with the initials "MG." At the time the transaction occurred, MG's EAD credential showed an expiration date of February 22, 2025. However, DMV issued a non-domiciled CDL with an expiration date of August 17, 2027, more than two years after the EAD's expiration date.

21. On October 15, 2024, DMV issued a non-domiciled CDL with an expiration date of November 15, 2025 to a driver with the initials "KS." At the time the transaction occurred, KS's EAD credential showed an expiration date of June 8, 2025. However, DMV issued a non-domiciled CDL with an expiration date of November 15, 2025, more than five months after the EAD's expiration date.

22. On March 25, 2025, DMV issued a non-domiciled CDL with an expiration date of April 4, 2032 to a driver with the initials "MS." At the time the transaction occurred, MS's EAD credential showed an expiration date of December 11, 2029. However, DMV issued a non-domiciled CDL with an expiration date of April 4, 2032, more than two years after the EAD's expiration date.

23. On January 30, 2024, DMV issued a non-domiciled CDL with an expiration date of January 12, 2027 to a driver with the initials "GS." At the time the transaction occurred, GS's EAD credential showed an expiration date of March 31, 2025. However, DMV issued a non-domiciled CDL with an expiration date of January 12, 2027, more than one year after the EAD's expiration date.

24. On April 10, 2024, DMV issued a non-domiciled CDL with an expiration date of July 23, 2028 to a driver with the initials "SH." At the time the transaction occurred, SH's EAD credential showed an expiration date of May 19, 2025. However, DMV issued a non-domiciled CDL with an expiration date of July 23, 2028, more than three years after the EAD's expiration date.

25. On December 27, 2023, DMV issued a non-domiciled CDL with an expiration date of December 28, 2028 to a driver with the initials "SS." At the time the transaction occurred, SS's EAD credential showed an expiration date of December 18, 2028. However, DMV issued a non-domiciled CDL with an expiration date of December 28, 2028, 10 days after the EAD's expiration date.

26. On November 1, 2024, DMV issued a non-domiciled CDL with an expiration date of February 12, 2029 to a driver with the initials "RS." At the time the transaction occurred, RS's EAD credential showed an expiration date of November 22, 2024. However, DMV issued a non-domiciled CDL with an expiration date of February 12, 2029, more than four years after the EAD's expiration date.

**A7**

27. On January 22, 2024, DMV issued a non-domiciled CDL with an expiration date of March 15, 2032 to a driver with the initials "GS." At the time the transaction occurred, GS's EAD credential showed an expiration date of December 5, 2028. However, DMV issued a non-domiciled CDL with an expiration date of March 15, 2032, more than three years after the EAD's expiration date.

28. On August 16, 2022, DMV issued a non-domiciled CDL with an expiration date of September 9, 2030 to a driver with the initials "SK." At the time the transaction occurred, SK's EAD credential showed an expiration date of June 14, 2024. However, DMV issued a non-domiciled CDL with an expiration date of September 9, 2030, more than six years after the EAD's expiration date.

29. On June 26, 2024, DMV issued a non-domiciled CDL with an expiration date of November 19, 2028 to a driver with the initials "RS." At the time the transaction occurred, RS's EAD credential showed an expiration date of February 23, 2025. However, DMV issued a non-domiciled CDL with an expiration date of November 19, 2028, more than three years after the EAD's expiration date.

30. On January 8, 2025, DMV issued a non-domiciled CDL with an expiration date of April 30, 2027 to a driver with the initials "EK." At the time the transaction occurred, EK's EAD credential showed an expiration date of January 17, 2027. However, DMV issued a non-domiciled CDL with an expiration date of April 30, 2027, more than three months after the EAD's expiration date.

31. On July 13, 2022, DMV issued a non-domiciled CDL with an expiration date of May 9, 2031 to a driver with the initials "HV." At the time the transaction occurred, HV's EAD credential showed an expiration date of September 29, 2023. However, DMV issued a non-domiciled CDL with an expiration date of May 9, 2031, more than seven years after the EAD's expiration date.

32. On July 9, 2024, DMV issued a non-domiciled CDL with an expiration date of December 1, 2032 to a driver with the initials "SS." At the time the transaction occurred, SS's EAD credential showed an expiration date of January 22, 2029. However, DMV issued a non-domiciled CDL with an expiration date of December 1, 2032, more than three years after the EAD's expiration date.

33. On July 6, 2022, DMV issued a non-domiciled CDL with an expiration date of April 24, 2026 to a driver with the initials "KS." At the time the transaction occurred, KS's EAD credential showed an expiration date of April 28, 2024. However, DMV issued a non-domiciled CDL with an expiration date of April 24, 2026, more than one year after the EAD's expiration date.

34. On May 9, 2023, DMV issued a non-domiciled CDL with an expiration date of October 14, 2027 to a driver with the initials "SF." At the time the transaction occurred, SF's EAD credential showed an expiration date of July 18, 2024. However, DMV issued a non-domiciled CDL with an expiration date of October 14, 2027, more than three years after the EAD's expiration date.

35. On August 5, 2024, DMV issued a non-domiciled CDL with an expiration date of February 26, 2030 to a driver with the initials "VS." At the time the transaction occurred, VS's EAD credential showed an expiration date of January 24, 2029.

8

**A8**

However, DMV issued a non-domiciled CDL with an expiration date of February 26, 2030, more than one year after the EAD's expiration date.

36.    On December 30, 2022, DMV issued a non-domiciled CDL with an expiration date of February 2, 2027 to a driver with the initials "GS." At the time the transaction occurred, GS's EAD credential showed an expiration date of January 11, 2024. However, DMV issued a non-domiciled CDL with an expiration date of February 2, 2027, more than three years after the EAD's expiration date.

37.    On April 23, 2025, DMV issued a non-domiciled CDL with an expiration date of April 21, 2030 to a driver with the initials "AR." At the time the transaction occurred, AR's EAD credential showed an expiration date of September 9, 2025. However, DMV issued a non-domiciled CDL with an expiration date of April 21, 2030, more than four years after the EAD's expiration date.

38.    On November 22, 2024, DMV issued a non-domiciled CDL with an expiration date of November 17, 2027 to a driver with the initials "OK." At the time the transaction occurred, OK's EAD credential showed an expiration date of October 29, 2026. However, DMV issued a non-domiciled CDL with an expiration date of November 17, 2027, more than one year after the EAD's expiration date.

39.    On December 13, 2024, DMV issued a non-domiciled CDL with an expiration date of November 16, 2026 to a driver with the initials "RA." At the time the transaction occurred, RA's EAD credential showed an expiration date of April 8, 2026. However, DMV issued a non-domiciled CDL with an expiration date of November 16, 2026, more than seven months after the EAD's expiration date.

40.    On May 19, 2022, DMV issued a non-domiciled CDL with an expiration date of July 16, 2030 to a driver with the initials "ST." At the time the transaction occurred, ST's EAD credential showed an expiration date of June 29, 2023. However, DMV issued a non-domiciled CDL with an expiration date of July 16, 2030, more than seven years after the EAD's expiration date.

41.    On June 5, 2023, DMV issued a non-domiciled CDL with an expiration date of September 24, 2029 to a driver with the initials "BQ." At the time the transaction occurred, BQ's EAD credential showed an expiration date of November 14, 2024. However, DMV issued a non-domiciled CDL with an expiration date of September 24, 2029, more than four years after the EAD's expiration date.

42.    On January 29, 2025, DMV issued a non-domiciled CDL with an expiration date of June 7, 2030 to a driver with the initials "VP." At the time the transaction occurred, VP's EAD credential showed an expiration date of March 9, 2025. However, DMV issued a non-domiciled CDL with an expiration date of June 7, 2030, more than five years after the EAD's expiration date.

43.    On June 14, 2024, DMV issued a non-domiciled CDL with an expiration date of May 2, 2029 to a driver with the initials "OH." At the time the transaction occurred, OH's EAD credential showed an expiration date of December 6, 2028. However, DMV issued a non-domiciled CDL with an expiration date of May 2, 2029, more than four months after the EAD's expiration date.

9

**A9**

44. On June 26, 2025, DMV issued a non-domiciled CDL with an expiration date of February 9, 2033 to a driver with the initials "FH." At the time the transaction occurred, FH's EAD credential showed an expiration date of March 30, 2029. However, DMV issued a non-domiciled CDL with an expiration date of February 9, 2033, more than three years after the EAD's expiration date.

45. On September 9, 2025, DMV issued a non-domiciled CDL with an expiration date of June 9, 2029 to a driver with the initials "PS." At the time the transaction occurred, PS's EAD credential showed an expiration date of September 10, 2026. However, DMV issued a non-domiciled CDL with an expiration date of June 9, 2029, more than two years after the EAD's expiration date.

46. On June 28, 2023, DMV issued a non-domiciled CDL with an expiration date of December 26, 2026 to a driver with the initials "KS." At the time the transaction occurred, KS's EAD credential showed an expiration date of October 23, 2024. However, DMV issued a non-domiciled CDL with an expiration date of December 26, 2026, more than two years after the EAD's expiration date.

47. On November 29, 2024, DMV issued a non-domiciled CDL with an expiration date of July 5, 2027 to a driver with the initials "BJ." At the time the transaction occurred, BJ's EAD credential showed an expiration date of January 1, 2027. However, DMV issued a non-domiciled CDL with an expiration date of July 5, 2027, more than six months after the EAD's expiration date.

48. On December 18, 2024, DMV issued a non-domiciled CDL with an expiration date of January 20, 2033 to a driver with the initials "HS." At the time the transaction occurred, HS's EAD credential showed an expiration date of February 5, 2029. However, DMV issued a non-domiciled CDL with an expiration date of January 20, 2033, more than three years after the EAD's expiration date.

49. On September 6, 2024, DMV issued a non-domiciled CDL with an expiration date of January 15, 2026 to a driver with the initials "LS." At the time the transaction occurred, LS's EAD credential showed an expiration date of August 14, 2025. However, DMV issued a non-domiciled CDL with an expiration date of January 15, 2026, more than five months after the EAD's expiration date.

50. On October 30, 2023, DMV issued a non-domiciled CDL with an expiration date of August 20, 2030 to a driver with the initials "GS." At the time the transaction occurred, GS's EAD credential showed an expiration date of October 3, 2024. However, DMV issued a non-domiciled CDL with an expiration date of August 20, 2030, more than five years after the EAD's expiration date.

51. On December 21, 2021, DMV issued a non-domiciled CDL with an expiration date of March 24, 2026 to a driver with the initials "RO." At the time the transaction occurred, RO's EAD credential showed an expiration date of May 12, 2023. However, DMV issued a non-domiciled CDL with an expiration date of March 24, 2026, more than two years after the EAD's expiration date.

52. On August 23, 2021, DMV issued a non-domiciled CDL with an expiration date of January 20, 2026 to a driver with the initials "AS." At the time the transaction occurred, AS's EAD credential showed an expiration date of March 28, 2023.

**A10**

However, DMV issued a non-domiciled CDL with an expiration date of January 20, 2026, more than two years after the EAD's expiration date.

53. On April 19, 2024, DMV issued a non-domiciled CDL with an expiration date of April 20, 2032 to a driver with the initials "AK." At the time the transaction occurred, AK's EAD credential showed an expiration date of June 12, 2024. However, DMV issued a non-domiciled CDL with an expiration date of April 20, 2032, more than seven years after the EAD's expiration date.

54. On September 8, 2025, DMV issued a non-domiciled CDL with an expiration date of September 16, 2033 to a driver with the initials "ZT." At the time the transaction occurred, ZT's EAD credential showed an expiration date of October 26, 2025. However, DMV issued a non-domiciled CDL with an expiration date of September 16, 2033, more than seven years after the EAD's expiration date.

55. On October 2, 2024, DMV issued a non-domiciled CDL with an expiration date of August 9, 2029 to a driver with the initials "CS." At the time the transaction occurred, CS's EAD credential showed an expiration date of October 29, 2028. However, DMV issued a non-domiciled CDL with an expiration date of August 9, 2029, more than nine months after the EAD's expiration date.

56. On February 7, 2023, DMV issued a non-domiciled CDL with an expiration date of April 16, 2031 to a driver with the initials "AS." At the time the transaction occurred, AS's EAD credential showed an expiration date of August 22, 2024. However, DMV issued a non-domiciled CDL with an expiration date of April 16, 2031, more than six years after the EAD's expiration date.

57. On May 28, 2025, DMV issued a non-domiciled CDL with an expiration date of September 29, 2026 to a driver with the initials "AS." At the time the transaction occurred, AS's EAD credential showed an expiration date of January 24, 2026. However, DMV issued a non-domiciled CDL with an expiration date of September 29, 2026, more than eight months after the EAD's expiration date.

58. On May 17, 2023, DMV issued a non-domiciled CDL with an expiration date of December 17, 2027 to a driver with the initials "WM." At the time the transaction occurred, WM's EAD credential showed an expiration date of December 13, 2024. However, DMV issued a non-domiciled CDL with an expiration date of December 17, 2027, more than three years after the EAD's expiration date.

59. On January 12, 2021, DMV issued a non-domiciled CDL with an expiration date of June 20, 2028 to a driver with the initials "JN." At the time the transaction occurred, JN's EAD credential showed an expiration date of July 8, 2022. However, DMV issued a non-domiciled CDL with an expiration date of June 20, 2028, more than five years after the EAD's expiration date.

60. On August 1, 2022, DMV issued a non-domiciled CDL with an expiration date of August 2, 2030 to a driver with the initials "NS." At the time the transaction occurred, NS's EAD credential showed an expiration date of February 3, 2023. However, DMV issued a non-domiciled CDL with an expiration date of August 2, 2030, more than seven years after the EAD's expiration date.

11

**A11**

61. On August 19, 2022, DMV issued a non-domiciled CDL with an expiration date of October 12, 2025 to a driver with the initials "VK." At the time the transaction occurred, VK's EAD credential showed an expiration date of March 20, 2024. However, DMV issued a non-domiciled CDL with an expiration date of October 12, 2025, more than one year after the EAD's expiration date.

62. On June 17, 2025, DMV issued a non-domiciled CDL with an expiration date of February 2, 2031 to a driver with the initials "BI." At the time the transaction occurred, BI's EAD credential showed an expiration date of February 11, 2027. However, DMV issued a non-domiciled CDL with an expiration date of February 2, 2031, more than three years after the EAD's expiration date.

63. On June 26, 2025, DMV issued a non-domiciled CDL with an expiration date of October 24, 2029 to a driver with the initials "SS." At the time the transaction occurred, SS's EAD credential showed an expiration date of October 15, 2026. However, DMV issued a non-domiciled CDL with an expiration date of October 24, 2029, more than three years after the EAD's expiration date.

64. On February 11, 2025, DMV issued a non-domiciled CDL with an expiration date of November 17, 2028 to a driver with the initials "HY." At the time the transaction occurred, HY's EAD credential showed an expiration date of November 8, 2028. However, DMV issued a non-domiciled CDL with an expiration date of November 17, 2028, nine days after the EAD's expiration date.

65. On September 15, 2023, DMV issued a non-domiciled CDL with an expiration date of August 31, 2030 to a driver with the initials "GZ." At the time the transaction occurred, GZ's EAD credential showed an expiration date of June 30, 2024. However, DMV issued a non-domiciled CDL with an expiration date of August 31, 2030, more than six years after the EAD's expiration date.

66. On November 14, 2024, DMV issued a non-domiciled CDL with an expiration date of December 17, 2032 to a driver with the initials "AJ." At the time the transaction occurred, AJ's EAD credential showed an expiration date of February 27, 2025. However, DMV issued a non-domiciled CDL with an expiration date of December 17, 2032, more than seven years after the EAD's expiration date.

67. On August 21, 2023, DMV issued a non-domiciled CDL with an expiration date of July 9, 2027 to a driver with the initials "IY." At the time the transaction occurred, IY's EAD credential showed an expiration date of December 16, 2023. However, DMV issued a non-domiciled CDL with an expiration date of July 9, 2027, more than three years after the EAD's expiration date.

68. On December 9, 2024, DMV issued a non-domiciled CDL with an expiration date of September 14, 2028 to a driver with the initials "RK." At the time the transaction occurred, RK's EAD credential showed an expiration date of September 17, 2025. However, DMV issued a non-domiciled CDL with an expiration date of September 14, 2028, more than two years after the EAD's expiration date.

69. On January 5, 2024, DMV issued a non-domiciled CDL with an expiration date of January 21, 2030 to a driver with the initials "GS." At the time the transaction occurred, GS's EAD credential showed an expiration date of December 14, 2028.

12

**A12**

However, DMV issued a non-domiciled CDL with an expiration date of January 21, 2030, more than one year after the EAD's expiration date.

70. On March 28, 2024, DMV issued a non-domiciled CDL with an expiration date of March 20, 2028 to a driver with the initials "SS." At the time the transaction occurred, SS's EAD credential showed an expiration date of January 24, 2025. However, DMV issued a non-domiciled CDL with an expiration date of March 20, 2028, more than three years after the EAD's expiration date.

71. On March 28, 2024, DMV issued a non-domiciled CDL with an expiration date of September 15, 2028 to a driver with the initials "JS." At the time the transaction occurred, JS's EAD credential showed an expiration date of May 9, 2026. However, DMV issued a non-domiciled CDL with an expiration date of September 15, 2028, more than two years after the EAD's expiration date.

72. On April 12, 2024, DMV issued a non-domiciled CDL with an expiration date of September 10, 2032 to a driver with the initials "ML." At the time the transaction occurred, ML's EAD credential showed an expiration date of March 21, 2025. However, DMV issued a non-domiciled CDL with an expiration date of September 10, 2032, more than seven years after the EAD's expiration date.

73. On November 21, 2022, DMV issued a non-domiciled CDL with an expiration date of November 3, 2028 to a driver with the initials "CR." At the time the transaction occurred, CR's EAD credential showed an expiration date of December 31, 2022. However, DMV issued a non-domiciled CDL with an expiration date of November 3, 2028, more than five years after the EAD's expiration date.

74. On March 18, 2024, DMV issued a non-domiciled CDL with an expiration date of December 16, 2025 to a driver with the initials "SB." At the time the transaction occurred, SB's EAD credential showed an expiration date of September 5, 2024. However, DMV issued a non-domiciled CDL with an expiration date of December 16, 2025, more than one year after the EAD's expiration date.

75. On January 22, 2021, DMV issued a non-domiciled CDL with an expiration date of January 31, 2029 to a driver with the initials "RS." At the time the transaction occurred, RS's EAD credential showed an expiration date of May 7, 2022. However, DMV issued a non-domiciled CDL with an expiration date of January 31, 2029, more than six years after the EAD's expiration date.

76. On June 11, 2021, DMV issued a non-domiciled CDL with an expiration date of September 2, 2028 to a driver with the initials "CF." At the time the transaction occurred, CF's EAD credential showed an expiration date of December 3, 2021. However, DMV issued a non-domiciled CDL with an expiration date of September 2, 2028, more than six years after the EAD's expiration date.

77. On January 10, 2022, DMV issued a non-domiciled CDL with an expiration date of February 26, 2030 to a driver with the initials "NI." At the time the transaction occurred, NI's EAD credential showed an expiration date of April 11, 2023. However, DMV issued a non-domiciled CDL with an expiration date of February 26, 2030, more than six years after the EAD's expiration date.

13

**A13**

78. On July 8, 2025, DMV issued a non-domiciled CDL with an expiration date of December 9, 2031 to a driver with the initials "AG." At the time the transaction occurred, AG's EAD credential showed an expiration date of August 6, 2025. However, DMV issued a non-domiciled CDL with an expiration date of December 9, 2031, more than six years after the EAD's expiration date.

79. On August 29, 2022, DMV issued a non-domiciled CDL with an expiration date of January 19, 2027 to a driver with the initials "JY." At the time the transaction occurred, JY's EAD credential showed an expiration date of July 20, 2023. However, DMV issued a non-domiciled CDL with an expiration date of January 19, 2027, more than three years after the EAD's expiration date.

80. On December 17, 2019, DMV issued a non-domiciled CDL with an expiration date of September 20, 2028 to a driver with the initials "PS." At the time the transaction occurred, PS's EAD credential showed an expiration date of August 18, 2021. However, DMV issued a non-domiciled CDL with an expiration date of September 20, 2028, more than seven years after the EAD's expiration date.

81. On December 11, 2024, DMV issued a non-domiciled CDL with an expiration date of September 12, 2026 to a driver with the initials "DP." At the time the transaction occurred, DP's EAD credential showed an expiration date of August 14, 2025. However, DMV issued a non-domiciled CDL with an expiration date of September 12, 2026, more than one year after the EAD's expiration date.

82. On March 2, 2023, DMV issued a non-domiciled CDL with an expiration date of October 15, 2025 to a driver with the initials "JF." At the time the transaction occurred, JF's EAD credential showed an expiration date of December 13, 2024. However, DMV issued a non-domiciled CDL with an expiration date of October 15, 2025, more than 10 months after the EAD's expiration date.

83. On January 23, 2025, DMV issued a non-domiciled CDL with an expiration date of May 20, 2029 to a driver with the initials "AS." At the time the transaction occurred, AS's EAD credential showed an expiration date of March 28, 2025. However, DMV issued a non-domiciled CDL with an expiration date of May 20, 2029, more than four years after the EAD's expiration date.

84. On September 27, 2024, DMV issued a non-domiciled CDL with an expiration date of October 24, 2027 to a driver with the initials "GS." At the time the transaction occurred, GS's EAD credential showed an expiration date of May 24, 2025. However, DMV issued a non-domiciled CDL with an expiration date of October 24, 2027, more than two years after the EAD's expiration date.

85. On November 1, 2018, DMV issued a non-domiciled CDL with an expiration date of November 8, 2026 to a driver with the initials "FB." At the time the transaction occurred, FB's EAD credential showed an expiration date of January 5, 2020. However, DMV issued a non-domiciled CDL with an expiration date of November 8, 2026, more than six years after the EAD's expiration date.

86. On May 6, 2024, DMV issued a non-domiciled CDL with an expiration date of July 28, 2028 to a driver with the initials "AS." At the time the transaction occurred, AS's EAD credential showed an expiration date of November 15, 2024. However, DMV

14

**A14**

issued a non-domiciled CDL with an expiration date of July 28, 2028, more than three years after the EAD's expiration date.

87. On March 28, 2024, DMV issued a non-domiciled CDL with an expiration date of December 9, 2029 to a driver with the initials "SM." At the time the transaction occurred, SM's EAD credential showed an expiration date of December 31, 2022. However, DMV issued a non-domiciled CDL with an expiration date of December 9, 2029, more than six years after the EAD's expiration date.

88. On November 13, 2024, DMV issued a non-domiciled CDL with an expiration date of January 27, 2029 to a driver with the initials "SM." At the time the transaction occurred, SM's EAD credential showed an expiration date of September 13, 2025. However, DMV issued a non-domiciled CDL with an expiration date of January 27, 2029, more than three years after the EAD's expiration date.

89. On September 24, 2025, DMV issued a non-domiciled CDL with an expiration date of April 12, 2029 to a driver with the initials "FL." At the time the transaction occurred, FL's EAD credential showed an expiration date of March 7, 2026. However, DMV issued a non-domiciled CDL with an expiration date of April 12, 2029, more than three years after the EAD's expiration date.

90. On December 14, 2022, DMV issued a non-domiciled CDL with an expiration date of June 13, 2031 to a driver with the initials "GS." At the time the transaction occurred, GS's EAD credential showed an expiration date of March 23, 2024. However, DMV issued a non-domiciled CDL with an expiration date of June 13, 2031, more than seven years after the EAD's expiration date.

91. On April 2, 2025, DMV issued a non-domiciled CDL with an expiration date of August 3, 2032 to a driver with the initials "PM." At the time the transaction occurred, PM's EAD credential showed an expiration date of May 1, 2029. However, DMV issued a non-domiciled CDL with an expiration date of August 3, 2032, more than three years after the EAD's expiration date.

92. On August 8, 2024, DMV issued a non-domiciled CDL with an expiration date of December 15, 2028 to a driver with the initials "IP." At the time the transaction occurred, IP's EAD credential showed an expiration date of April 19, 2025. However, DMV issued a non-domiciled CDL with an expiration date of December 15, 2028, more than three years after the EAD's expiration date.

93. On March 21, 2022, DMV issued a non-domiciled CDL with an expiration date of February 14, 2026 to a driver with the initials "CD." At the time the transaction occurred, CD's EAD credential showed an expiration date of April 9, 2022. However, DMV issued a non-domiciled CDL with an expiration date of February 14, 2026, more than three years after the EAD's expiration date.

94. On April 19, 2021, DMV issued a non-domiciled CDL with an expiration date of April 19, 2029 to a driver with the initials "JC." At the time the transaction occurred, JC's EAD credential showed an expiration date of October 4, 2021. However, DMV issued a non-domiciled CDL with an expiration date of April 19, 2029, more than seven years after the EAD's expiration date.

15

**A15**

95. On May 27, 2025, DMV issued a non-domiciled CDL with an expiration date of May 5, 2030 to a driver with the initials "AM." At the time the transaction occurred, AM's EAD credential showed an expiration date of October 20, 2029. However, DMV issued a non-domiciled CDL with an expiration date of May 5, 2030, more than six months after the EAD's expiration date.

96. On December 5, 2024, DMV issued a non-domiciled CDL with an expiration date of December 6, 2028 to a driver with the initials "VY." At the time the transaction occurred, VY's EAD credential showed an expiration date of September 21, 2026. However, DMV issued a non-domiciled CDL with an expiration date of December 6, 2028, more than two years after the EAD's expiration date.

97. On January 13, 2025, DMV issued a non-domiciled CDL with an expiration date of May 5, 2029 to a driver with the initials "VK." At the time the transaction occurred, VK's EAD credential showed an expiration date of November 12, 2025. However, DMV issued a non-domiciled CDL with an expiration date of May 5, 2029, more than three years after the EAD's expiration date.

98. On November 25, 2024, DMV issued a non-domiciled CDL with an expiration date of August 18, 2029 to a driver with the initials "EB." At the time the transaction occurred, EB's EAD credential showed an expiration date of September 20, 2026. However, DMV issued a non-domiciled CDL with an expiration date of August 18, 2029, more than two years after the EAD's expiration date.

99. On July 8, 2025, DMV issued a non-domiciled CDL with an expiration date of January 17, 2028 to a driver with the initials "GA." At the time the transaction occurred, GA's EAD credential showed an expiration date of December 26, 2026. However, DMV issued a non-domiciled CDL with an expiration date of January 17, 2028, more than one year after the EAD's expiration date.

100. On June 6, 2025, DMV issued a non-domiciled CDL with an expiration date of April 17, 2028 to a driver with the initials "EB." At the time the transaction occurred, EB's EAD credential showed an expiration date of April 12, 2026. However, DMV issued a non-domiciled CDL with an expiration date of April 17, 2028, more than two years after the EAD's expiration date.

101. On September 23, 2024, DMV issued a non-domiciled CDL with an expiration date of June 28, 2026 to a driver with the initials "VA." At the time the transaction occurred, VA's EAD credential showed an expiration date of February 14, 2025. However, DMV issued a non-domiciled CDL with an expiration date of June 28, 2026, more than one year after the EAD's expiration date.

b. **Finding: 49 CFR § 384.212—The New York DMV Issued Non-Domiciled CLPs or CDLs Without Providing Evidence of lawful Presence Verification Under the Standards of 49 CFR Part 383.**

During the 2025 APR, FMCSA discovered that six of the driver records sampled showed that DMV issued non-domiciled CDLs to drivers without providing evidence that, at the time the transaction occurred, it verified the drivers' lawful presence with an unexpired EAD or unexpired foreign passport and Form I-94 documenting the driver's most recent admittance into the United States. These transactions are described below.

16

**A16**

1. On November 4, 2024, DMV issued a non-domiciled CDL with an expiration date of October 17, 2033 to a driver with the initials "IM." At the 2025 APR, DMV provided IM's EAD credential that showed an expiration date of November 3, 2024. However, DMV did not provide any evidence that IM presented an unexpired EAD or an unexpired foreign passport accompanied by an approved I-94 form, as required under 49 CFR § 383.71(f) at the time the transaction occurred. Thus, DMV issued a non-domiciled CDL with an expiration date of October 17, 2033, more than eight years after the EAD's expiration date.

2. On September 3, 2025, DMV issued a non-domiciled CDL with an expiration date of October 15, 2033 to a driver with the initials "MV." At the 2025 APR, DMV provided MV's EAD credential that showed an expiration date of April 9, 2025. However, DMV did not provide any evidence that MV presented an unexpired EAD or an unexpired foreign passport accompanied by an approved I-94 form, as required under 49 CFR § 383.71(f) at the time the transaction occurred. Thus, DMV issued a non-domiciled CDL with an expiration date of October 15, 2033, more than eight years after the EAD's expiration date.

3. On November 4, 2025, DMV issued a non-domiciled CDL with an expiration date of August 11, 2029 to a driver with the initials "MJ." At the 2025 APR, DMV provided MJ's EAD credential that showed an expiration date of October 31, 2023. However, DMV did not provide any evidence that MJ presented an unexpired EAD or an unexpired foreign passport accompanied by an approved I-94 form, as required under 49 CFR § 383.71(f) at the time the transaction occurred. Thus, DMV issued a non-domiciled CDL with an expiration date of August 11, 2029, more than five years after the EAD's expiration date.

4. On October 20, 2025, DMV issued a non-domiciled CDL with an expiration date of January 6, 2028 to a driver with the initials "JS." At the 2025 APR, DMV provided JS's EAD credential that showed an expiration date of April 27, 2025. However, DMV did not provide any evidence that JS presented an unexpired EAD or an unexpired foreign passport accompanied by an approved I-94 form, as required under 49 CFR § 383.71(f) at the time the transaction occurred. Thus, DMV issued a non-domiciled CDL with an expiration date of January 6, 2028, more than two years after the EAD's expiration date.

5. On January 12, 2022, DMV issued a non-domiciled CDL with an expiration date of December 16, 2025 to a driver with the initials "GS." At the 2025 APR, DMV provided GS's EAD credential that showed an expiration date of July 10, 2021. However, DMV did not provide any evidence that GS presented an unexpired EAD or an unexpired foreign passport accompanied by an approved I-94 form, as required under 49 CFR § 383.71(f) at the time the transaction occurred. Thus, DMV issued a non-domiciled CDL with an expiration date of December 16, 2025, more than four years after the EAD's expiration date.

17

**A17**

6. On November 23, 2023, DMV issued a non-domiciled CDL with an expiration date of May 3, 2026 to a driver with the initials "ND." At the 2025 APR, DMV provided ND's EAD credential that showed an expiration date of October 6, 2022. However, DMV did not provide any evidence that ND presented an unexpired EAD or an unexpired foreign passport accompanied by an approved I-94 form, as required under 49 CFR § 383.71(f) at the time the transaction occurred. Thus, DMV issued a non-domiciled CDL with an expiration date of May 3, 2026, more than three years after the EAD's expiration date.

## IV. Required Corrective Action

Approximately 32,000 drivers hold an unexpired CLP or CDL issued by DMV. In light of the errors and deficiencies in DMV's issuance of non-domiciled CLPs and CDLs uncovered by the 2025 APR, FMCSA determines that New York must take the following actions:

- Immediately pause the issuance of all new, renewed, transferred, or upgraded non-domiciled CLPs and CDLs until FMCSA provides written confirmation that the State's corrective action plan has been accepted and implemented;
- As soon as practicable, identify all unexpired non-domiciled CLPs and CDLs that were not issued in compliance with Parts 383 and 384;
- Conduct an internal audit to identify all procedural and programming errors; training and quality assurance problems; insufficient policies and practices; and other issues that have resulted in the issuance of non-domiciled CLPs and CDLs that did not meet the standards of Parts 383 and 384 (the scope of the audit should not be limited to the issues identified in this letter);
- As part of the internal audit, review all supporting documentation for all new, renewed, transferred, or upgraded non-domiciled CLP and CDL transactions to ensure compliance with Parts 383 and 384;
- Provide FMCSA a copy of the audit findings and the number of unexpired noncompliant non-domiciled CLPs and CDLs;
- Take immediate action to correct the deficiencies identified in the State's internal audit and in this letter;
- Take immediate action to void or rescind all unexpired noncompliant non-domiciled CLPs and CDLs and reissue the licenses in accordance with Parts 383 and 384, in effect at the time of reissuance;
- Resume issuing non-domiciled CLPs and CDLs only after the State has voided or rescinded all unexpired noncompliant non-domiciled CLPs and CDLs and reissued the licenses in accordance with Parts 383 and 384, in effect at the time of reissuance, and the State ensures that all statutes, regulations, administrative procedures and practices, organizational structures, internal control mechanisms, resources assignments (facilities, equipment, and personnel), and enforcement practices meet each and every standard of Subpart B of Part 384 and 49 U.S.C. § 31311, and FMCSA provides written confirmation that the State's corrective action plan has been accepted and implemented.

**A18**

## V. Responding to this Preliminary Determination

The procedural regulations applicable to this action are found at 49 CFR § 384.307. Within 30 calendar days, the State must respond to this preliminary determination. The State's response must explain what corrective action it either has implemented or intends to implement to correct the deficiencies cited. The required corrective actions are set forth in section IV of this preliminary determination. It is imperative that the corrective action addresses voiding or rescinding all unexpired noncompliant non-domiciled CLPs and CDLs. The State must provide documentation of implemented or planned corrective action, which must be adequate to address the deficiencies cited and be implemented on a schedule mutually agreed upon by FMCSA and the State. Upon request by the State, an informal conference will be provided during this time.

Alternatively, the State's response may explain why FMCSA's preliminary determination is incorrect and may include any additional documentation the State wishes FMCSA to consider.

After reviewing a timely response to the preliminary determination by the State, FMCSA will notify the State of the final determination. In making its final determination, FMCSA will take into consideration the corrective action either implemented or planned to be implemented in accordance with the mutually agreed upon schedule.

## VI. Potential Penalties for a Final Determination of Substantial Noncompliance

If FMCSA issues a final determination of substantial noncompliance, the Agency may withhold up to four percent of the National Highway Performance Program and the Surface Transportation Block Grant Program funds beginning in Fiscal Year (FY) 2027 that would otherwise be apportioned to New York under 23 U.S.C. § 104(b)(1) and (2).[14] Accordingly, upon a final determination of substantial noncompliance, New York risks losing up to approximately $73,500,000 for FY 2027.[15] Further, if the substantial noncompliance persists beyond the first fiscal year, FMCSA may withhold up to eight percent of these funds; therefore, New York risks losing up to approximately $147,000,000 in the second and subsequent FY(s) of noncompliance.[16] Once funds are withheld following a substantial noncompliance determination, they are no longer available for apportionment to New York.[17]

In addition, if FMCSA issues a final determination of substantial noncompliance, the Agency may decertify New York's CDL program. Decertification of New York's CDL program would prohibit the State from issuing, renewing, transferring, or upgrading CLPs and CDLs until such time as FMCSA determines that DMV is in substantial compliance with 49 U.S.C. § 31311 and 49 CFR Part 384, Subpart B.[18]

---

[14] 49 U.S.C. § 31314(c)(1); 49 CFR § 384.401(a).

[15] FMCSA estimates this amount based on FY 2026 funding levels.

[16] 49 U.S.C. § 31314(c)(2); 49 CFR § 384.401(b).

[17] 49 U.S.C. § 31314(d); 49 CFR § 384.403.

[18] 49 U.S.C. § 31312(a); 49 CFR § 384.405(a).

19

**A19**

**VII.      Conclusion**

The 2025 APR uncovered 107 non-domiciled CDL issuances sampled by FMCSA that failed to comply with Parts 383 and 384. This is a grossly unacceptable deviation from FMCSA's regulations when issuing credentials to operate commercial motor vehicles. DMV must take immediate corrective action to audit its non-domiciled CDL program, correct the deficiencies that FMCSA identified above, and any deficiencies identified through the State's internal audit, and void or rescind and reissue all non-domiciled CLPs and CDLs that failed to comply with Federal regulations at the time of issuance, renewal, transfer, or upgrade.

New York is an important partner in FMCSA's mission to reduce crashes, injuries and fatalities involving large trucks and buses. However, the State's failure to issue non-domiciled CLPs and CDLs in accordance with Federal regulations jeopardizes these shared safety goals. FMCSA issues this preliminary determination of substantial noncompliance with a clear understanding of the gravity of the findings, but also with the expectation that New York will act expeditiously to achieve substantial compliance. To continue in that spirit of partnership, my staff stands ready to assist DMV in resolving these serious issues.

Please note that this letter addresses noncompliance with DMV's issuance of non-domiciled CDLs only. FMCSA will separately address areas of noncompliance unrelated to non-domiciled CDLs. If you or your staff need additional information or assistance, please contact Philip Thomas, Deputy Associate Administrator for Safety, at philip.thomas@dot.gov.

Sincerely,

Derek D. Barrs
Administrator

20

**A20**



**KATHY HOCHUL**
Governor

**MARK J.F. SCHROEDER**
Commissioner

January 9, 2026

Derek D. Barrs
Administrator
U.S. Department of Transportation
Federal Motor Carrier Safety Administration
1200 New Jersey Ave., S.E.
Washington, D.C. 20590

VIA U.S. MAIL AND E-MAIL TO: PHILIP.THOMAS@DOT.GOV

Dear Administrator Barrs:

This letter is in response to your letter of December 12, 2025, notifying New York State that the U.S. Department of Transportation (USDOT)'s Federal Motor Carrier Safety Administration (FMCSA) made a preliminary determination that New York failed to meet requirements for substantial compliance with the standards for issuing non-domiciled commercial driver's licenses (CDLs) and commercial learner's permits (CLPs).

As an initial matter, the New York State Department of Motor Vehicles (DMV) seeks to ensure that commercial driver's licenses and learner's permits are issued according to federal requirements and continuously reviews and refines its procedures and systems accordingly. New York's guiding principle in issuing driver's licenses is safety, for both CDL holders and the traveling public. DMV is proud of the safety record established in New York.

DMV has carefully reviewed FMCSA's preliminary determination, as well as each of the non-domiciled CDL records that FMCSA reviewed and alleges are non-compliant. DMV has clarifying questions about FMCSA's determination and maintains that it has always met federal requirements for substantial compliance with the standards for issuing non-domiciled CDLs and CLPs. DMV's understanding of these federal requirements has been consistent, and DMV understands its view to have been consistent with FMCSA's understanding until at least September 29, 2025. To better understand how FMCSA arrived at its preliminary determination and FMCSA's position on a number of issues outlined below, DMV requests an informal conference.[1]

   1. **Federal Highway Trust Fund Apportionment**

---

[1] DMV reserves all rights to disagree with FMCSA's preliminary determination and currently believes that FMCSA's preliminary determination is incorrect. *See* 49 C.F.R. § 384.307(c).

**A21**

Funds are made available to States "to assist the State in complying with the requirements of section 31311 [commercial motor vehicle licensing requirements]; and . . . to improve the State's implementation of its commercial driver's license program." 49 U.S.C. § 31313(a)(2).

To avoid withholding from this apportionment, States must be in substantial compliance with the licensing requirements outlined in section 31311. *Id.* §§ 31311-12.

That statute permits commercial driver's licenses to be issued to individuals not domiciled in the issuing State pursuant to regulations prescribed by the Secretary of Transportation. *Id*. § 31311(a)(12)(B). Upon notice of a preliminary determination of non-compliance with such regulations, a State has thirty days to respond, and any corrective action taken in response to the notice must "be implemented on a schedule mutually agreed upon by the agency and the State." 49 C.F.R. § 384.307(c).

If, after considering the corrective action "implemented or planned to be implemented in accordance with the mutually agreed upon schedule," FMCSA still determines that a State is not in substantial compliance, funding may be withheld on the first day of the following fiscal year according to a schedule set by statute. 49 C.F.R. § 384.307(c)-(d); *see also* 49 U.S.C. § 31314; 49 C.F.R. § 384.401(a).

Moreover, DMV understands the substantial-compliance concept included within 49 U.S.C. § 31314 ("does not comply substantially") to not permit the federal government to withhold funding based on any finding of literal but unintentional non-compliance. Though undefined in the statute, and perhaps subject to a number of definitions, the concept of substantial noncompliance likely entails "less than a strict and literal compliance," such that certain unintentional deviations would not be covered. *See, e.g.*, *Jeff D. v. Otter*, 643 F.3d 278, 284 (9th Cir. 2011).

Upon review, DMV has not identified legal or factual evidence to support a determination of substantial non-compliance, but, again, requests a conference with FMCSA to discuss the issues raised herein.

### 2. Regulations Governing Issuance of Commercial Driver's Licenses

States are permitted to issue non-domiciled CDLs and CLPs pursuant to Code of Federal Regulations title 49 sections 383.23(b), 383.71(f) and 383.73(f). 49 C.F.R. § 384.212.[2]

---

[2] Unless otherwise stated, all citations to the Code of Federal Regulations refer to the regulations in effect as of September 28, 2025. This analysis does not incorporate the provisions of the Interim Final Rule (IFR) *Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)*, 90 Fed. Reg. 46,509 (Sept. 29, 2025) published in the Federal Register on September 29, 2025, and effective that date, because the IFR is not retroactive. Moreover, as noted by FMCSA, pursuant to ongoing litigation over the IFR, on "November 10, 2025, the U.S. Court of Appeals for the District of Columbia Circuit issued an administrative stay of [the IFR] that prevents the interim final rule from taking effect until further notice. Accordingly . . . States are not prohibited from issuing non-domiciled CDLs and commercial learner's permits in accordance with the FMCSA's regulations and guidance in effect immediately prior to issuance of the interim final rule." (https://www.fmcsa.dot.gov/newsroom/order-granting-administrative-stay-interim-final-rule-titled-restoring-integrity-issuance). Three days later, the court granted an emergency stay, holding in part, "[FMCSA conceded that

A22

As relevant here, the regulations provide that a person may obtain a non-domiciled CDL or CLP if the person is not domiciled in a foreign jurisdiction that the Administrator has determined tests drivers and issues CDLs in accordance with, or under standards similar to, the U.S. federal standards. 49 CFR §§ 383.23(b)(1); 383.71(f)(1)(i). Non-domiciled applicants are required to satisfy the requirements for issuance of a resident CDL, but instead of providing proof of citizenship or legal residence, they are required to provide an unexpired employment authorization document (EAD), or an unexpired foreign passport accompanied by an approved I-94 form. 49 C.F.R. § 383.71(f)(2)(i). Applicants do not need to show proof of domicile under the federal rules. 49 C.F.R. § 383.71(f)(2)(i).

Federal law requires that the CDLs and CLPs include "the dates between which the license or learner's permit is valid." 49 U.S.C. § 31308(4)(E); *see also* 49 C.F.R.§§ 383.153(a)(7), (b)(2)(vi) (requiring that all CDLs and CLPs contain "[t]he date of issuance and the date of expiration of the [license or permit]").

Under the applicable provisions, CLPs had to expire within one year of issuance (49 C.F.R. §§ 383.25(c); 383.73(a)(3)), and CDLs had to expire within eight years of issuance (49 C.F.R. § 383.73(b)(9)).[3] Apart from these rules, there were no other provisions in subparts 383 or 384 of Title 49 of the CFR specifying the means of calculating expiration dates for CDLs or CLPs.

Until adoption of an Interim Final Rule (IFR) on September 29, 2025, which was promulgated without any notice to DMV or the public, FMCSA regulations did not specify expiration dates. DMV notes that other federal agencies have explicitly limited expiration dates to the date of an individual's authorized stay for years. *Cf.* 6 C.F.R. § 37.21(b)(1) (effective Mar. 31, 2008, last amended Jan. 3, 2017, and prohibiting REAL ID licenses from issuing "[f]or a time period longer than the expiration of the applicant's authorized stay in the United States, or, if there is no expiration date, for a period longer than one year[.]"). The IFR has been stayed and has not taken effect. (*Lujan v. FMCSA*, Case No. 25-1215, Document #2145204 (Nov.13, 2025)).

DMV of course would be willing to review any prior guidance or statements from FMCSA or USDOT that specified expiration date requirements in a manner consistent with FMCSA's current view and asks that FMCSA provide such materials, if available. DMV is not aware of any such prior guidance or statements.

---

"[t]here is not sufficient evidence, derived from well-designed, rigorous, quantitative analyses, to reliably demonstrate a measurable empirical relationship between the nation of domicile or a CDL driver and safety outcomes in the United States"" and noting "FMCSA's own data appears to indicate that the CDL holders excluded by the rule are involved in fatal crashes at a lower rate than CDL holders who are not excluded. Accordingly, the FMCSA does not appear to have "articulate[d] a satisfactory explanation" for how the rule would promote safety." (*Lujan v. FMCSA*, Case No. 25-1215, Document #2145204, at 3 (Nov.13, 2025)). Nevertheless, DMV immediately paused its non-domiciled CDL program effective September 29, 2025. It remains paused as of the date of this response.

[3] Section 383.73(f)(2) provides that the procedures for issuing a non-domiciled CLP or CDL are "identical" to those for issuing a resident CDL and CLP, apart from three exceptions, none of which address expiry period. 49 CFR § 383.73(f)(2). Thus, the provisions cited here—sections 383.25(c), 383.73(a)(3), and 383.73(b)(9)—govern the validity period for both resident and non-domiciled CDLs and CLPs.

**A23**

### 3. FMCSA's Preliminary Determination of Non-Compliance

FMCSA claims that a sample of 200 records obtained from DMV show that 107, or about 53 percent, of the CDLs and CLPs issued to non-domiciled drivers failed to comply with federal requirements. In response to your letter, DMV immediately initiated a review of all 107 non-domiciled CDLs and CLPs.

DMV's review did not corroborate FMCSA's preliminary determination. Rather, DMV found that it has issued its non-domiciled CDLs and CLPs in substantial compliance with all federal requirements.

### A. Expiration Dates for CDLs and CLPs

In the cases of 101 of the 107 records FMCSA sampled, FMCSA claims that DMV was required "to ensure that the non-domiciled CLP or CDL period of validity *did not exceed* the expiration of the driver's lawful presence documents" (Dec. 12, 2025, Letter at 3 (emphasis in original)). As discussed above, however, such requirement did not exist anywhere in law or regulation except in the new (and administratively stayed) IFR, which has no current or past force or effect. Accordingly, in its letter to DMV, FMCSA cited no express regulatory language or any other authority for what appears to be a novel interpretation of the regulation.

This new interpretation appears to contradict FMCSA's longstanding past application of Federal regulations. Until September 29, 2025, federal regulations required only that CLPs must expire within one year of issuance, and that CDLs must expire within eight years of issuance. *See* 49 C.F.R. §§ 383.25(c); 383.73(a)(3); 383.73(b)(9). In adopting that rule, FMCSA expressly rejected comments that raised concerns that the eight-year period would "increase the potential for unsafe drivers to evade detection and magnify the possibility of fraud[.]" 76 Fed. Reg. 26,854, 26,861 (May 9, 2011). Indeed, FMCSA acknowledged that the corrective action for any such concern is *State* regulation. *Id.* ("States are free to set shorter validity periods.").

Moreover, FMCSA has never previously conducted an Annual Program Review (APR) of DMV's CDL program and made a preliminary determination that New York failed to meet requirements for substantial compliance with the standards for issuing non-domiciled CDLs and CLPs for such reason. That FMCSA issued an IFR to *add* this requirement to the federal regulations strongly implies that it was not previously in existence. *See, e.g.*, *United States v. Greene*, No. 1:23-cr-52 (RDA), 2025 WL 310128, at *5 (E.D. Va. Jan. 27, 2025) ("[T]hat the regulation has now been amended to include more specific language suggests to the Court that the Agency recognized that the plain language of the prior regulation . . . did *not* include [the new addition].") (emphasis in original) (citing cases); *Hecker v. Deere & Co.*, 496 F. Supp. 2d 967, 973 (W.D. Wis. 2007) ("Moreover, recent proposals to amend the regulations . . . to require [a new rule] make it apparent that present regulations do not require it.") (citations omitted), *aff'd*, 556 F.3d 575 (7th Cir. 2009).

Hence, because federal law did not prohibit CDL or CLP expiration dates which extend beyond an initial term of lawful presence, in text or administrative practice, FMCSA's claim that DMV has failed to meet the requirement for substantial compliance with the standards for issuing non-

**A24**

domiciled CDLs and CLPs seems unsupported. DMV wishes to discuss and better understand FMSCA's interpretation at the proposed conference.

### B. DMV Verifies Lawful Presence Before Issuing CDLs

FMCSA claims that "six of the driver records sampled showed that DMV issued non-domiciled CDLs to drivers without providing evidence that, at the time the transaction occurred, it verified the drivers' lawful presence with an unexpired EAD or unexpired foreign passport and Form I-94 documenting the driver's most recent admittance into the United States."

DMV carefully reviewed the six driver records in question that FMCSA sampled. In the cases of these remaining six records, it appears FMCSA may have reviewed and relied upon outdated application information from a prior transaction. Instead, DMV's review revealed their licenses were, like the other 101, validly issued.

Referring to the motorists by their initials and the same numbers as assigned in FMCSA's letter, DMV determined as follows:

1. A driver with the initials "IM": The Employment Authorization Document (EAD) expiration date FMCSA relied on appears to have been obtained from outdated application information from a prior transaction. The customer performed a new transaction on November 4, 2024, with a new EAD that had a new expiration date of July 17, 2029.

2. A driver with the initials "MV": The EAD expiration date FMCSA relied on appears to have been obtained from outdated application information from a prior transaction. The customer performed a new transaction on September 3, 2025, with a new EAD that had a new expiration date of October 1, 2026.

3. A driver with the initials "MJ": On November 4, 2025, the driver presented a Valid Permanent Resident card, and thus, is no longer a non-domiciled CDL holder. Notably, this transaction occurred after FMCSA's onsite review.

4. A driver with the initials "JS": The issuance date FMCSA cites in this instance is for a Class D license (generally speaking, valid to operate any ordinary passenger or limited use automobile), not a CDL. Notably, this transaction occurred on October 20, 2025, after FMCSA's onsite review.

5. A driver with the initials "GS": The EAD expiration date FMCSA relied on appears to have been obtained from outdated application information from a prior transaction. The customer performed a new transaction on January 12, 2022, with a new EAD that had a new expiration date of December 14, 2023.

6. A driver with the initials "ND": The EAD expiration date FMCSA relied on appears to have been obtained from outdated application information from a prior transaction. The customer performed a new transaction on November 22, 2023, with a new EAD that had a new expiration date of August 11, 2025.

**A25**

DMV offers the attached additional documentation showing the newer EAD expiration dates.

**4. DMV's Response to FMCSA's List of Required Corrective Action**

As a result of its findings, FMCSA requested that DMV take several corrective actions in response to its letter, including to "[t]ake immediate action to void or rescind all unexpired noncompliant non-domiciled CLPs and CDLs and reissue the licenses in accordance with Parts 383 and 384, in effect at the time of reissuance".

As the timeline for any corrective action must be mutually agreed-upon between DMV and FMCSA, DMV also seeks to understand how FMCSA intends to address and safeguard the Federal Due Process rights of the holders of unexpired non-domiciled CDLs and CLPs affected by FMCSA's action. The Supreme Court has indicated that those protections extend to commercial licenses, as "individuals have constitutionally protected property interests in state-issued licenses essential to pursuing an occupation or livelihood," and cited a "driver's license" as an example. *See Cleveland v. United States*, 531 U.S. 12, 25 n.4 (2000) (unanimous Court); *see also*, *Gudema v. Nassau County*, 163 F.3d 717, 724 (2d Cir. 1998) (quoting *Bell v. Burson*, 401 U.S. 535, 539 (1971)).

DMV is concerned that such actions would affirmatively harm motor carriers reliant on these drivers for commerce and transportation and suddenly worsen an already serious bus driver shortage impacting children, families, and school districts.

DMV maintains these issues should also suffice to create pause by FMCSA before it mandates that any state agency take immediate action under penalty of losing significant Federal funding.

DMV recognizes the importance of road safety and will continue to pause its non-domiciled CDL program pending further coordination with FMCSA. Furthermore, DMV appreciates its longstanding partnership with FMCSA in promoting road safety among CDL holders and welcomes an opportunity to have an informal conference with FMCSA to discuss its findings and better understand how FMCSA arrived at its legal conclusion before FMCSA makes a final determination.

Very truly yours,

*Mark J.F. Schroeder*

Mark J.F. Schroeder
Commissioner
New York State Department of Motor Vehicles

**A26**



**U.S. Department
of Transportation**

**1200 New Jersey Ave, S.E.
Washington, D.C. 20590**

**Federal Motor Carrier
Safety Administration**

March 13, 2026

<u>Via Electronic Mail and USPS</u>
The Honorable Kathy Hochul
Governor of New York State
NYS State Capitol Building
Albany, NY 12224

Mark J.F. Schroeder, Commissioner
New York Department of Motor Vehicles
6 Empire State Plaza
Albany, NY 12220

Dear Governor Hochul and Commissioner Schroeder:

The U.S. Department of Transportation's Federal Motor Carrier Safety Administration (FMCSA or Agency) served the State of New York a Preliminary Determination of Noncompliance (Preliminary Determination) in accordance with 49 CFR § 384.307(b) on December 12, 2025. The Preliminary Determination proposed a finding that New York Department of Motor Vehicles' (DMV) commercial driver's license (CDL) program has failed to meet the requirement for substantial compliance with the standards for issuing non-domiciled commercial learner's permits (CLPs) and CDLs set forth in 49 CFR § 384.212.[1] FMCSA reviewed New York's response to the Preliminary Determination (Response), which DMV submitted on January 9, 2026. FMCSA also convened an informal conference on February 10, 2026 with Director Schroeder and other DMV representatives to provide New York an opportunity to inform FMCSA of its implemented or planned corrective actions, as well as present or discuss any other information for FMCSA's consideration.

---

[1] On September 29, 2025, FMCSA issued an interim final rule (IFR) amending Federal regulations in 49 CFR Parts 383 and 384 applicable to State Driver's Licensing Agencies' (SDLAs) issuance of non-domiciled CLPs and CDLs. *See* Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses, 90 Fed. Reg. 46509 (Sept. 29, 2025). On November 10, 2025, the U.S. Court of Appeals for the District of Columbia Circuit issued an Order in *Lujan v. FMCSA*, Case No. 25-1215, that administratively stayed the IFR. On February 13, 2026, FMCSA published the Final Rule (91 Fed. Reg. 7044 (Feb. 13, 2026)) to the IFR under the same title. The effective date of the Final Rule is March16, 2026. Because the transactions detailed in the Preliminary Determination occurred prior to publication of the IFR, the regulations cited in this letter reflect the pre-IFR text of Parts 383 and 384, specifically the 2024 edition of Title 49 of the Code of Federal Regulations, which is currently in effect until the March 16, 2026 effective date of the Final Rule.

**A27**

FMCSA will base its final determination on DMV's implementation of the required corrective actions set forth in the Preliminary Determination. DMV must provide FMCSA evidence of its corrective action plan implementation as set forth in section III below. DMV's failure to implement, or undue delay in implementing, the required corrective actions will result in FMCSA issuing a Final Determination of Substantial Noncompliance and withholding up to four percent of certain Federal-aid Highway funds as well as possible decertification of New York's CDL program, as described in section III.

### I. Background

FMCSA initiated an Annual Program Review (APR) of DMV's CDL program in July 2025 in accordance with 49 U.S.C. § 31311 and 49 CFR § 384.307. As set forth in the Preliminary Determination, FMCSA found that approximately 53 percent of the 200 non-domiciled driver records sampled during the 2025 APR failed to comply with requirements in 49 CFR parts 383 and 384. FMCSA found that DMV issued non-domiciled CDLs that extend beyond expiration of drivers' lawful presence in the United States and non-domiciled CDLs to drivers without first validating the driver's lawful presence.

FMCSA found that the repeated errors discovered during the 2025 APR evinced an unacceptable deviation from FMCSA's regulations when issuing non-domiciled CLPs and CDLs and indicated a systemic breakdown in DMV's issuance process for non-domiciled CLPs and CDLs. Accordingly, as set forth in the Preliminary Determination, FMCSA determined that DMV must take the following immediate corrective actions:

- Immediately pause the issuance of all new, renewed, transferred, or upgraded non-domiciled CLPs and CDLs until FMCSA provides written confirmation that the State's corrective action plan has been accepted and implemented;
- As soon as practicable, identify all unexpired non-domiciled CLPs and CDLs that were not issued in compliance with 49 CFR parts 383 and 384;
- Conduct an internal audit to identify all procedural and programming errors; training and quality assurance problems; insufficient policies and practices; and other issues that have resulted in the issuance of non-domiciled CLPs and CDLs that did not meet the standards of 49 CFR parts 383 and 384 (the scope of the audit should not be limited to the issues identified in the Preliminary Determination);
- As part of the internal audit, review all supporting documentation for all new, renewed, transferred, or upgraded non-domiciled CLP and CDL transactions to ensure compliance with 49 CFR parts 383 and 384;
- Provide FMCSA a copy of the audit findings and the number of unexpired noncompliant non-domiciled CLPs and CDLs;
- Take immediate action to correct the deficiencies identified in the State's internal audit and in the Preliminary Determination;
- Take immediate action to void or rescind all unexpired noncompliant non-domiciled CLPs and CDLs and reissue the licenses in accordance with Parts 383 and 384, in effect at the time of reissuance;

2

**A28**

- Resume issuing non-domiciled CLPs and CDLs only after the State has voided or rescinded all unexpired noncompliant non-domiciled CLPs and CDLs and reissued the licenses in accordance with 49 CFR parts 383 and 384, in effect at the time of reissuance, and the State ensures that all statutes, regulations, administrative procedures and practices, organizational structures, internal control mechanisms, resources assignments (facilities, equipment, and personnel), and enforcement practices meet each and every standard of 49 CFR subpart B of part 384 and 49 U.S.C. § 31311, and FMCSA provides written confirmation that the State's corrective action plan has been accepted and implemented.

## II. FMCSA Appropriately Issued the Preliminary Determination

### a. Finding: 49 CFR § 384.212—The New York DMV Issued Non-Domiciled CLPs or CDLs With an Expiration Date that Exceeded the Expiration of the Driver's Lawful Presence Documents.

As explained in the Preliminary Determination, regulations in effect prior to September 29, 2025, required that States accept as valid only *unexpired* lawful presence documents, which also meant that the State must make the period of validity of the non-domiciled CLP or CDL less than or equal to the period of validity of the driver's lawful presence documents. In other words, because FMCSA's regulations considered only unexpired lawful presence documents to be valid, DMV was required to ensure that the non-domiciled CLP or CDL period of validity *did not exceed* the expiration of the driver's lawful presence documents. Therefore, State driver's licensing agencies were required to ensure that the validity of non-domiciled CLPs or CDLs did not exceed the expiration date of drivers' lawful presence documents.

During the 2025 APR, FMCSA discovered that 101 of the driver records sampled showed that DMV issued a non-domiciled CDL for a period of validity that exceeded the driver's lawful presence documents. The Preliminary Determination provided a detailed explanation for each transaction. FMCSA learned through discussions with DMV staff during the 2025 APR that this error occurs because DMV only ensures that the expiration date of non-domiciled CLPs and CDLs does not exceed the drivers' legal presence documents, as confirmed in USCIS's online verification service, Systematic Alien Verification for Entitlements[2] (SAVE) if the licenses are REAL ID compliant. However, DMV staff stated that, during issuance of non-domiciled CDLs that are *not* REAL ID compliant, DMV's electronic records system, Common Portal to Search Services (COMPASS), will default to an expiration date that is 8 years from the date of initial issuance.[3]

---

[2] "SAVE is a service by USCIS that helps Federal, State, and local benefit-issuing agencies, institutions, and licensing agencies determine the immigration status of benefit applicants, so only those entitled to benefits receive them." U.S. CITIZENSHIP AND IMMIGR. SERVS., *Guide to Understanding SAVE Verification Responses* (April 2022), https://www.uscis.gov/sites/default/files/document/guides/SAVE-Guide%20to%20Understanding%20SAVE%20Verification%20Responses.pdf.

[3] For example, if DMV issues a class D non-commercial driver's license to a driver with an eight-year expiration and the driver later obtains a CDL, the CDL's expiration date will be the remainder of the eight-year period of validity. If the license is within one year of renewal, DMV will extend the pervious expiration date by eight years.

3

**A29**

In response to the 101 transactions identified in section III(a) of the Preliminary Determination, New York did not dispute that DMV issued non-domiciled CLPs and CDLs that exceeded the expiration dates of the drivers' lawful presence documents presented during their transactions. Rather, New York contends that DMV issued non-domiciled CDLs and CLPs in substantial compliance with all Federal requirements. It argues that FMCSA's claim that the DMV failed to meet the requirements for substantial compliance with the standards for issuing non-domiciled CLPs and CDLs "seems unsupported" because Federal law did not prohibit CLP or CDL expiration dates which extend beyond an initial term of lawful presence, in text or administrative practice. New York further argues that FMCSA's new interpretation appears to contradict its longstanding application of Federal regulations and FMCSA issued an IFR to add the requirement to Federal regulations for states to issue non-domiciled CLPs and CDLs with expiration dates that do not exceed the expiration dates of the driver's lawful presence documents.

FMCSA disagrees with these arguments. Under 49 U.S.C. § 31311(a)(12)(B)(ii), States are authorized to issue non-domiciled CDLs, but they must do so in accordance with regulations prescribed by FMCSA. The Agency's regulations in effect at the time that the transactions detailed on the preliminary determination occurred provided that States that issue non-domiciled CLPs and CDLs may only accept as valid proof of lawful presence (i) an unexpired employment authorization document (EAD) issued by the United States Customs and Immigration Service (USCIS) or (ii) an unexpired foreign passport accompanied by an approved I-94 form documenting the driver's most recent admittance into the United States (hereinafter "lawful presence documents").[4] In addition, State procedures for issuing, renewing, or upgrading a non-domiciled CLP and CDL must, at a minimum, be identical to those pertaining to any other CLP or CDL.[5]

The regulatory universe of non-domiciled CLPs and CDLs is premised on the basic notion that a non-domiciled driver's commercial motor vehicle driving privileges cannot extend beyond that driver's lawful presence in the United States. 49 U.S.C. § 31308 is the statutory basis for part 383's minimum standards for CDL expiration dates. It governs State issuance of CLPs and CDLs and permits FMCSA to issue regulations that compel all CDLs and CLPs to contain "the dates between which the license or learner's permit is valid." Pursuant to this statutory authority, FMCSA issued regulations requiring that CLPs and CDLs issued by the States "must contain . . . the date of issuance and the date of expiration of the license." 49 CFR §§ 383.153(a)(7); 383.153(b)(2)(vi). Under 49 CFR §§ 383.73(a)(3) and 383.73(b)(9), FMCSA mandates that CLPs be valid for no more than one year from the date of issuance, while CDLs may not be valid for more than eight years from the date of issuance.

However, these rules merely provide a regulatory ceiling for CLP and CDL expiration generally. States must follow additional procedures prior to issuing non-domiciled CLPs and CDLs. These additional rules further restrict the period of validity for such credentials. First, under regulations in effect at the time the transactions at issue occurred, FMCSA obligated the States to require proof of an applicant's legal presence prior to issuing a non-domiciled CLP or CDL. 49 CFR

---

[4] 49 CFR §§ 383.71(f)(2)(i), 383.73(f)(3), 384.201, 384.212(b).

[5] *Id.* at § 383.73(f)(2).

4

**A30**

§ 383.73(f)(3). In addition, FMCSA required that "[a]n applicant domiciled in a foreign jurisdiction must provide an unexpired employment authorization document (EAD) issued by USCIS or an unexpired foreign passport accompanied by an approved I–94 form documenting the applicant's most recent admittance into the United States." 49 CFR § 383.71(f)(2)(i).

Whenever possible, regulations must be read in harmony to avoid redundancy and surplusage. *See, e.g.*, *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 669 (2007) (cautioning against reading a regulation "in a way that makes part of it redundant"); *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1078 (7th Cir. 2013) ("We do not construe regulations in such a way as to render other provisions of the regulations meaningless or superfluous."). New York's argument that the State could issue a non-domiciled CLP or CDL that remains valid after a driver's lawful presence in the United States expires is rooted in an isolated reading of regulatory text that disrupts the overall framework. Further, New York's interpretation of FMCSA's regulations would render the requirements regarding verification of lawful presence in 49 CFR §§ 383.73(f)(3) and 383.71(f)(2)(i) meaningless. If a State may issue a non-domiciled CLP or CDL that expires after the expiration of the driver's lawful presence document, 49 CFR § 383.71(f)(2)(i)'s mandate to present an unexpired EAD or foreign passport would be irrelevant and inconsequential. Similarly, there would be no reason to verify lawful presence as 49 CFR § 383.73(f)(3) requires. FMCSA's interpretation of its own regulations avoids this conflict. Under FMCSA's regulatory framework, States must require proof of legal presence, in the form of an unexpired EAD or foreign passport and ensure the expiration date of the CLP or CDL does not exceed the expiration date stated on the driver's lawful presence documents. Viewed in the totality, the regulatory framework demands this result.

Further, New York's reading of FMCSA's regulations currently in effect would allow non-domiciled drivers unlawfully present in the United States to operate commercial motor vehicles, at odds with the clear intent of FMCSA's non-domiciled CLP and CDL regulations. The absurdity doctrine cuts against New York's interpretation. Permitting States to issue non-domiciled CLPs and CDLs to individuals in a manner that permits them to continue operating commercial motor vehicles without being lawfully present in the United States is illogical, unreasonable, and contrary to the fundamental purpose of FMCSA's regulations establishing legal presence requirements for all CLP and CDL applicants: to ensure CLP and CDL drivers, including non-domiciled drivers, operate commercial motor vehicles while lawfully present in the United States. See 76 Fed. Reg. 26854, 26856 (May 9, 2011); 73 Fed. Reg. 19282, 19285 (Apr. 9, 2008). As the Supreme Court has consistently reaffirmed, "[w]here the literal reading of a [regulatory scheme] would 'compel an odd result,' we must search for other evidence of [regulatory] intent to lend the [scheme] its proper scope." *Public Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 454 (1989) (quoting *Green v. Bock Laundry Machine Co.*, 490 U.S. 504, 509 (1989)); *see also U.S. v. Am. Trucking Assn's, Inc.*, 310 U.S. 534, 543-44 (1940) ("When aid to construction of the meaning of words, as used in the [regulation], is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination'") (citations omitted). Thus, with respect to the 101 transactions identified in section III(a) of the Preliminary Determination, DMV failed to comply with 49 CFR § 384.212 because it issued non-domiciled CDLs and CLPs that exceeded the expiration dates of the drivers' lawful presence documents that the drivers presented during the transactions. FMCSA reaffirms this finding.

5

**A31**

b. **Finding: 49 CFR § 384.212—The New York DMV Issued Non-Domiciled CLPs or CDLs Without Providing Evidence of lawful Presence Verification Under the Standards of 49 CFR Part 383.**

The Preliminary Determination also found that New York failed to provide evidence to demonstrate that DMV verified the drivers' lawful presence for six drivers identified in section III(b). The Preliminary Determination explained that DMV failed to verify the drivers' lawful presence with an unexpired EAD or unexpired foreign passport and Form I-94 documenting the drivers' most recent admittance into the United States, as required under FMCSA's regulations in effect at the time the transactions occurred.

New York disputed the six violations. Regarding four of the transactions, New York asserted that drivers with the initials "IM", "MV", "GS", and "ND" presented unexpired EADs at the time of their transactions to demonstrate their lawful presence. In New York's Response, it submitted heavily redacted documents that appear to support its assertion. Though these documents appear to support New York's assertion, the documents also indicate that DMV issued non-domiciled CDLs that exceeded the expiration dates of the drivers' lawful presence documents. Regardless, these non-domiciled CDL issuances failed to comply with 49 CFR parts 383 and 384.

Regarding the transaction involving the driver with the initials "JS," New York explained that FMCSA cited an October 20, 2025 transaction that did not involve an issuance of a CDL. New York is correct. However, DMV issued JS a non-domiciled CDL on October 5, 2023 that was valid until October 7, 2025. During the onsite review, DMV provided evidence that showed that JS's EAD credential showed an expiration date of April 27, 2025. Thus, DMV issued JS a non-domiciled CDL that exceeded the expiration date of JS's lawful presence document. This is another transaction where DMV issued non-domiciled CDLs that exceeded the expiration date of the driver's lawful presence documents which failed to comply with 49 CFR parts 383 and 384.

New York also asserted that the driver with the initials "MJ" presented a valid legal permanent resident card on November 4, 2025, and is no longer a non-domiciled CDL holder. New York explained that the November 4, 2025 transaction cited in the Preliminary Determination occurred after FMCSA's onsite review. In its Response, New York did not present a copy of an unexpired legal permanent resident card; it submitted undated, heavily redacted documents. The cited transaction was based on the documentation DMV provided which indicated that it issued MJ a non-domiciled CDL after presenting an EAD that expired on October 31, 2023. DMV previously issued MJ a non-domiciled CDL that appears was valid through September 29, 2025. At the time of that transaction, November 30, 2021, MJ's EAD had an expiration date of October 31, 2023. The evidence is unclear whether MJ was a lawful permanent resident on November 4, 2025, but it is clear that DMV issued MJ a non-domiciled CDL that failed to comply with 49 CFR parts 383 and 384.

Finally, irrespective of DMV's objections to FMCSA's findings, DMV advances an additional argument. DMV appears to argue that even if FMCSA concludes that DMV is noncompliant, DMV reads the language in 49 U.S.C. § 31314 as authorizing FMCSA to withhold funding based on a State's *intentional* rather than *unintentional* noncompliance. The Agency rejects this assertion. While the term substantial compliance is not defined by statute, FMCSA has

6

**A32**

determined that "[t]o be in substantial compliance with 49 U.S.C. § 31311(a), a State must meet each and every standard of subpart B of [part 384] by means of the demonstrable combined effect of its statutes, regulations, administrative procedures and practices, organizational structures, internal control mechanisms, resource assignments (facilities, equipment, and personnel), and enforcement practices."[6]

The standard is performance based and leaves no room for scienter. Part 384 sets forth the minimum standards to which States must adhere to be deemed in substantial compliance. As noted in the Notice of Proposed Rulemaking proposing the standards for State compliance with the CDL program, "[FMCSA] would not agree that a State meets the standard for a given transaction if it successfully accomplishes the transaction only a given portion of the time, for example 80 percent. Rather, any departure from the minimum standard, together with evidence that the State does not have in place such procedures and internal controls as would offer reasonable assurance of comprehensive adherence, would be cause for a determination that the State is not meeting the standard and is not in substantial compliance."[7] At that point, FMCSA is authorized to direct the withholding of a percentage of a State's Federal-aid highway funds, as specified in 49 U.S.C. § 31314. FMCSA rejects the argument that the Agency is not empowered to declare a State to be in substantial noncompliance without evidence that the noncompliance was intentional and to thereafter direct the withholding authorized by statute.

For the reasons stated above, FMCSA appropriately issued the Preliminary Determination and rejects DMV's arguments as unavailing. Under 49 CFR § 384.301, either category of noncompliance was sufficient to issue the Preliminary Determination and would also be a sufficient basis upon which to make a final determination of substantial noncompliance if DMV fails to complete the required corrective actions.

## III.    Required Corrective Actions

The Preliminary Determination set forth specific corrective actions DMV must undertake to avoid having amounts withheld from Highway Trust Fund apportionment under 49 U.S.C. § 31314 and to avoid CDL program decertification under 49 U.S.C. § 31312. The required corrective actions centered on DMV immediately pausing issuance of non-domiciled CLPs and CDLs; identifying non-domiciled CLPs and CDLs that were not issued in accordance with FMCSA's standards; conducting an internal audit to identify the reasons for noncompliance and notifying FMCSA of its findings; immediately acting to correct the deficiencies identified in the internal audit; acting to void or rescind all unexpired noncompliant non-domiciled CLPs and CDLs; and reissuing the licenses subject to the standards in parts 383 and 384, as amended.[8] DMV was also permitted to resume non-domiciled CLP and CDL issuance only after it is able to meet each and every standard of subpart B of part 384 and 49 U.S.C. § 31311.[9] Under 49 CFR § 384.307(c), DMV's corrective action must be adequate to correct the deficiencies noted in the preliminary determination and must be implemented on a schedule mutually agreed upon by FMCSA and DMV. As noted during DMV's informal conference, DMV's corrective action

---

[6] 49 CFR 384.301(a).
[7] 58 FR 34344, 34345 (Jun. 24, 1993).
[8] Preliminary Determination at Sec. IV.

[9] *Id*.

implementation schedule may account for any administrative due process actions required under State law for drivers whose operating privileges will be affected.

Based on our initial review, FMCSA has determined that the additional information below is required to begin a comprehensive follow-up:

**1. Identification of all Unexpired Non-Compliant Licenses**

Please identify all unexpired non-domiciled CLPs and CDLs that were not issued in compliance with 49 CFR parts 383 and 384. Please conduct an internal audit of all unexpired non-compliant licenses and provide a root cause analysis and specific data points, including:

- A comprehensive breakdown of the approximately 32,606 unexpired non-domiciled CLPs and CDLs.
- Explain the methodology used to identify the 32,606 unexpired non-domiciled CLPs and CDLs.
- How many CLPs and CDLs were found to be inconsistent with current FMCSRs?
- Of the noncompliant licenses identified for how many of those did DMV remove the CLP or CDL privilege?
- How many CLPs and CDLs were issued beyond the expiration of immigration documents?
- How many CLPs and CDLs were issued without evidence of Lawful Presence Verification?
- How many CLPs and CDLs were issued to lawful permanent residents?
- Provide FMCSA with a list of all affected drivers, including license numbers, full names, and dates of birth, and documentation confirming the actions taken by DMV to address their non-compliance.
- FMCSA needs to validate the actions taken on the above records.

**2. Internal Audit to identify all procedural and programming errors.**

Provide the root cause analysis and the methodology used to identify non-compliant non-domiciled CLPs/CDLs, specifically:

- An explanation of the methodology used to isolate unexpired non-domiciled records.
- A description of any system/IT changes required to remediate these non-compliance issues.
- What steps will DMV take to review non-domiciled transactions and ensure that staff are following updated policy, procedure, and training.
- Provide specifics on the policies, procedures, and training, being updated to address CLP/CDL issuances to non-domiciled individuals.
- Provide FMCSA a copy of those policy, procedures, and training curriculum updates.
- How will training be conducted? (e.g. online, In-person)
- What will be the frequency of training?
- Provide proof that all DMV staff has been trained on any updated policies or procedures.

8

**A34**

- How will DMV track training completion for all applicable staff.
- Provide FMCSA a copy of the full internal audit report.
- The internal audit should include a review of all supporting documentation for all non-domiciled credential transactions for new, renewed, transferred, or upgraded non-domiciled CLP/CDL transactions to ensure compliance with 49 CFR parts 383 and 384.

### 3. Corrective Action Plan

Please take immediate action to correct the deficiencies identified in the audit providing specific, time-bound goals. FMCSA will validate all corrective measures, including IT programming, training materials, Standard Operating Procedures (SOPs), and the resolution of the non-compliant driver records identified in the audit.

- Provide FMCSA evidence that DMV has taken immediate action to correct the deficiencies identified in DMV's internal audit and in this non-compliance letter.

- Provide FMCSA evidence that DMV took immediate action to void or rescind all unexpired noncompliant non-domiciled CLPs and CDLs.

Therefore, DMV must also provide information on its implemented, or planned, corrective actions to address this deficiency. DMV must provide the additional information **no later than March 23, 2026**.

**As previously communicated, the State may not resume issuing non-domiciled CLPs or CDLs until FMCSA completes its review of the State's corrective action(s) and has issued a determination that DMV is in compliance with the standards in subpart B of Part 384.** Please note that additional information may be requested as our review of the non-domiciled licensing issuance process progresses.

DMV cannot demonstrate substantial compliance with the standards for issuing non-domiciled CLPs and CDLs until it has completed the required corrective actions within the mutually agreed-upon schedule. Further, upon DMV's notification that it has completed the required corrective actions, FMCSA will conduct a supplemental review of DMV's non-domiciled CLP and CDL issuance practices to verify that the corrective actions have been completed.

DMV's failure to complete, or undue delay in completing, the required corrective actions as set forth in the preliminary determination will result in FMCSA issuing a Final Determination of Substantial Noncompliance and withholding up to four percent of the National Highway Performance Program and the Surface Transportation Block Grant Program funds beginning in Fiscal Year (FY) 2027 that would otherwise be apportioned to New York under 23 U.S.C. § 104(b)(1) and (2).[10] Under 49 U.S.C. § 31314(d) and 49 CFR § 384.403, funds withheld following a substantial noncompliance determination are no longer available for apportionment to New York. Further, DMV may also be subject to decertification of its CDL program in accordance with 49 U.S.C. § 31312 and 49 CFR § 384.405.

---

[10] Four percent of these funds totals approximately $73,500,000.

**IV.    Conclusion**

FMCSA remains committed to working with DMV officials and stands ready to assist the State to ensure its substantial compliance with the standards for issuing non-domiciled CLPs and CDLs. Please direct all questions regarding this Notice to Philip Thomas, Deputy Associate Administrator for Safety, at philip.thomas@dot.gov.

Sincerely,

Derek D. Barrs
Administrator

10

**A36**



**KATHY HOCHUL**
Governor

**MARK J.F. SCHROEDER**
Commissioner

March 23, 2026

Derek D. Barrs
Administrator
U.S. Department of Transportation
Federal Motor Carrier Safety Administration
1200 New Jersey Ave., S.E.
Washington, D.C.  20590

VIA U.S. MAIL AND E-MAIL TO: PHILIP.THOMAS@DOT.GOV

Dear Administrator Barrs:

This letter is in response to your correspondence of March 13, 2026, following an informal conference on February 10, 2026.

The U.S. Department of Transportation (USDOT)'s Federal Motor Carrier Safety Administration (FMCSA) asserts its preliminary determination that the New York State Department of Motor Vehicles (DMV) failed to meet requirements for substantial compliance with the standards for issuing non-domiciled commercial driver's licenses (CDLs) and commercial learner's permits (CLPs) was appropriate and directs DMV to take purportedly corrective action. For the reasons already explained in its January 9, 2026 letter, DMV continues to dispute the legal and procedural merits of FMCSA's determination and, therefore, has concluded that a corrective action plan is not warranted.

New York has always met federal requirements for substantial compliance with the standards for issuing CDLs and CLPs, including non-domiciled CDLs and CLPs. DMV has strictly adhered to these federal requirements in a manner consistent with FMCSA's own longstanding interpretation and administrative oversight in practice. Indeed, FMSCA's previous reviews of DMV's program lacked any findings of non-compliance related to non-domiciled CDLs and CLPs. The core federal requirements for issuing non-domiciled CDLs and CLPs that are relevant to this annual review have been in place since July 2015. *See* 49 C.F.R. § 384.301(f). Since that time, across administrations, FMCSA has conducted several annual reviews of DMV's CDL program; FMCSA has *never* found DMV to be noncompliant with its federal obligations for issuing non-domiciled CDLs and CLPs, or otherwise.

In its March 2026 letter, FMCSA now acknowledges that the evidence does not support its initial determination that five CDLs were issued without proper verification of the driver's lawful presence at the time of issuance. With respect to the single remaining license that FMCSA initially also flagged as noncompliant in this respect, FMCSA now states that the evidence is "unclear" whether the licensee, "MJ," was a lawful permanent resident at the time of license issuance. Yet, as FMCSA demonstrated in its January 2026 letter and submissions, DMV verified the driver's lawful presence as required by FMCSA on November 30, 2021, and issued the driver a non-domiciled CDL in compliance with all applicable state and federal laws. The driver has since become a permanent resident and is no longer a non-domiciled CDL holder. In any event, FMCSA's identification of a single license that—by FMSCA's own account—does not clearly support a finding of noncompliance cannot sustain a finding of substantial noncompliance.

Moreover, despite DMV's request, FMCSA has failed to provide any examples of prior guidance or statements from FMCSA or USDOT that specified expiration date requirements in a manner consistent with FMCSA's current view.

FMCSA does not dispute that its non-domiciled CDL regulations that governed the review period in question did not contain an explicit expiration-date requirement. FMCSA's insistence during the informal conference that its novel

**A37**

interpretation is "inherent in the language of the rule" is belied by its own past practice and interpretation, the interpretation of multiple states as evinced by their common practice, and FMCSA's publication of a new rule making express the novelty of its interpretation. A finding of substantial noncompliance must be grounded in a State's failure to abide by FMCSA's regulations implementing 49 U.S.C. § 31311(a), as they existed during the review period at issue— FMCSA's annual-review process allows for the consideration of no other factors in reaching a determination of substantial noncompliance. *See* 49 C.F.R. § 384.309(b). FMSCA's new regulation cannot impact the lawfulness of DMV's past practices in accordance with regulations in effect at the time.

Additionally, FMCSA ignores that, for a CDL holder to renew their credential under DMV's procedures, they would be required to again show valid lawful presence to complete the renewal transaction. FMCSA's letter inexplicably and wrongly assumes—without any supporting evidence—that DMV accepts an unexpired employment authorization document for that purpose—and treats that document as if it were valid in perpetuity.

FMCSA's retroactive application of its novel interpretation is not only unsupported and contrary to law, but its threat to withhold federal funding unless New York takes immediate, specific action is arbitrary and capricious. It serves to illegally punish not only New York State, but also thousands of law-abiding license holders, their families, and the countless others who rely upon their services. That includes many localities who depend upon licensees for the safe daily transportation of the children of tens of thousands of working families to and from school.

Indeed, New York's approximately 25,000 non-domiciled licensees make up roughly 5% of the State's pool of CDL holders. These individuals work in industries ranging from commercial trucking to sanitation to school transportation. Removing these individuals from the New York workforce would create immediate disruptions in these and other industries that would be felt by all New Yorkers, as well as local governments. A recent survey of just seven school bus operators, for example, found that more than 7,300 students relied on non-domiciled drivers for transportation to and from school. Disqualifying these drivers would limit school districts' ability to maintain full route coverage, causing disruptions for students and families alike.

New York's guiding principle in issuing driver's licenses remains safety, for both CDL holders and the traveling public. DMV is proud of the safety record established in New York. As FMCSA's preliminary determination is without merit, New York declines to take the demanded action for the reasons stated herein.

Very truly yours,

*Mark J.F. Schroeder*

Mark J.F. Schroeder
Commissioner
New York State Department of Motor Vehicles

**A38**



**U.S. Department
of Transportation**

**Federal Motor Carrier
Safety Administration**

**1200 New Jersey Ave, S.E.
Washington, D.C. 20590**

April 16, 2026

<u>Via Electronic Mail and UPS</u>
The Honorable Kathy Hochul
Governor of New York State
NYS State Capitol Building
Albany, NY 12224

Mark J.F. Schroeder, Commissioner
New York Department of Motor Vehicles
6 Empire State Plaza
Albany, NY 12220

### NOTICE OF FINAL DETERMINATION OF SUBSTANTIAL NONCOMPLIANCE

Dear Governor Hochul and Commissioner Schroeder:

The U.S. Department of Transportation's Federal Motor Carrier Safety Administration (FMCSA or Agency) served the State of New York a Preliminary Determination of Noncompliance (Preliminary Determination) in accordance with 49 CFR § 384.307(b) on December 12, 2025. The Preliminary Determination proposed a finding that New York Department of Motor Vehicles' (DMV) commercial driver's license (CDL) program has failed to meet the requirement for substantial compliance with the standards for issuing non-domiciled commercial learner's permits (CLPs) and CDLs set forth in 49 CFR § 384.212.[1] FMCSA reviewed New York's response to the Preliminary Determination (January Response), which it submitted on January 9, 2026, contesting the basis for the Preliminary Determination of noncompliance. FMCSA also convened an informal conference on February 10, 2026 with Commissioner Schroeder and other DMV representatives to provide New York an opportunity to inform FMCSA of its implemented

---

[1] On September 29, 2025, FMCSA issued an interim final rule (IFR) amending Federal regulations in 49 CFR parts 383 and 384 applicable to State Driver's Licensing Agencies' (SDLAs) issuance of non-domiciled CLPs and CDLs. *See* Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses, 90 Fed. Reg. 46509 (Sept. 29, 2025). On November 10, 2025, the U.S. Court of Appeals for the District of Columbia Circuit issued an Order in *Lujan v. FMCSA*, Case No. 25-1215, that administratively stayed the IFR. On February 13, 2026, FMCSA published a Final Rule (91 Fed. Reg. 7044 (Feb. 13, 2026)) under the same title as the IFR. The effective date of the Final Rule was March 16, 2026. Because the transactions detailed in the Preliminary Determination occurred prior to publication of the IFR, the regulations cited in this letter reflect the pre-IFR text of parts 383 and 384, specifically the 2024 edition of Title 49 of the Code of Federal Regulations, which was in effect prior to September 19, 2025, and between November 10, 2025 and the March 16, 2026 effective date of the Final Rule.

**A39**

or planned corrective actions, as well as present or discuss any other information for FMCSA's consideration.

On March 13, 2026, FMCSA sent New York a letter addressing the issues raised in New York's Response (March 2026 Letter), reiterating that DMV's failure to complete the required corrective actions as set forth in the Preliminary Determination, including immediate rescission of all noncompliant non-domiciled CLPs and CDLs, would result in FMCSA issuing a Final Determination of Substantial Noncompliance.[2] New York submitted a response to FMCSA's March 2026 Letter (March Response) on March 23, 2026, which stated that New York continues to dispute the legal and procedural merits of FMCSA's determination of noncompliance. New York asserted that the determination is without merit and stated that it declined to take corrective action.

After considering New York's responses and its refusal to correct any of the deficiencies noted in the Preliminary Determination, FMCSA issues this Final Determination of Substantial Noncompliance with the standards for issuing non-domiciled CLPs and CDLs set forth in 49 CFR § 384.212(a). FMCSA rejects New York's legal and procedural arguments used to justify its noncompliance with 49 CFR parts 383 and 384. FMCSA makes this Final Determination of Substantial Noncompliance in accordance with 49 CFR §§ 384.307(d) and 384.309(a)(2). Accordingly, pursuant to 49 U.S.C. § 31314(c)(1) and 49 CFR § 384.401(a), FMCSA is withholding four percent of the National Highway Performance Program and the Surface Transportation Block Grant Program funds beginning in Fiscal Year (FY) 2027 that would otherwise be apportioned to New York under 23 U.S.C. §§ 104(b)(1) and (2), which totals approximately $73,502,543.[3,4]

## I. Background[5]

FMCSA initiated an Annual Program Review (APR) of DMV's CDL program in July 2025 in accordance with 49 U.S.C. § 31311 and 49 CFR § 384.307. As set forth in the Preliminary Determination, FMCSA found that more than 50 percent of the 200 non-domiciled driver records sampled during the 2025 APR failed to comply with requirements in 49 CFR parts 383 and 384. The Preliminary Determination cited 101 of the driver records sampled that showed that DMV issued a non-domiciled CDL for a period of validity that exceeded the driver's lawful presence documents. The Preliminary Determination also cited six of the driver records sampled that appeared to show that DMV issued non-domiciled CDLs to drivers without first validating the driver's lawful presence.

FMCSA found that the repeated errors discovered during the 2025 APR evinced an unacceptable deviation from FMCSA's regulations when issuing non-domiciled CLPs and CDLs and indicated

---

[2] The Agency's December 12, 2025 Preliminary Determination and the March 2026 Letter are incorporated by reference into this Final Determination of Substantial Noncompliance.

[3] FMCSA calculates this amount based on FY 2026 funding levels.

[4] 49 U.S.C. § 31314(d), 49 CFR § 384.403.

[5] The relevant statutory and regulatory authorities are set forth in the Preliminary Determination and March 2026 Letter and are not repeated in this Final Determination of Substantial Noncompliance.

2

**A40**

a systemic breakdown in DMV's issuance process for non-domiciled CLPs and CDLs. Accordingly, as set forth in the Preliminary Determination, FMCSA determined that DMV must take the following corrective actions:

- Immediately pause the issuance of all new, renewed, transferred, or upgraded non-domiciled CLPs and CDLs until FMCSA provides written confirmation that the State's corrective action plan has been accepted and implemented;
- As soon as practicable, identify all unexpired non-domiciled CLPs and CDLs that were not issued in compliance with 49 CFR parts 383 and 384;
- Conduct an internal audit to identify all procedural and programming errors; training and quality assurance problems; insufficient policies and practices; and other issues that have resulted in the issuance of non-domiciled CLPs and CDLs that did not meet the standards of 49 CFR parts 383 and 384 (the scope of the audit should not be limited to the issues identified in the Preliminary Determination);
- As part of the internal audit, review all supporting documentation for all new, renewed, transferred, or upgraded non-domiciled CLP and CDL transactions to ensure compliance with 49 CFR parts 383 and 384;
- Provide FMCSA a copy of the audit findings and the number of unexpired noncompliant non-domiciled CLPs and CDLs;
- Take immediate action to correct the deficiencies identified in the State's internal audit and in the Preliminary Determination;
- Take immediate action to void or rescind all unexpired noncompliant non-domiciled CLPs and CDLs and reissue the licenses in accordance with 49 CFR parts 383 and 384, as those regulations are in effect at the time of reissuance;
- Resume issuing non-domiciled CLPs and CDLs only after the State has voided or rescinded all unexpired noncompliant non-domiciled CLPs and CDLs and reissued the licenses in accordance with 49 CFR parts 383 and 384, as in effect at the time of reissuance, and the State ensures that all statutes, regulations, administrative procedures and practices, organizational structures, internal control mechanisms, resources assignments (facilities, equipment, and personnel), and enforcement practices meet each and every standard of 49 CFR subpart B of part 384 and 49 U.S.C. § 31311, and FMCSA provides written confirmation that the State's corrective action plan has been accepted and implemented.

In New York's January Response, it asserted that DMV issued non-domiciled CDLs and CLPs in substantial compliance with all Federal requirements. New York did not dispute the 101 transactions where DMV issued non-domiciled CLPs and CDLs that exceeded the expiration dates of the drivers' lawful presence documents presented during their transactions. Rather, it argued that FMCSA's claim that the DMV failed to meet the standards for issuing non-domiciled CLPs and CDLs "seems unsupported" because Federal law did not prohibit CLP or CDL expiration dates that extend beyond an initial term of lawful presence, in text or administrative practice. New York further argued that FMCSA's interpretation appears to contradict its longstanding application of Federal regulations, and it noted that FMCSA issued an IFR to add the requirement for States to issue non-domiciled CLPs and CDLs with expiration dates that do not exceed the expiration dates of the driver's lawful presence documents.

3

**A41**

The Agency's March 2026 Letter reiterated the basis for the Agency's issuance of the Preliminary Determination: DMV did not demonstrate substantial compliance with the standards for issuing non-domiciled CLPs and CDLs. The Agency explained that the regulatory universe of non-domiciled CLPs and CDLs is premised on the basic notion that a non-domiciled driver's commercial motor vehicle driving privileges cannot extend beyond that driver's lawful presence in the United States. As the Agency previously explained, regulations in effect prior to September 29, 2025, required that States accept as valid only *unexpired* lawful presence documents, which also meant that the State must make the period of validity of the non-domiciled CLP or CDL less than or equal to the period of validity of the driver's lawful presence documents. In other words, because FMCSA's regulations considered only unexpired lawful presence documents to be valid, DMV was required to ensure that the non-domiciled CLP or CDL period of validity *did not exceed* the expiration of the driver's lawful presence documents. Therefore, State driver's licensing agencies, including New York's DMV, were required to ensure that the validity of non-domiciled CLPs or CDLs did not exceed the expiration date of drivers' lawful presence documents. However, the 2025 APR uncovered that DMV made no effort to ensure the expiration date of non-domiciled CDLs that were *not* REAL ID compliant did not exceed the date of the drivers' lawful presence documents. As noted in the Preliminary Determination, DMV staff admitted that, during issuance transactions involving non-domiciled CDLs that are not REAL ID compliant, DMV's electronic records system, Common Portal to Search Services (COMPASS), defaults to an expiration date that is 8 years from the date of initial issuance irrespective of when the drivers' lawful presence documents expire. Consequently, there are likely thousands of drivers who hold a DMV-issued non-domiciled CDL that will remain valid long after their lawful presence documents are no longer valid. New York's systemic noncompliance in this regard is made even more egregious by the State's refusal to take any corrective action to address it, as discussed in Section II below.

In addition to the 101 transactions addressed above, the Preliminary Determination also found that New York failed to provide evidence to demonstrate that DMV verified the drivers' lawful presence for six additional drivers. The Preliminary Determination explained that DMV failed to demonstrate it verified the drivers' lawful presence with an employment authorization document (EAD) or unexpired foreign passport and Form I-94 documenting the drivers' most recent admittance into the United States, as required under FMCSA's regulations in effect at the time the transactions occurred. In its January Response, New York disputed the six violations, submitting documents in support. After FMCSA reviewed New York's documents, FMCSA's March letter acknowledged that the lawful presence documents provided with its January 2026 Response appear to support DMV's assertions that it verified the drivers' lawful presence in accordance with parts 383 and 384 for five of the six transactions. However, as FMCSA noted, New York's supporting documentation also showed that for those five transactions, it issued non-domiciled CDLs that exceeded the drivers' lawful presence and therefore violated parts 383 and 384. The lawful presence documentation New York submitted to dispute the Preliminary Determination as to the sixth transaction, which involved driver "MJ," lacked sufficient clarity to rebut the determination of noncompliance.

4

**A42**

Under 49 CFR § 384.301, a State must meet "each and every standard" of part 384, Subpart B to be in substantial compliance with 49 U.S.C. § 31311(a). The evidence clearly indicates that DMV failed to comply with 49 CFR § 384.212 because it issued non-domiciled CDLs and CLPs that exceeded the expiration dates of the drivers' lawful presence documents presented at the time the transactions occurred. Moreover, FMCSA's determination that the transaction involving driver "MJ" failed to comply with parts 383 and 384 remains unrebutted.

## II. New York's March Response

New York continues to dispute the legal and procedural merits of FMCSA's Preliminary Determination. New York reiterated its assertion that it strictly adhered to the Federal requirements in a manner consistent with FMCSA's own longstanding interpretation and administrative oversight in practice. New York argues that FMCSA's February 13, 2026 final rule cannot impact the lawfulness of DMV's past practices that occurred before the final rule's effective date. New York also argues that FMCSA has conducted several annual reviews of New York's CDL program and has never found DMV to be noncompliant with its Federal obligations for issuing non-domiciled CDLs and CLPs, or otherwise.

New York's arguments are without merit. States must require proof of lawful presence, in the form of an unexpired EAD or foreign passport, and must ensure the expiration date of the CLP or CDL does not exceed the expiration date stated on the driver's lawful presence documents. This is not a new requirement. FMCSA previously addressed New York's arguments in the Preliminary Determination and in the March 2026 Letter and reaffirms the Agency's positions set forth therein. Furthermore, under 49 U.S.C. § 31311 and 49 CFR § 384.307, FMCSA is authorized to evaluate all aspects of the State's CDL program. During the 2025 APR of each State, FMCSA conducted a thorough review of each State's nondomiciled CLP and CDL issuance practices as a part of the overall APR. As set forth in the Preliminary Determination and the March 2026 Letter, FMCSA found that DMV substantially failed to comply with 49 CFR parts 383 and 384 in issuing non-domiciled CLPs and CDLs. The Agency's focus on other aspects of a State's CDL program in previous years does not preclude the Agency from assessing a State's compliance with the requirements of 49 CFR parts 383 and 384 in the current year's APR and all future APRs. New York's assertion that prior clean APRs act as a safeguard against compliance standards subverts the safety purpose of the CDL program and the Agency's oversight responsibility. The Agency cannot be estopped from enforcing safety regulations—nor are Federal standards waived—simply because a State's noncompliant practice went undetected in prior sample sets. Accordingly, DMV is required to implement corrective actions to address the deficiencies identified in the Preliminary Determination and the March 2026 Letter irrespective of how long DMV's noncompliant nondomiciled CLP and CDL issuance practices have existed.

New York also argued that FMCSA ignores that, for a CDL holder to renew their credential under DMV's procedures, they would be required to again show valid lawful presence to complete the renewal transaction. New York averred that FMCSA assumes that DMV accepts an unexpired EAD to demonstrate valid lawful presence and treats that document as if it were valid in perpetuity. Again, New York is mistaken. As previously stated, under 49 U.S.C. § 31311(a)(12)(B)(ii), States are authorized to issue non-domiciled CDLs, but they must do so in accordance with regulations prescribed by FMCSA. The Agency's regulations in effect at the

5

**A43**

time that the transactions detailed in the Preliminary Determination occurred provided that States that issue non-domiciled CLPs and CDLs may only accept as valid proof of lawful presence (i) an unexpired EAD issued by the United States Customs and Immigration Service (USCIS) or (ii) an unexpired foreign passport accompanied by an approved I-94 form documenting the driver's most recent admittance into the United States.[6] In addition, State procedures for issuing, *renewing*, or upgrading a non-domiciled CLP and CDL must, at a minimum, be identical to those pertaining to any other CLP or CDL.[7] Thus, FMCSA did not assume that DMV would treat an EAD as valid in perpetuity; DMV is required to review a driver's lawful presence documents at the time of each transaction, including when the driver renews a CDL.

New York further argued that FMCSA's threat to withhold Federal funding unless it takes immediate, specific action is arbitrary and capricious. New York's argument is misinformed and contradicts the factual record. DMV is well aware of its obligations under 49 CFR § 384.307(c) that its corrective action must be adequate to correct the deficiencies noted in the Preliminary Determination and must be implemented on a schedule mutually agreed upon by FMCSA and DMV. This is not a one-way street. While the Agency identified corrective action that should be taken immediately, the Agency understands that delays may occur, and specifically informed DMV that its corrective action implementation schedule may account for any administrative due process actions required under State law. The Agency also informed New York that it remains committed to working with DMV officials and stands ready to assist the State to ensure its substantial compliance with the standards for issuing non-domiciled CLPs and CDLs. However, rather than implementing corrective action on a mutually agreed upon schedule, New York issued a blanket refusal to take any corrective action. The Agency cannot mutually agree to a schedule with a State that refuses to acknowledge its deficiencies or act to correct them.

The Agency informed New York of the consequences of its noncompliance, explaining that 49 CFR part 384, Subpart B sets forth the minimum standards to which States must adhere to be deemed in substantial compliance. In this regard, under 49 CFR § 384.301, a State must meet "each and every standard" of part 384, Subpart B to be in substantial compliance with 49 U.S.C. § 31311(a). As noted in the Notice of Proposed Rulemaking proposing the standards for State compliance with the CDL program, "[FMCSA] would not agree that a State meets the standard for a given transaction if it successfully accomplishes the transaction only a given portion of the time, for example 80 percent. Rather, any departure from the minimum standard, together with evidence that the State does not have in place such procedures and internal controls as would offer reasonable assurance of comprehensive adherence, would be cause for a determination that the State is not meeting the standard and is not in substantial compliance."[8] At that point, FMCSA is authorized to direct the withholding of a percentage of a State's Federal-aid highway funds, as specified in 49 U.S.C. § 31314. As required by 49 CFR § 384.401(a), the Federal-aid highway funds "shall be withheld" from a noncompliant State. A State's failure to comply with *any* standard in Subpart B is a basis for determining the State is in substantial noncompliance.[9]

---

[6] 49 CFR §§ 383.71(f)(2)(i), 383.73(f)(3), 384.201, 384.212(b).

[7] *Id*. at § 383.73(f)(2) (emphasis added).

[8] 58 FR 34344, 34345 (Jun. 24, 1993).

[9] 49 CFR § 384.301.

6

**A44**

In this case, the evidence clearly indicates that New York failed to comply with 49 CFR § 384.212 because it issued non-domiciled CDLs and CLPs that exceeded the expiration dates of the drivers' lawful presence documents presented at the time of the transactions. Notably, this occurred in more than 50 percent of the driver records sampled. Under 49 CFR § 384.301, New York's pervasive failure in this regard is more than sufficient to show the State is in substantial noncompliance, rendering FMCSA's determination firmly supported by the factual record and hardly arbitrary or capricious.

As New York acknowledges in its March Response, New York has approximately 25,000 non-domiciled licensees who work in industries ranging from commercial trucking to sanitation to school transportation. However, because DMV mistakenly believes that the Preliminary Determination is without merit, it refuses to even identify the drivers with noncompliant CLPs and CDLs and take corrective action. Again, there are likely thousands of drivers who continue to hold noncompliant New York-issued non-domiciled CLPs or CDLs currently operating throughout New York and this country. This is unacceptable and a significant safety risk.

### III. Withholding of Funds Based on Noncompliance

FMCSA determines that New York has failed to meet the requirement for substantial compliance with the standards for issuing non-domiciled CLPs and CDLs set forth in 49 CFR § 384.212. Accordingly, pursuant to 49 U.S.C. § 31314(c)(1) and 49 CFR § 384.401(a), FMCSA is withholding four percent of the National Highway Performance Program and the Surface Transportation Block Grant Program funds beginning in Fiscal Year (FY) 2027 that would otherwise be apportioned to New York under 23 U.S.C. §§ 104(b)(1) and (2), which totals approximately $73,502,543. Under 49 U.S.C. § 31314(d) and 49 CFR § 384.403, funds withheld following a substantial noncompliance determination are no longer available for apportionment to New York. Further, DMV may also be subject to decertification of its CDL program in accordance with 49 U.S.C. § 31312 and 49 CFR § 384.405.

If DMV persists in substantial noncompliance with the standards set forth in 49 CFR §§ 384.212 and 384.225 in subsequent years, FMCSA may withhold up to eight percent of the National Highway Performance Program and the Surface Transportation Block Grant Program funds beginning in Fiscal Year (FY) 2028 that would otherwise be apportioned to New York under 23 U.S.C. §§ 104(b)(1) and (2), which totals approximately $147,005,086.[10]

### IV. Conclusion

FMCSA is deeply disappointed by DMV's refusal to take the necessary corrective actions set forth in the Preliminary Determination. The withholding of Federal funds is the direct and necessary consequence of New York's own actions and its demonstrated disregard for Federal safety standards. The Agency remains committed to working with DMV officials to bring New York's CDL program into substantial compliance to ensure that further withholding of funds or decertification of New York's CDL program is unnecessary.

---

[10] FMCSA calculates this amount based on FY 2026 funding levels.

7

**A45**

Please direct all questions regarding this Notice to Philip Thomas, Acting Associate Administrator for Safety, at philip.thomas@dot.gov.

Sincerely,

Derek D. Barrs
Administrator

8

**A46**

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF SECOND CIRCUIT**

| |
|---|
| THE STATE OF NEW YORK; NEW YORK STATE DEPARTMENT OF MOTOR VEHICLES, |
| Petitioners, |
| v. |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, et al. |
| Respondents. |

Case No. 26-1097

**DECLARATION OF JASEN CATALFAMO**

Pursuant to 28 U.S.C. § 1746, I, Jasen Catalfamo, declare as follows:

**<u>Introduction</u>**

1.    I am the Director of Compliance, Vehicle Safety and Driver Licensing at the New York Department of Motor Vehicles (DMV). I have held that position since July 2024. My responsibilities include general oversight of DMV's Commercial Driver's License Program and compliance with state and federal regulations.

2.    As the Director of Compliance, Vehicle Safety and Driver Licensing, I am familiar with the processes for issuing and renewing commercial driver's licenses in the State of New York, the requirements for doing so under federal and New York law, and the annual program review conducted by the Federal Motor Carrier Safety Administration (FMCSA). I make this declaration as a representative of DMV, in part based on DMV business records and in part based on my personal knowledge and experience, as well as representations made by DMV staff as to commercial driver's license/commercial learner's permit program requirements. In these

capacities, I am familiar with, and if called upon to do so, would be competent to testify as to the facts and circumstances set forth herein.

**Overview of New York's Commercial Driver's License Program**

3.      The procedures and standards for issuance of commercial driver's licenses (CDLs) and commercial learner's permits (CLPs) in New York are governed by Vehicle and Traffic Law § 501 et seq., regulations set forth at 15 N.Y.C.R.R. part 3, and the New York State Commercial Driver's License Manual.[1]

4.      CDLs in New York are available in three distinct classes. These include classes A (tractor-trailer), B (bus or single-unit truck), and C (truck, bus, or stretch limo). To qualify for a CDL, an applicant must be a New York State resident and at least 18 years old.[2] Applicants for certain types of CDLs may be required to undergo a medical examination. In addition, an applicant must already have a conventional New York State driver's license or a valid CDL from another state.

5.      To obtain a CLP, the applicant must pass a written knowledge test covering information contained in New York's Commercial Driver's License Manual. To then obtain a CDL, the applicant must complete a driver training course and pass a skills test, during which the applicant must be able to understand and respond to verbal commands and instructions in English.

6.      Applicants who are U.S. citizens or lawful permanent residents must provide proof of citizenship or unrestricted lawful permanent residency at a DMV office as part of the application process.

---

[1] New York Dep't of Motor Vehicles, *New York State Commercial Driver's License (CDL) Manual* (n.d.), https://dmv.ny.gov/driver-license/commercial-drivers/new-york-state-commercial-drivers-manual.

[2] Applicants under the age of 21 are subject to additional restrictions not applicable to other drivers.

7.      Applicants from a foreign jurisdiction, other than Mexico or Canada, may obtain a "nondomiciled" CDL or CLP.[3] The term "nondomiciled" refers to individuals who live in the United States temporarily but consider another country their permanent home.[4] This category includes Deferred Action for Childhood Arrivals (DACA) recipients, temporary visitors, nonimmigrants, asylees, and refugees. States are permitted to issue nondomiciled CDLs and CLPs pursuant to 49 C.F.R. §§ 383.23(b), 383.71(f), 383.73(f), and 384.212(a).[5] These regulations provide that a person may obtain a nondomiciled CDL or CLP if the person is not domiciled in a foreign jurisdiction that the Administrator has determined tests drivers and issues CDLs in accordance with, or under standards similar to, federal standards. *See* 49 CFR §§ 383.23(b)(1), 383.71(f)(1)(i).

8.      For nondomiciled applicants, the process for obtaining a commercial license is largely the same as it is for applicants who are citizens or permanent residents. All of the same training and testing requirements apply with one exception. In lieu of demonstrating proof of citizenship or unrestricted lawful permanent residency, applicants for a nondomiciled CDL or CLP must show proof of lawful presence and employment authorization in the United States, via an unexpired employment authorization document (EAD) or an unexpired foreign passport accompanied by an approved I-94 form. 49 C.F.R. § 383.71(f)(2)(i).

---

[3] Canadian and Mexican drivers who have valid equivalent CDLs from those countries may continue to use them to drive commercial motor vehicles in the United States and therefore do not need and are not eligible for CDLs issued by States. *See* Federal Motor Carrier Safety Admin., *Which Foreign Country's Commercial Licenses Are Reciprocally Recognized for Operating a CMV in the United States?* (Mar. 5, 2018), https://www.fmcsa.dot.gov/international-programs/which-foreign-countrys-commercial-licenses-are-reciprocally-recognized.

[4] The term also includes individuals domiciled in another state that is prohibited from issuing CDLs. *See* 49 C.F.R. §§ 383.5, 383.23(b)(1).

[5] In September 2025, FMCSA issued an Interim Final Rule modifying certain regulations relevant to the issuance of CDLs and CLPs. Although the Interim Final Rule was stayed, *see Lujan v. Federal Motor Carrier Safety Admin.*, No. 25-1215, 2025 WL 3182504 (D.C. Cir. Nov. 13, 2025), FMCSA subsequently issued a Final Rule implementing the same changes. The Final Rule went into effect in March 2026. *See Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses*, 91 Fed. Reg. 7044 (Feb. 13, 2026) (the "Final Rule"). Unless otherwise stated, all citations to FMCSA's regulations refer to the version in effect prior to September 2025, under which all of the CDLs and CLPs relevant to this matter were issued.

3

**A49**

9.      Applicants who cannot provide proof of legal presence and employment authorization valid at the time of their application will not be issued a CDL or CLP. Likewise, CDL holders must provide valid proof of legal presence and employment authorization every time they are required to renew their CDL. This requirement is laid out in the New York State Commercial Driver's License Manual, which states that "[a]pplicants from a foreign jurisdiction must provide proof of your legal presence at a DMV office *for every transaction*." (*See* Ex. A, App. 63 (emphasis added).)

10.     Under the federal provisions applicable during the relevant time period, CLPs had to expire within a maximum period of one year after issuance, 49 C.F.R. §§ 383.25(c), 383.73(a)(3), and CDLs had to expire within a maximum period of eight years after issuance, *id.* § 383.73(b)(9).[6] Apart from these rules, no other provision in FMCSA's regulations specifies the means of calculating expiration dates for standard or nondomiciled CDLs and CLPs, or links expiration dates to an applicant's lawful status, which the federal government often renews, extends, or otherwise makes permanent.

11.     Consistent with federal requirements, it has long been DMV's practice to issue domiciled and nondomiciled CDLs with a default expiration date of five years after the initial license issuance. Upon renewal, CDLs are issued with a default expiration date of eight years after issuance. Both domiciled and nondomiciled CLPs have long been issued with a default expiration date of one year after issuance. Given the frequency with which the federal government renews,

---

[6] Section 383.73(f)(2) provides that the procedures for issuing a nondomiciled CLP or CDL are "identical" to those for issuing any other CDL or CLP, apart from three exceptions not relevant here. 49 CFR § 383.73(f)(2). Thus, the provisions cited here—§§ 383.25(c), 383.73(a)(3), and 383.73(b)(9)—govern the validity period for both domiciled and nondomiciled CDLs and CLPs.

extends, and makes permanent lawful status, this approach improves efficiencies, and reduces the costs and operational barriers to participating in the economy as a commercial driver.[7]

12.     As of the time of the 2025 Annual Program Review of New York's CDL program, there were approximately 32,600 nondomiciled CDL/CLP holders in the State, representing approximately seven percent of the total CDLs/CLPs in issuance.[8]

**FMCSA's 2025 Annual Review and the Preliminary Notice of Noncompliance**

13.     Each state's CDL program is subject to an annual program review (APR) by FMCSA to determine whether it is in substantial compliance with federal requirements. 49 C.F.R. §§ 384.307(a), 384.309(a)(2). If, after performing such a review, FMCSA makes a preliminary determination that the state has not demonstrated substantial compliance with those requirements, the state is given thirty days to respond to the preliminary determination. *Id.* § 384.397(b)-(c). The state's response must explain the corrective actions it has taken, or intends to take, or, alternatively, why FMCSA's preliminary determination was wrong. In addition, the state may also request an informal conference with FMCSA. *Id.* § 384.307(c). Following a final determination of noncompliance, FMCSA may withhold up to four percent of a state's federal highway funds for the fiscal year following the state's first year of noncompliance. This withholding increases to up to eight percent of apportioned funds in subsequent, consecutive years of noncompliance. *See* 49 C.F.R. § 384.401(a)-(b). Following a determination of noncompliance, withheld funds are no longer available for apportionment to the state. *See* 49 C.F.R. § 384.403.

14.     Before the 2025 APR, FMCSA had never previously found DMV to be noncompliant with federal requirements. And by all available metrics, New York's CDL program

---

[7] A nondomiciled CDL or CLP that is REAL ID compliant is issued with an expiration date that does not exceed the driver's lawful presence documentation, as required under separate federal regulations applicable to REAL ID licenses. *See* 6 C.F.R. § 37.21(b)(1).

[8] As of October 2025, there were approximately 476,100 total CDL holders in the State.

is operating well. For example, as FMCSA's own data indicates, the number of fatal and nonfatal crashes involving trucks and buses in New York has steadily decreased from 2022 to 2025.[9] In addition, the CDL program has received the highest ratings category possible with respect to its safety reporting and record-keeping practices.[10]

15. The 2025 APR differed in several ways from prior audits. In May 2025, FMCSA contacted DMV to schedule a site visit in September, as it had consistently done in previous years. Several weeks later and after agreeing to a date in September, FMCSA advised DMV by email that it had accelerated the timeline for conducting the site visit. DMV accommodated this accelerated schedule, with the site visit ultimately taking place on July 15-17, 2025.[11] That site visit was attended by FMCSA State Program Manager Laura Dillon, along with Dustin Reinauer of FMCSA's regional office.

16. In the weeks leading up to and following that onsite visit, FMCSA sent, by email, several information requests to DMV that it had not made in previous annual reviews. For instance, FMCSA requested that DMV produce a complete list of all nondomiciled CDL and CLP holders in New York, along with checklists and statistics related to DMV's issuance of licenses to nondomiciled individuals.[12] Dillon attributed these new requests to a priority set by the new administration to find "unusual patterns or numbers or other irregularities with respect to non-

---

[9] *See* Federal Motor Carrier Safety Admin., *Crash Statistics* (n.d.), https://ai.fmcsa.dot.gov/CrashStatistics?tab=Summary&type=&report_id=1&crash_type_id=1&datasource_id=1&time_period_id=2&report_date=0&vehicle_type=1&state=NY&domicile=ALL&measure_id=1&operation_id=null; *see also* Federal Motor Carrier Safety Admin., *Crash Summary Report Description* (n.d.) (explaining that MCMIS data reports crashes involving trucks and buses reported by states to FMCSA), https:/ai.fmcsa.dot.gov/downloadfile.axd/CrashSummaryReportDescription.pdf.

[10] *See* Federal Motor Carrier Safety Admin., *State Data* (n.d.), https://ai.fmcsa.dot.gov/DataQuality/StateOverall.aspx?state=NY&sn=New%20York.

[11] (*See* Admin. R. (A.R.) 000001-000008 (Doc. 1).)

[12] (*See* A.R. 000009-000014 (Doc. 2); *see also* A.R. 000750-000751 (Doc. 5), 000817-000824 (Doc. 6), 000833-000835 (Doc. 7), 002056-002057 (Doc. 10), 002063-002064 (Doc. 13), 002066-002075 (Doc. 14), 002149-002160 (Doc. 18).)

domiciled CDL issuance."[13] DMV promptly provided the requested information and identified more than 32,600 active CDLs and CLPs issued to nondomiciled individuals.[14]

17. In early August, FMCSA sent DMV an email, containing several additional questions concerning whether DMV issues licenses to "undocumented immigrants." (*See* Ex. B., App. 65.)

18. Approximately one month later, FMCSA informed DMV by email that it would randomly select and review records and documents submitted for drivers with a "temporary visitor" status on their license. One week later, FMCSA requested to review, in-person, a larger sample of records drawn from 200 nondomiciled licenses. DMV again complied and, in late October 2025, representatives from FMCSA visited DMV to review the requested records.[15]

19. The October in-person review was attended by Dillon in addition to Bernard McWay, the Acting New York Division Administrator for FMCSA, and Summer Bowman, the CDL Program Manager for FMCSA's Eastern Service Center, among others. During the review, Dillon informed DMV personnel that any action resulting from its review would be coming from "headquarters."

**FMCSA's Preliminary Determination of Substantial Noncompliance**

20. On December 12, 2025, FMCSA issued a preliminary determination that New York had failed to meet the requirements for substantial compliance with CDL standards. (*See* App. 1-20.)

21. In its preliminary determination, FMCSA claimed that the sample of 200 records that it reviewed showed that 107 of the CDLs and CLPs issued to nondomiciled drivers failed to

---

[13] (*See* A.R. 002064 (Doc. 13); *see also* A.R. 000750-000751 (Doc. 5).)
[14] (*See* A.R. 000009 (Doc. 2).)
[15] (*See* A.R. 000837-000844 (Doc. 8), 002058-002060 (Doc. 11).)

comply with federal requirements. For 101 of those records, FMCSA asserted that DMV failed "to ensure that the non-domiciled CLP or CDL period of validity *did not exceed* the expiration of the driver's lawful presence documents." (App. 3.) FMCSA cited no express regulatory language or any other authority for this novel expiration-matching requirement, and DMV was and remains unaware of any statutory or regulatory basis for it. FMCSA claimed that the remaining six records were issued without valid proof of lawful presence in the United States.[16] (*See* App. 16.)

22. Based on its findings regarding these 107 records, FMCSA indicated that DMV must take a number of "corrective actions" to remedy these alleged deficiencies. In relevant part, FMCSA directed DMV to void or rescind all nondomiciled CDLs and CLPs that were issued with expiration dates that do not match the driver's lawful presence documentation; to provide to FMCSA the identities of all nondomiciled CDL and CLP holders whose licenses did not satisfy the novel expiration-matching requirement; and to pause the issuance and renewal of nondomiciled CDLs and CLPs until FMCSA is satisfied that these corrective actions had been implemented. (*See* App. 18.)

23. The preliminary determination threatened financial consequences if DMV did not comply with these directives. It advised that a final determination of substantial noncompliance may result in the withholding of up to four percent of the National Highway Performance Program and the Surface Transportation Block Grant Program funds that would otherwise be apportioned to New York under 23 U.S.C. § 104(b)(1) and (2), beginning in fiscal year 2027. The determination further advised that if New York's noncompliance persists beyond the first fiscal year, FMCSA may withhold up to eight percent of these funds in subsequent fiscal years. The determination

---

[16] As explained *infra*, FMCSA has since conceded that its findings with respect to five of these six records were erroneous, and that the evidence is otherwise "unclear" with respect to the sixth license.

indicated that once funds are withheld, they are no longer available for apportionment to New York in future years. (*See* App. 19.)

24.     FMCSA also threatened that a final determination of substantial noncompliance could result in decertification of New York's CDL program pursuant to 49 U.S.C. § 31312. Decertification would prohibit the State from issuing, renewing, transferring, or upgrading any CLPs and CDLs until FMCSA determines that New York is in substantial compliance with 49 U.S.C. § 31311 and 49 CFR Part 384, Subpart B. (*See* App. 19.)

25.     DMV sent a letter response to FMCSA on January 9, 2026. (App. 21-26.) In that letter, DMV noted that it had carefully reviewed the preliminary determination and each of the nondomiciled licenses that FMCSA had deemed noncompliant. DMV explained that it had determined from that review that it had issued all of the at-issue licenses in full compliance with federal requirements. In the case of the 101 licenses that FMCSA alleged did not satisfy its novel expiration-matching requirement, DMV noted that because federal law did not prohibit CDL or CLP expiration dates that extend beyond an initial term of lawful presence, in text or administrative practice, FMCSA's principal basis for the preliminary determination was unsupported. To better understand FMCSA's position, DMV requested that FMCSA provide any examples of prior guidance or statements from FMCSA or the U.S. Department of Transportation that specified expiration date requirements for nondomiciled CDLs and CLPs in a manner consistent with FMCSA's current view. (App. 22.)

26.     With respect to the other six licenses that FMCSA identified as noncompliant, DMV explained that it had carefully reviewed the underlying records associated with each of those licenses and found that FMCSA had apparently reviewed and relied upon outdated application information from prior transactions in reaching its findings. DMV further explained that its own

9

**A55**

review revealed that each of these licenses was also validly issued, and it attached additional supporting documentation showing as much.[17] (App. 23-24.) DMV closed its response letter with a request for an informal conference with FMCSA. (App. 26.)

27.     DMV and FMCSA met to discuss FMCSA's preliminary findings on February 10, 2026. The FMCSA attendees included Assistant Administrator and Senior Policy Advisor Michael Hampton, Director of Office of Safety Programs Patrick Nemons, Chief Counsel Rebecca Pettit, Senior Attorney Tracy White, in addition to McWay and Bowman, along with U.S. Department of Transportation Director of Enforcement and Compliance Thomas Liberatore, among others. Acting Commissioner Christian Jackstadt and Deputy Commissioner and General Counsel Joshua Vinciguerra attended on behalf of DMV.

28.     At that meeting, Nemons and other FMCSA personnel reiterated the agency's findings and reasoning, and stated that it did not wish to relitigate the issues related to the preliminary determination. FMCSA did not dispute that its nondomiciled CDL regulations governing the review period in question did not contain an explicit expiration-date requirement specific to nondomiciled CDLs and CLPs. And despite DMV's request, FMCSA failed to provide any examples of prior guidance or statements consistent with its current view. Instead, FMCSA personnel insisted during the informal conference that its novel interpretation is "inherent in the language" of its rules. When DMV asked FMCSA what due process protections it would extend to the nondomiciled CDL and CLP holders whose licenses would need to be voided under FMCSA's proposed corrective action plan, FMCSA replied that it was New York's responsibility to afford those protections pursuant to state law.

---

[17] As discussed *infra*, FMCSA later retracted its findings with respect to these six licenses.

10

29.     Following the informal conference, FMCSA sent DMV a follow-up letter on March 13, 2026. (App. 27-36.) The letter largely restated the findings and threatened consequences laid out in the preliminary determination, and reiterated its position that the supposed expiration-matching requirement was implicit to the "regulatory universe of non-domiciled CLPs and CDLs." (*See* App. 30.)

30.     With respect to the six records that FMCSA previously identified as noncompliant for other reasons, FMCSA conceded that five of the six nondomiciled CDLs at issue were properly issued with adequate documentation. With respect to the sixth record, FMCSA claimed that the evidence was "unclear" as to whether adequate documentation was provided at the time of license issuance. (*See* App. 32.)

31.     On March 23, 2026, DMV responded to FMCSA. (App. 37-38.) The response reiterated that DMV had issued nondomiciled CDLs and CLPs in full compliance with applicable federal laws and regulations, and FMCSA's preliminary finding to the contrary was grounded in legal error. DMV further emphasized that undertaking the "corrective actions" demanded by FMCSA would affect thousands of law-abiding license holders, and would harm industries and communities across New York that rely on those drivers for essential services. In view of DMV's assertion that FMCSA's preliminary determination was without merit, the letter indicated that the corrective actions demanded by FMCSA were unwarranted. (App. 37.)

**FMCSA's Final Determination of Substantial Noncompliance**

32.     On April 16, 2026, FMCSA issued a final determination, finding New York's CDL program substantially noncompliant with federal CDL standards. (App. 39-46.) The final determination was based solely on DMV's purported failure to abide by the expiration-matching

11
**A57**

rule, despite no such requirement existing in law or regulation at the time the 106 supposedly noncompliant licenses were issued.[18] (App. 39, 45.)

33.    As a penalty for DMV's supposed noncompliance, the final determination withholds four percent of New York's National Highway Performance Program and the Surface Transportation Block Grant Program funds (totaling approximately $73,502,543 annually), beginning in fiscal year 2027, and it threatens to withhold eight percent of apportioned funds (approximately $147,005,086 annually) in subsequent years if DMV fails to take the "corrective actions" mentioned above. The final determination indicates that, to avoid further withholdings, DMV may not recommence issuing or renewing any nondomiciled licenses until FMCSA provides written confirmation that these "corrective actions" have been satisfactorily implemented. (*See* App. 41, 45.)

34.    The Final Determination further threatens that DMV may be subject to decertification of its CDL program pursuant to 49 U.S.C. § 31312 and 49 CFR § 384.405. (*See* App. 45.)

**The Impacts of the Final Determination on the State and DMV**

34.    Decertification would have significant negative impacts on the State's revenues, its economy, and its commercial drivers. As an initial matter, New York collects substantial revenues from administering the testing and licensure requirements needed to obtain a CDL or CLP. In fiscal year 2024-2025 alone, these revenues amounted to approximately $10.8 million. These revenues would be lost if the State's CDL program were decertified in line with FMCSA's threats.

---

[18] This figure consists of the 101 CDLs initially cited in the preliminary determination, plus five of the six CDLs that FMCSA originally found were defective for not being issued pursuant to valid lawful presence and employment documentation. In the final determination, FMCSA concedes that its preliminary findings regarding those five licenses were incorrect, but it now asserts that they were also defective under the expiration-matching requirement. With respect to the sixth CDL, DMV similarly presented documentation demonstrating that it was validly issued, and FMCSA now solely alleges that that documentation "lacked sufficient clarity to rebut the determination of noncompliance." (App. 42.)

35.     In addition, as October 2025, there were approximately 476,100 total CDL holders in New York. These licenses support a broad range of jobs that represent a significant tax base for the State. For example, the State's commercial trucking industry pays approximately $22.5 billion in wages to New York drivers and approximately $1.1 billion in federal and state roadway taxes on annual basis.[19] And, as of 2023, there were approximately 115,000 trucking companies located in New York, many of which are small and locally owned.[20] If the State's CDL program were decertified, existing and prospective drivers would need to seek licensure in another state. At minimum, this would impose significant burdens and costs on New York commercial drivers, who would need to travel out of state for testing and license administration purposes. It would also deprive the State of its role in overseeing the safety and training of commercial drivers who operate in New York. Even worse, in some instances, existing and prospective drivers may need to relocate to another state because many states require proof of in-state residence as a mandatory prerequisite for the issuance of a CDL.[21] This displacement of drivers would represent a loss to the State's tax base, and would pose a significant obstacle to meeting the State's commercial driving needs— particularly in rural areas that are not near a neighboring state with an approved CDL program.

36.     At the same time, if DMV were forced to undertake FMCSA's "corrective actions," significant additional harms to New York drivers and numerous state interests would follow.

37.     New York's approximately 32,600 nondomiciled CDL licensees make up roughly seven percent of the State's pool of CDL holders. These are drivers with the same training, testing,

---

[19] *See* Trucking Ass'n of N.Y., *Fast Facts About the Trucking Industry* (n.d.), https://nytrucks.org/resources/fast-facts.
[20] *Id.*

[21] *See, e.g.*, Connecticut Dep't of Motor Vehicles, *Get a Commercial Driver's License* (requiring proof of Connecticut residency to obtain a CDL), https://portal.ct.gov/dmv/commercial-and-industry-services/get-commercial-driver-license; New Jersey Motor Vehicle Comm'n, *CDL Eligibility* (n.d.) (requiring proof of New Jersey residency to obtain a CDL), https://www.nj.gov/mvc/drivertopics/cdleligibility.htm; New Jersey Motor Vehicle Comm'n, *2025 New Jersey Driver Manual* 11 (n.d.) (requiring proof of New Jersey residency and possession of a basic New Jersey driver's license before being eligible for a CDL), https://www.nj.gov/mvc/pdf/license/drivermanual.pdf.

and safe driving records as domiciled CDL holders, and provide a range of critical services across the State, including commercial trucking, sanitation, agriculture, and public-transportation services, among others.

38. These 32,600 drivers and their families rely on their licenses for their livelihoods, and would suffer greatly if their CDLs were summarily voided or rescinded, as FMCSA demands. Importantly, many of these licensees will never be able to obtain new CDLs once they are cancelled. FMCSA's new regulations significantly restrict who is eligible for a CDL, prohibiting entire categories of immigrants (all Deferred Action for Childhood Arrivals recipients, for example), from receiving CDLs. *See* 91 Fed. Reg. at 7,044-45.

39. Relatedly, FMCSA's directive that DMV indefinitely "pause" the issuance and renewal of all nondomiciled CDLs and CLPs puts DMV and the State in an untenable position. Commercial drivers in New York are in urgent need of licenses and renewals that will allow them to work and to perform essential services. Because of the final determination, DMV cannot fulfill those necessary licensing transactions without risking future withholdings and/or decertification of the CDL program.

40. FMCSA's demand that DMV void or rescind "noncompliant" licenses and permits would also cause significant harm to communities across the State that rely on their services. Nondomiciled CDL holders work in industries ranging from commercial trucking to sanitation to school transportation to agriculture. Removing these individuals from the New York workforce would create immediate disruptions in these and other industries that would be felt by all New Yorkers. For example, approximately 1,600 Class B/C nondomiciled CDL holders serve as bus drivers for school districts. These drivers transport the children of tens of thousands of working families to and from school each day. Some of these children may have Individualized Education

14
**A60**

Programs, which may include federally required transportation services. FMCSA's order will make it more difficult, if not impossible, to provide federally mandated transportation for these children.

41.     Easing these shortages, to the extent possible, would require replacing these experienced nondomiciled CDL holders with newer, less experienced drivers, which will inevitably make the State's roads less safe for all drivers.

42.     Moreover, the work of retroactively voiding or rescinding as many as 32,600 licenses would place substantial administrative burdens on DMV. DMV is currently in the middle of a yearslong technological transformation in which it is retiring its legacy systems and implementing a new, more efficient and comprehensive system. Retroactively aligning CDL and CLP expiration dates with the proof-of-residency paperwork presented at the time of issuance would require a significant and unfunded technological undertaking. The DMV staff who would need to perform this work are already fully allocated to other critical projects. This process would also require bringing thousands of CDL holders into DMV offices to reproof and reissue documents, placing an enormous burden on DMV staff, CDL holders, and all other drivers who require DMV's services. And it would also involve significant expense in printing and mailing new licenses, permits, and explanatory letters.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Albany, New York, on July 6, 2026.


_/s/ Jasen Catalfamo_
Jasen Catalfamo
Director of Compliance, Vehicle Safety and Driver Licensing
New York Department of Motor Vehicles

15

**A61**

# Exhibit A

## 1.2 - Commercial Driver License (CDL) and Commercial Learner Permit (CLP) Classes, Endorsements & Restrictions

CDL and CLP classes, endorsements and restrictions are based on the type of CMV driven. The type of CMV is determined by the vehicle manufacturer's GVWR (for single vehicles) or GCWR (for combination vehicles), construction or use.  (Under the NYS VTL, CMV weight classifications are based on the **greater** of the following weights: manufacturer's GVWR or GCWR, registration weight, or actual weight of the vehicle(s) and load.)  CLP/CDL classes, endorsements and restrictions, therefore, correspond to vehicle weight, construction or use, as shown in Figure 1.1, 1.2 and 1.3 on page 1-2.

## 1.3 – Commercial Driver License and Commercial Learner Permit Requirements

New York State driver licensing standards comply with the federal laws related to commercial driver licenses (CDL) and commercial learner permits (CLP). To get a NYS CDL or CLP you must meet the following standards and requirements:

### 1.3.1 – Legal Presence Requirement

US citizens and Lawful Permanent Residents must provide proof of citizenship or unrestricted Lawful Permanent Residency at a DMV office. Once you have met this requirement in a DMV office you will not be required to prove your legal status again. Applicants from a foreign jurisdiction must provide proof of your legal presence at a DMV office for every transaction. Please refer to form ID-44CDL for a list of all the documents that you may submit as proof of US citizenship, Lawful Permanent Residency, or temporary legal presence.

### 1.3.2 – Residency Requirement

You must be a resident of New York State to be issued a NYS CLP or CDL.  One proof of residence is required to apply, transfer, renew, and amend your CLP/CDL. Please refer to form ID-44CDL for a list of all the documents that you may submit as proof of New York State residency.

A driver holding a CDL issued by another jurisdiction who moves to New York must apply for a NYS CDL within 30 days after establishing residency.  A new resident may apply to exchange a CDL issued by another jurisdiction for a NYS CDL (reciprocity).  *However, to keep a Hazardous Material (HazMat) endorsement, you must pay the test fee, take and pass the HazMat written knowledge test (a score of 80% is passing), and pay for and pass a background investigation. (See Section 9, Hazardous Materials.)*

### 1.3.3 – Age Requirement

Class A, B and C – You must be at least **18** years of age, *but if under 21, you can drive a CMV only for **intra**state commerce (within New York State), cannot transport students in a school bus, and cannot transport hazardous material.*

### 1.3.4 – Language Requirement

You must be able to read and speak the English language well enough to:

- converse with other people,
- understand highway traffic signs and signals in the English language,
- answer questions from officials,
- make entries on reports and records, and
- take skills tests as required for getting your CDL

# Exhibit B

| **From:** | Catalfamo, Jasen (DMV) <Jasen.Catalfamo@dmv.ny.gov> |
|---|---|
| **Sent:** | Tuesday, August 12, 2025 5:02 PM |
| **To:** | 'Dillon, Laura (FMCSA)' |
| **Cc:** | Noonan, Ryan (DMV); Wheaton, Tracey (DMV); DeThomasis, Joe (DMV) |
| **Subject:** | FW: ACTION: Undocumented Immigrants Licenses |

Good Afternoon Laura. Please see our responses below. Thank you.

---

**From:** Dillon, Laura (FMCSA) <laura.dillon@dot.gov>
**Sent:** Monday, August 11, 2025 3:06 PM
**To:** Wheaton, Tracey (DMV) <Tracey.Wheaton@dmv.ny.gov>
**Cc:** Noonan, Ryan (DMV) <Ryan.Noonan@dmv.ny.gov>
**Subject:** ACTION: Undocumented Immigrants Licenses

> *ATTENTION: This email came from an external source. Do not open attachments or click on links from unknown senders or unexpected emails.*

Good afternoon –

We have a request from the Office of Safety to reach for each SDLA to provide a response to the following two questions:

1. Does the SDLA issue a base license to undocumented immigrants? Please see NYS Vehicle and Traffic Law section 502.
2. Does the SDLA issue a CDL to undocumented immigrants? Please see NYS Vehicle and Traffic Law section 502 and please note the law distinguishes between commercial and non-commercial driver licenses.

Apologies for the quick turnaround, but if you could kindly provide a response by COB tomorrow, it would be great appreciated.

Thank you,


**Laura Dillon**, State Program Manager
*Eastern Service Center*
Federal Motor Carrier Safety Administration
11A Clinton Ave, Rm 700 | Albany, NY 12207
P: (518)431-6401 | M: (518) 727-0456 |
laura.dillon@dot.gov

 

U.S. Department
of Transportation

Federal Motor
Carrier Safety
Administration

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF SECOND CIRCUIT**

| | |
|---|---|
| THE STATE OF NEW YORK, et al.,<br><br>Petitioners,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>TRANSPORTATION, et al.<br><br>Respondents. | Case No. 26-1097 |

**DECLARATION OF JANET HO**

Pursuant to 28 U.S.C. § 1746, I, Janet Ho, declare as follows:

**Introduction**

1. I am the Assistant Commissioner for Finance & Integrated Modal Services for the New York State Department of Transportation (NYSDOT).

2. I have held this position for four years. My responsibilities include overseeing transportation budgeting and accounting; rail, aviation, and local programs; and the Public Transportation Bureau.

3. As Assistant Commissioner, I am familiar with the federal funding administered by the U.S. Department of Transportation ("U.S. DOT") through the National Highway Performance Program and the Surface Transportation Block Grant Program, and how those funds are allocated throughout the State. I make this declaration as a representative of NYSDOT. In my official capacity and based on my personal knowledge and other sources of information I have obtained and reviewed in that official capacity, I am familiar with, and if called upon to do so, would be competent to testify as to the facts and circumstances set forth herein.

1
**A66**

**New York State Department of Transportation**

4.      NYSDOT works to ensure that those who live, work, and travel in New York State have a safe, efficient, and reliable transportation system. NYSDOT has an extremely broad set of responsibilities relating to travel in New York. In addition to performing critical infrastructure inspections, NYSDOT maintains, designs, and constructs highways, bridges, and roads.

5.      In fact, NYSDOT is responsible for directly maintaining and improving approximately 40,500 miles of state highways and nearly 7,700 bridges, and it otherwise coordinates federal funding eligibility and inspections for nearly all of the 17,600 bridges that carry traffic throughout the State, regardless of ownership. In addition, NYSDOT plays a significant role in overseeing the safety and funding of locally operated transit systems, local highway and bridge construction, and rail and certain aviation travel. NYSDOT also ensures that highways are clear of snow and ice, flooding, fallen trees, and other obstructions.

6.      NYSDOT's spending on transportation results in jobs. The Federal Highway Administration, a division of U.S. DOT, projects that every $1 million spent on highway investment supports thirteen jobs.[1]

**Overview of Federal Transportation Grants to New York**

7.      It would be difficult to overstate the impact of federal funding on NYSDOT's work. Federal funds are used to advance projects that address critical safety needs, improve overall system performance, and promote economic growth. Approximately 55% of NYSDOT's current five-year plan for road and bridge projects is funded federally. Any interruption in funding— especially a decrease which continues year-after-year—would impede a significant portion of important projects that directly benefit the public.

---

[1] Federal Highway Admin., *Employment Impacts of Highway Infrastructure Investment* (n.d.), https://www.fhwa.dot.gov/policy/otps/pubs/impacts/.

2
**A67**

8.      Many of the U.S. DOT programs from which NYSDOT receives funding consist of formula funds that are mandated by Congress under various federal statutes. For these funding awards, the relevant appropriation statutes specify the total amount of funding available nationally and how those funds are to be allocated to each state.

**Federal Highway Administration Funding**

9.      As relevant here, NYSDOT receives the following formula funding from the Federal Highway Administration:

a. Pursuant to the National Highway Performance Program, NYSDOT has been apportioned over $5.9 billion to date (encompassing fiscal years 2022-2026) since the most recent authorization statute in 2021. The apportionment for 2026 was $1.2 billion.

b. Pursuant to the 2026 Surface Transportation Block Grant Program, NYSDOT has been apportioned $600 million. *See* 23 U.S.C. § 104(b)(1)-(2).

10.     These funds are used for core repairs to highways, roadways, and bridges. This apportioned funding was fully programmed into NYSDOT's current five-year capital plan, which was adopted in May 2022. NYSDOT relies on the continued availability of these federal formula funds in order to deliver on this five-year capital plan. Terminating a portion of this funding would undermine NYSDOT's important safety and other work as described in further detail below.

11.     For each region of the State, NYSDOT maintains a list of anticipated transportation projects through 2029 that are expected to receive federal funding.[2] As an example, the list for Region 10 (Suffolk and Nassau Counties), identifies dozens of new projects funded in part by the National Highway Performance Program and/or Surface Transportation Block Grant Program.[3]

---

[2] *See* New York Dep't of Transp., *STIP Project Listings – Latest Monthly Downloads* (July 1, 2026), https://www.dot.ny.gov/programs/stip/stip-project-rpt.

[3] *See* New York Dep't of Transp., *STIP Project List (PDF) – Long Island (10)* (n.d.), https://www.dot.ny.gov/programs/stip/files/R10.pdf.

Any of these projects that receives money from these federal programs is currently under threat if funding is withheld.

**FMCSA's Final Determination**

12. FMCSA issued a final determination, finding the State in substantial noncompliance with federal commercial driver's license (CDL) requirements, on April 16, 2026. The final determination letter sets forth a penalty of four percent of the National Highway Performance Program and the Surface Transportation Block Grant Program funds for fiscal year 2027, which will likely amount to approximately $73.5 million in funds withheld. For every year of noncompliance thereafter, the penalty increases to eight percent of those funds, or approximately $147 million withheld.

13. These cuts are carried forward to future fiscal years, and the cancelled funding is lost permanently even if FMCSA determines in the future that New York has come into compliance with the CDL requirements in question. In other words, NYSDOT will lose approximately $73.5 million in funding in *all* future years, even if New York's alleged noncompliance is remedied. If New York were to remain allegedly noncompliant for two years, triggering the eight percent withholding in all future years, the total loss to the State would be approximately $1.4 billion after ten years.

14. Penalties in these amounts would severely impact critical safety and infrastructure projects throughout the State. NYSDOT uses funds from the National Highway Performance Program and Surface Transportation Block Grant Program for projects such as bridge replacements and repairs, and culvert maintenance and construction. If NYSDOT were to lose funding in the amounts projected above, numerous such projects would have to be delayed. The first year's threatened funding alone is significant enough to fund fifteen bridge replacements or forty-eight

4

**A69**

large culvert projects. The loss of this funding would necessitate delays of important projects, or reallocating funding in a way that may delay other critical priorities. And as this loss of funding is not a one-time penalty, these impacts would compound over time.

15. The ultimate result of these withholdings will be the deterioration of New York's transportation infrastructure and delayed efforts to remediate that deterioration, leading to increased risks to public safety, and additional financial impacts as costs of material, equipment, and labor rise over time. Critical failures of transportation infrastructure due to lack of funding for these necessary projects could follow.

16. Moreover, the uncertainty in funding caused by the final determination threatens NYSDOT's ability to adequately plan for future projects. NYSDOT is currently operating under a five-year capital plan that runs through the 2026-2027 fiscal year.[4] NYSDOT is in the process of developing its next five-year capital plan, which includes the projects that NYSDOT plans to fund through the 2031-2032 fiscal year. The uncertain status of a substantial portion of NYSDOT's federal funding creates significant obstacles in developing that plan, and will require NYSDOT to make assumptions about funding that NYSDOT might never receive.

17. In these ways, the impending loss of U.S. DOT funding will severely undermine NYSDOT's mission and obstruct its efforts to carry out its duties to maintain and improve New York's transportation infrastructure and services. In turn, these withholdings will harm virtually all New Yorkers; all people traveling through New York, including truckers transporting goods; and anyone else who relies on transportation of any kind in the State. Safety, security, and commerce will all be negatively affected..

---

[4] New York Dep't of Transp., *State Fiscal Year 2022-23/2026-27 Transportation Capital Plan* (May 10, 2022), https://www.dot.ny.gov/programs/capital-plan/repository/DOT 5yr Capital Plan MOU Final SIGNED.pdf.

5

**A70**

I declare under penalty of perjury that the foregoing is true and correct. Executed in Albany, New York, on July 6, 2026.

/s/ Janet Ho

Janet Ho
Assistant Commissioner for Finance & Integrated Modal Services
New York State Department of Transportation

6

United States Code Annotated
  Title 49. Transportation (Refs & Annos)
    Subtitle VI. Motor Vehicle and Driver Programs
      Part B. Commercial
        Chapter 313. Commercial Motor Vehicle Operators (Refs & Annos)

49 U.S.C.A. § 31311

§ 31311. Requirements for State participation

Effective: December 17, 2024

Currentness

**(a)** General.--To avoid having amounts withheld from apportionment under section 31314 of this title, a State shall comply with the following requirements:

(1) The State shall adopt and carry out a program for testing and ensuring the fitness of individuals to operate commercial motor vehicles consistent with the minimum standards prescribed by the Secretary of Transportation under section 31305(a) of this title.

(2) The State may issue a commercial driver's license to an individual only if the individual passes written and driving tests for the operation of a commercial motor vehicle that comply with the minimum standards.

(3) The State shall have in effect and enforce a law providing that an individual with a blood alcohol concentration level at or above the level established by section 31310(a) of this title when operating a commercial motor vehicle is deemed to be driving under the influence of alcohol.

(4) The State shall authorize an individual to operate a commercial motor vehicle only by issuing a commercial driver's license containing the information described in section 31308(3) of this title.[1]

(5) Not later than the time period prescribed by the Secretary by regulation, the State shall notify the Secretary or the operator of the information system under section 31309 of this title, as the case may be, of the proposed issuance of the license and other information the Secretary may require to ensure identification of the individual applying for the license.

(6) Before issuing a commercial driver's license to an individual or renewing such a license, the State shall request from any other State that has issued a driver's license to the individual all information about the driving record of the individual.

(7) Not later than 30 days after issuing a commercial driver's license, the State shall notify the Secretary or the operator of the information system under section 31309 of this title, as the case may be, of the issuance.

(8) Not later than 10 days after disqualifying the holder of a commercial driver's license from operating a commercial motor vehicle (or after revoking, suspending, or canceling the license) for at least 60 days, the State shall notify the Secretary or the operator of the information system under section 31309 of this title, as the case may be, and the State that issued the license, of the disqualification, revocation, suspension, or cancellation, and the violation that resulted in the disqualification, revocation, suspension, or cancellation shall be recorded.

**A72**

(9) If an individual violates a State or local law on motor vehicle traffic control (except a parking violation) and the individual--

  (A) has a commercial driver's license issued by another State; or

  (B) is operating a commercial vehicle without a commercial driver's license and has a driver's license issued by another State,

  the State in which the violation occurred shall notify a State official designated by the issuing State of the violations not later than 10 days after the date the individual is found to have committed the violation.

(10)(A) The State may not issue a commercial driver's license to an individual during a period in which the individual is disqualified from operating a commercial motor vehicle or the individual's driver's license is revoked, suspended, or canceled.

(B) The State may not issue a special license or permit (including a provisional or temporary license) to an individual who holds a commercial driver's license that permits the individual to drive a commercial motor vehicle during a period in which--

  (i) the individual is disqualified from operating a commercial motor vehicle; or

  (ii) the individual's driver's license is revoked, suspended, or canceled.

(11) The State may issue a commercial driver's license to an individual who has a commercial driver's license issued by another State only if the individual first returns the driver's license issued by the other State.

(12)(A) Except as provided in subparagraphs (B) and (C), the State may issue a commercial driver's license only to an individual who operates or will operate a commercial motor vehicle and is domiciled in the State.

(B) Under regulations prescribed by the Secretary, the State may issue a commercial driver's license to an individual who--

  (i) operates or will operate a commercial motor vehicle; and

  (ii) is not domiciled in a State that issues commercial driver's licenses.

(C) The State may issue a commercial driver's license to an individual who--

  (i) operates or will operate a commercial motor vehicle;

  (ii) is an active duty member of--

    (I) the armed forces (as that term is defined in section 101(a) of title 10); or

    (II) the reserve components (as that term is defined in section 31305(d)(2) of this title); and

  (iii) is not domiciled in the State, but whose temporary or permanent duty station is located in the State.

(13) The State shall impose penalties consistent with this chapter that the State considers appropriate and the Secretary approves for an individual operating a commercial motor vehicle.

**A73**

(14) The State shall allow an individual to operate a commercial motor vehicle in the State if--

(A) the individual has a commercial driver's license issued by another State under the minimum standards prescribed by the Secretary under section 31305(a) of this title;

(B) the license is not revoked, suspended, or canceled; and

(C) the individual is not disqualified from operating a commercial motor vehicle.

(15) The State shall disqualify an individual from operating a commercial motor vehicle for the same reasons and time periods for which the Secretary shall disqualify the individual under subsections (b) to (e), (i)(1)(A) and (i)(2) of section 31310.

(16)(A) Before issuing a commercial driver's license to an individual, the State shall request the Secretary for information from the National Driver Register maintained under chapter 303 of this title (after the Secretary decides the Register is operational) on whether the individual--

(i) has been disqualified from operating a motor vehicle (except a commercial motor vehicle);

(ii) has had a license (except a license authorizing the individual to operate a commercial motor vehicle) revoked, suspended, or canceled for cause in the 3-year period ending on the date of application for the commercial driver's license; or

(iii) has been convicted of an offense specified in section 30304(a)(3) of this title.

(B) The State shall give full weight and consideration to that information in deciding whether to issue the individual a commercial driver's license.

(17) The State shall adopt and enforce regulations prescribed by the Secretary under as[2] 31310(j) of this title.

(18) The State shall maintain, as part of its driver information system, a record of each violation of a State or local motor vehicle traffic control law while operating a motor vehicle (except a parking violation) for each individual who holds a commercial driver's license. The record shall be available upon request to the individual, the Secretary, employers, prospective employers, State licensing and law enforcement agencies, and their authorized agents.

(19) The State shall--

(A) record in the driving record of an individual who has a commercial driver's license issued by the State; and

(B) make available to all authorized persons and governmental entities having access to such record,

all information the State receives under paragraph (9) with respect to the individual and every violation by the individual involving a motor vehicle (including a commercial motor vehicle) of a State or local law on traffic control (except a parking violation), not later than 10 days after the date of receipt of such information or the date of such violation, as the case may be. The State may not allow information regarding such

**A74**

violations to be withheld or masked in any way from the record of an individual possessing a commercial driver's license.

(20) The State shall revoke, suspend, or cancel the commercial driver's license of an individual in accordance with regulations issued by the Secretary to carry out section 31310(g).

(21) The State shall operate a commercial driver's license information system that is compatible with the modernized commercial driver's license information system under section 31309.

(22) The State shall report a conviction of a foreign commercial driver by that State to the Federal Convictions and Withdrawal Database, or another information system designated by the Secretary to record the convictions. A report shall include--

(A) for a driver holding a foreign commercial driver's license--

(i) each conviction relating to the operation of a commercial motor vehicle; and

(ii) each conviction relating to the operation of a non-commercial motor vehicle; and

(B) for an unlicensed driver or a driver holding a foreign non-commercial driver's license, each conviction relating to the operation of a commercial motor vehicle.

(23) Not later than 1 year after the date of enactment of the Commercial Motor Vehicle Safety Enhancement Act of 2012, the State shall implement a system and practices for the exclusive electronic exchange of driver history record information on the system the Secretary maintains under section 31309, including the posting of convictions, withdrawals, and disqualifications.

(24) Before renewing or issuing a commercial driver's license to an individual, the State shall request information pertaining to the individual from the drug and alcohol clearinghouse maintained under section 31306a.

(25) Not later than 5 years after the date of enactment of the Commercial Motor Vehicle Safety Enhancement Act of 2012, the State shall establish and maintain, as part of its driver information system, the capability to receive an electronic copy of a medical examiner's certificate, from a certified medical examiner, for each holder of a commercial driver's license issued by the State who operates or intends to operate in interstate commerce.

\* \* \*

**A75**

United States Code Annotated
  Title 49. Transportation (Refs & Annos)
    Subtitle VI. Motor Vehicle and Driver Programs
      Part B. Commercial
        Chapter 313. Commercial Motor Vehicle Operators (Refs & Annos)

49 U.S.C.A. § 31314

§ 31314. Withholding amounts for State noncompliance

Effective: October 1, 2012

Currentness

**(a)** First fiscal year.--The Secretary of Transportation shall withhold up to 5 percent of the amount required to be apportioned to a State under section 104(b)(1), (3), and (4) of title 23 on the first day of the fiscal year after the first fiscal year beginning after September 30, 1992, throughout which the State does not comply substantially with a requirement of section 31311(a) of this title.

**(b)** Second fiscal year.--The Secretary shall withhold up to 10 percent of the amount required to be apportioned to a State under section 104(b)(1), (3), and (4) of title 23 on the first day of each fiscal year after the 2d fiscal year beginning after September 30, 1992, throughout which the State does not comply substantially with a requirement of section 31311(a) of this title.

**(c)** Penalties imposed in fiscal year 2012 and thereafter.--Effective beginning on October 1, 2011--

(1) the penalty for the first instance of noncompliance by a State under this section shall be not more than an amount equal to 4 percent of funds required to be apportioned to the noncompliant State under paragraphs (1) and (2) of section 104(b) of title 23; and

(2) the penalty for subsequent instances of noncompliance shall be not more than an amount equal to 8 percent of funds required to be apportioned to the noncompliant State under paragraphs (1) and (2) of section 104(b) of title 23.

**(d)** Availability for apportionment.--Amounts withheld under this section from apportionment to a State after September 30, 1995, are not available for apportionment to the State.

**A76**

Code of Federal Regulations - 2024

Code of Federal Regulations
  Title 49. Transportation
    Subtitle B. Other Regulations Relating to Transportation
      Chapter III. Federal Motor Carrier Safety Administration, Department of Transportation (Refs & Annos)
        Subchapter B. Federal Motor Carrier Safety Regulations
          Part 383. Commercial Driver's License Standards; Requirements and Penalties (Refs & Annos)
            Subpart B. Single License Requirement

49 C.F.R. § 383.23

§ 383.23 Commercial driver's license.

Effective: November 27, 2018

Currentness

\* \* \*

(b) Exception.

(1) If a CMV operator is not domiciled in a foreign jurisdiction that the Administrator has determined tests drivers and issues CDLs in accordance with, or under standards similar to, the standards contained in subparts F, G, and H of this part,[11] the person may obtain a Non-domiciled CLP or Non-domiciled CDL from a State that does comply with the testing and licensing standards contained in such subparts F, G, and H of this part, so long as that person meets the requirements of § 383.71(f).

(2) If an individual is domiciled in a State while that State is prohibited from issuing CDLs in accordance with § 384.405 of this subchapter, that individual is eligible to obtain a Non-domiciled CLP or Non-domiciled CDL from any State that elects to issue a Non-domiciled CDL and which complies with the testing and licensing standards contained in subparts F, G, and H of this part, so long as that person meets the requirements of § 383.71(f).

(3) If an individual possesses a CLP, as defined in § 383.5, the individual is authorized to operate a class of CMV as provided by the CLP in accordance with § 383.25.

---

[1] Effective December 29, 1988, the Administrator determined that commercial driver's licenses issued by Canadian Provinces and Territories in conformity with the Canadian National Safety Code are in accordance with the standards of this part. Effective November 21, 1991, and as amended on January 19, 2017, the Administrator determined that the new Licencias Federales de Conductor issued by the United Mexican States are in accordance with the standards of this part. Therefore, under the single license provision of § 383.21, a driver holding a commercial driver's license issued under the Canadian National Safety Code or a new Licencia Federal de Conductor issued by Mexico is prohibited from obtaining a non-domiciled CDL, or any other type of driver's license, from a State or other jurisdiction in the United States.

**A77**

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.   1

Code of Federal Regulations - 2024

Code of Federal Regulations
  Title 49. Transportation
    Subtitle B. Other Regulations Relating to Transportation
      Chapter III. Federal Motor Carrier Safety Administration, Department of Transportation (Refs & Annos)
        Subchapter B. Federal Motor Carrier Safety Regulations
          Part 383. Commercial Driver's License Standards; Requirements and Penalties (Refs & Annos)
            Subpart E. Testing and Licensing Procedures (Refs & Annos)

49 C.F.R. § 383.71

§ 383.71 Driver application and certification procedures.

Effective: October 14, 2021

Currentness

\* \* \*

**(f)** Non-domiciled CLP and CDL.

(1) A person must obtain a Non-domiciled CLP or CDL:

(i) If the applicant is domiciled in a foreign jurisdiction, as defined in § 383.5, and the Administrator has not determined that the commercial motor vehicle operator testing and licensing standards of that jurisdiction meet the standards contained in subparts G and H of this part.

(ii) If the applicant is domiciled in a State that is prohibited from issuing CLPs and CDLs in accordance with § 384.405 of this subchapter. That person is eligible to obtain a Non-domiciled CLP or CDL from any State that elects to issue a Non-domiciled CLP or CDL and that complies with the testing and licensing standards contained in subparts F, G, and H of this part.

(2) An applicant for a Non-domiciled CLP and CDL must do both of the following:

(i) Complete the requirements to obtain a CLP contained in paragraph (a) of this section or a CDL contained in paragraph (b) of this section. Exception: An applicant domiciled in a foreign jurisdiction must provide an unexpired employment authorization document (EAD) issued by USCIS or an unexpired foreign passport accompanied by an approved I–94 form documenting the applicant's most recent admittance into the United States. No proof of domicile is required.

(ii) After receipt of the Non-domiciled CLP or CDL, and for as long as it is valid, notify the State which issued the Non-domiciled CLP or CDL of any adverse action taken by any jurisdiction or governmental agency, foreign or domestic, against his/her driving privileges. Such adverse actions include, but are not be limited to, license disqualification or disqualification from operating a commercial motor vehicle for the convictions described in § 383.51. Notifications must be made within the time periods specified in § 383.33.

(3) An applicant for a Non-domiciled CLP or CDL is not required to surrender his/her foreign license.

\* \* \*

**A78**

Code of Federal Regulations - 2024

Code of Federal Regulations
  Title 49. Transportation
    Subtitle B. Other Regulations Relating to Transportation
      Chapter III. Federal Motor Carrier Safety Administration, Department of Transportation (Refs & Annos)
        Subchapter B. Federal Motor Carrier Safety Regulations
          Part 383. Commercial Driver's License Standards; Requirements and Penalties (Refs & Annos)
            Subpart E. Testing and Licensing Procedures (Refs & Annos)

49 C.F.R. § 383.73

§ 383.73 State procedures.

Effective: September 29, 2022

Currentness

**(a)** Commercial Learner's Permit. Prior to issuing a CLP to a person, a State must:

\* \* \*

(3) Make the CLP valid for no more than one year from the date of issuance without requiring the CLP holder to retake the general and endorsement knowledge tests. CLPs issued for a period of less than one year may be renewed provided the CLP is not valid for more than one year from the date of initial issuance.

\* \* \*

**(c)** License transfers. Prior to issuing a CDL to a person who has a CDL from another State, a State must:

\* \* \*

(9) Make the CDL valid for no more than 8 years from the date of issuance; and

\* \* \*

**(f)** Non-domiciled CLP and CDL.

(1) A State may only issue a Non-domiciled CLP or CDL to a person who meets one of the circumstances described in § 383.71(f)(1).

(2) State procedures for the issuance of a non-domiciled CLP and CDL, for any modifications thereto, and for notifications to the CDLIS must at a minimum be identical to those pertaining to any other CLP or CDL, with the following exceptions:

(i) If the applicant is requesting a transfer of his/her Non-domiciled CDL, the State must obtain the Non-domiciled CDL currently held by the applicant and issued by another State;

(ii) The State must add the word "non-domiciled" to the face of the CLP or CDL, in accordance with § 383.153(c); and

(iii) The State must have established, prior to issuing any Non-domiciled CLP or CDL, the practical capability of disqualifying the holder of any Non-domiciled CLP or CDL,

**A79**

by withdrawing or disqualifying his/her Non-domiciled CLP or CDL as if the Non-domiciled CLP or CDL were a CLP or CDL issued to a person domiciled in the State.

(3) The State must require compliance with the standards for providing proof of legal presence specified in § 383.71(b)(9) and § 383.71(f)(2)(i).

(4) Beginning November 18, 2024, the State must request information from the Drug and Alcohol Clearinghouse. If, in response to that request, the State receives notification that pursuant to § 382.501(a) of this chapter the applicant is prohibited from operating a commercial motor vehicle, the State must not issue, renew, transfer or upgrade a non-domiciled CLP or CDL and must comply with the procedures set forth in paragraph (q) of this section, as applicable.

\* \* \*

**A80**

Code of Federal Regulations - 2024

Code of Federal Regulations
  Title 49. Transportation
    Subtitle B. Other Regulations Relating to Transportation
      Chapter III. Federal Motor Carrier Safety Administration, Department of Transportation (Refs & Annos)
        Subchapter B. Federal Motor Carrier Safety Regulations
          Part 384. State Compliance with Commercial Driver's License Program (Refs & Annos)
            Subpart B. Minimum Standards for Substantial Compliance by States (Refs & Annos)

49 C.F.R. § 384.212
§ 384.212 Domicile requirement.
Effective: October 2, 2014
Currentness

(a) The State may issue CDLs or CLPs only to persons for whom the State is the State of domicile as defined in § 383.5 of this subchapter; except that the State may issue a Non-domiciled CLP or CDL under the conditions specified in §§ 383.23(b), 383.71(f), and 383.73(f) of this subchapter.

(b) The State must require any person holding a CDL issued by another State to apply for a transfer CDL from the State within 30 days after establishing domicile in the State, as specified in § 383.71(c) of this subchapter.

**A81**