# No. 26-1097

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

STATE OF NEW YORK, NEW YORK STATE DEPARTMENT OF
MOTOR VEHICLES,

*Petitioners,*

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION, SEAN
DUFFY, in his official capacity as Secretary of the Department of
Transportation, FEDERAL MOTOR CARRIER SAFETY
ADMINISTRATION, DEREK BARRS, in his official capacity as
Administrator of the Federal Motor Carrier Safety Administration,

*Respondents.*

On Petition for Review of a Final Determination of
the Federal Motor Carrier Safety Administration

## *AMICI CURIAE* BRIEF OF IMMIGRANT AND WORKERS RIGHTS ADVOCATES IN SUPPORT OF PETITIONERS

Munmeeth Kaur Soni
The Sikh Coalition
165 Broadway, 23rd Floor
New York, NY 10006
Tel: (212) 655-3095

Joshua Rosenthal
Katherine Zhao
Asian Law Caucus
55 Columbus Ave
San Francisco, CA 94111
Tel: (415) 896-1701

*Counsel for Amici Curiae*

## RULE 29(A)(4)(A) DISCLOSURE STATEMENT

Pursuant to Rule 29(a)(4)(A) of the Federal Rules of Appellate Procedure ("FRAP"), counsel for *amici curiae* certify that no *amicus* has a parent corporation and that no publicly held corporation owns 10 percent or more of any *amicus'* stock.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................... 1

ARGUMENT ............................................................................................ 3

I.  FMCSA's Unacknowledged Change in Position on the
    Expiration Date Issue was Arbitrary and Capricious .................... 3

    A.  FMCSA's New Expiration Date Policy Was a Change
        from its Prior Position ............................................................ 5

    B.  FMCSA Falsely Denied that it Changed Position ................. 6

    C.  FMCSA Failed to Consider Serious Reliance Interests ........ 8

        a.  Drivers' Reliance Interests ........................................... 10

        b.  Employers' Reliance Interests ..................................... 15

II. FMCSA's Determination is Arbitrary and Capricious for
    Failing to Consider Alternatives and the Harm from its
    Chosen Approach ........................................................................ 17

    A.  FMCSA Failed to Consider Alternatives to its
        Determination ...................................................................... 17

    B.  FMCSA Failed to Consider the Foreseeable Harms that
        Would Flow from its Determination, as Opposed to
        Alternatives ......................................................................... 19

CONCLUSION ...................................................................................... 22

CERTIFICATE OF COMPLIANCE ......................................................... 24

CERTIFICATE OF SERVICE .................................................................. 25

# TABLE OF AUTHORITIES

**Cases**                                                                       **Page(s)**

*Cboe Glob. Markets, Inc. v. Sec. & Exch. Comm'n,*
155 F.4th 704 (D.C. Cir. 2025) ....................................................... 7

*Cleveland v. United States,*
531 U.S. 12 (2000) ........................................................................ 13

*Dep't of Homeland Sec. v. Regents of the Univ. of California,*
591 U.S. 1 (2020) .................................................................. *passim*

*Encino Motorcars, LLC v. Navarro,*
579 U.S. 211 (2016) ............................................................. *passim*

*F.C.C. v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009) ............................................................. *passim*

*Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.,*
604 U.S. 542 (2025) ..................................................... 3, 5, 6, 9, 16

*Lujan Rivera v. FMCSA,*
No. 26-1032 (D.C. Cir.) ................................................................ 14

*Mendoza v. Perez,*
754 F.3d 1002 (D.C. Cir. 2014) ...................................................... 6

*United States v. Nixon,*
418 U.S. 683 (1974) ....................................................................... 7

**Federal Statutes**

5 U.S.C. § 706(2)(A) ...................................................................... 3

**Federal Administrative Sources**

57 Fed. Reg. 17,875 ...................................................................... 6, 10
73 Fed. Reg. 19,282 ........................................................................ 17
76 Fed. Reg. 26,854 ...................................................................... 6, 10
83 Fed. Reg. 65,564 ........................................................................ 10
91 Fed. Reg. 7,097 .......................................................................... 14

iv

## STATEMENT OF IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

*Amici Curiae* are immigrant and worker rights advocacy organizations, representing communities throughout New York and beyond. As further detailed below, each organization has members or clients that are threatened by FMCSA's change in position and resulting determination of noncompliance. In particular, many *amici* represent or advocate for members of the Sikh community, a demographic that forms a vital and indispensable part of the transportation and trucking industries.

**Asian Law Caucus** (ALC) was founded in 1972 as the nation's first legal and civil rights organization serving low-income, immigrant, and underserved Asian American and Pacific Islander communities. The organization continues to advocate for Asian, Pacific Islander, Arab, Muslim, and other immigrants across a range of issues—including the rights of immigrant workers.

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), *amici* certify that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money to fund this brief, and no person other than *amici* and their counsel contributed money to fund this brief. All parties consent to this filing.

v

The **Sikh Coalition** is a nonprofit and nonpartisan organization dedicated to ensuring that members of the Sikh community in America are able to practice their faith without fear of discrimination or backlash. It defends the civil rights and civil liberties of Sikhs by providing direct legal services and advocating for legislative change, educating the public about Sikhs and Sikhi, promoting local community empowerment, and fostering civic engagement amongst Sikh Americans. The organization also educates community members about their legally recognized free-exercise rights and works with public agencies and officials to implement policies that accommodate their sincerely held beliefs. The Sikh Coalition was originally founded as an effort to combat uninformed hate violence and discrimination against Sikh Americans after September 11, 2001. The Sikh Coalition has long stood for the legal rights of Sikh truckers, including by representing plaintiffs in landmark hiring discrimination legislation, fighting for clients' rights to maintain their articles of faith while working in the trucking industry, seeking justice for drivers who experience bias-motivated assault, producing accessible "know your rights resources" in Punjabi, and more.

The **Asian American Legal Defense and Education Fund** (AALDEF), founded in 1974, is a New York City-based national organization that promotes the civil rights of Asian Americans. Through litigation, advocacy, and education, AALDEF focuses on critical issues affecting Asian Americans, including workers' rights, immigrants' rights, voting rights, and racial justice. Through its Economic Justice program, AALDEF works to ensure that all workers—regardless of immigration status—are paid fairly, work in safe conditions, and can advocate for better workplaces without fear of retaliation, discrimination, stereotyping, or harassment. Because many Asian American workers rely on occupational licenses to support themselves and their families, AALDEF has a strong interest in preventing licensing systems from being used to unlawfully deprive workers of their livelihoods.

The **Asylum Seeker Advocacy Project** (ASAP) is a national voluntary membership organization of over 700,000 asylum seekers living across the United States, including thousands in New York state. ASAP provides members with legal and community support, including time-sensitive updates about immigration policies; legal information; and

opportunities to advocate for reform based on members' priorities, including access to employment authorization and drivers' licenses.

**Chinese for Affirmative Action (CAA)** is a nonprofit organization founded in 1969 to protect the civil and political rights of Chinese Americans and to advance multiracial democracy in the United States. Today, CAA is a progressive voice in and on behalf of the broader Asian American and Pacific Islander communities. CAA provides direct services to immigrants, including job placement and limited scope immigration legal services, and advocates for policies that protect and advance immigrant rights.

The **National Immigration Law Center** (NILC) is a non-profit organization dedicated to advancing the rights and opportunities of low-income immigrants and their families. NILC works to ensure that immigrant communities have access to justice and are protected against unlawful practices and governmental overreach. NILC has a long history of advocating for immigrants' access to drivers' licenses through litigation, policy work, and community education.

The **Sikh American Legal Defense and Education Fund (SALDEF)** is a 501c3 nonprofit organization that is dedicated to

empowering Sikh Americans by building dialogue, deepening understanding, promoting civic and political participation, and upholding civil rights and religious freedom for all Americans. Sikh truckers are deeply connected to SALDEF's mission because they represent one of the most visible and vital segments of the Sikh American community and their daily experiences directly reflect the issues SALDEF works to address.

The **South Asian Legal Defense Fund (South Asian LDF)** is a civil rights and racial justice organization dedicated to protecting and advancing the rights of South Asian communities in the United States, particularly immigrants, workers, and other communities vulnerable to discrimination and government overreach. We advocate at the intersection of economic justice, racialized immigration enforcement, and civil liberties, including on behalf of disproportionately South Asian workers whose livelihoods depend on fair and lawful access to occupational licensing. FMCSA's abrupt change in position threatens the economic security of immigrant commercial drivers, many of whom have structured their careers and family lives in reliance on state-issued commercial driver's licenses. We therefore have a strong interest in

ensuring that federal agencies comply with the Administrative Procedure Act and do not impose arbitrary policies that disproportionately destabilize immigrant workers and their families.

**Stop AAPI Hate** is a U.S.-based coalition dedicated to ending racism and discrimination against Asian Americans and Pacific Islanders (AAPIs). Stop AAPI Hate strives to advance the multiracial movement for equity and justice by building power for AAPI communities, working in solidarity with allied communities, and advocating for comprehensive solutions that tackle the root causes of race-based hate. Given that Asian Americans are the only racial group that is majority foreign-born, anti-immigrant policies have a disproportionate impact on Asian American communities and constitute a form of systemic anti-AAPI hate.

**Truckers Movement for Justice** is a cross border grass roots labor organization that is engaged in organizing all segments of truck drivers, O/O, company, and small fleets across the trucking industry to fight back against the horrific working conditions that have existed in the industry over the last 45 years. We stand in solidarity with both immigrant drivers as well as citizen drivers to be part of an industry that

places value on well-trained drivers alongside providing good working conditions.

**UNITED SIKHS** is an international humanitarian aid and civil and human rights advocacy, United Nations recognized civil society, nonprofit organization based in New York and dedicated to protecting civil liberties. For more than two decades, UNITED SIKHS has provided legal services, policy advocacy, and community support to individuals and families across the United States, including within the State of New York. Our organization proudly serves and represents thousands of members of the Sikh community, a demographic that forms a vital and indispensable part of the transportation and trucking industries.

We have witnessed firsthand the devastating human and economic toll that sudden, unannounced regulatory shifts inflict on vulnerable workers nationwide. FMCSA now threatens vital highway safety funds to coerce New York into abruptly canceling or downgrading legally issued licenses. Because this mandate threatens the livelihoods of our community members without a meaningful opportunity to demonstrate their safe driving records, and because it also harms the spouses and United States citizen children who depend on their income, it is

xi

arbitrary and capricious. As further detailed below, we urge the Court to

set aside the determination.

## PRELIMINARY STATEMENT

*Amici curiae*—immigrant and workers' rights advocates—submit this brief to highlight the experiences of commercial drivers in New York who relied on the Federal Motor Carrier Safety Administration ("FMCSA")'s position that their commercial drivers' licenses ("CDLs") were validly issued to embark on careers, start businesses, and support their families and communities.

Because FMCSA ignored these reliance interests—and in fact falsely denied that it had changed its position at all—*amici* support Petitioners' challenge to FMCSA's final determination of substantial noncompliance ("final determination" or "determination") to New York. This determination withholds over $73.5 million in highway funds and threatens decertification of the state's entire CDL program based on FMCSA's novel interpretation of its regulations that govern the expiration dates on CDLs and commercial learner's permits ("CLPs") issued to noncitizens.[2]

---

[2] FMCSA refers to these permits and licenses as "non-domiciled" CDLs or CLPs.

1

Petitioners correctly argue that FMCSA's determination was contrary to law and was arbitrary and capricious for several reasons, and *amici* endorse those arguments. *Amici* write separately to highlight two additional errors in FMCSA's determination, which result from FMCSA's false denial that its interpretation of its expiration date requirements was new. (This refusal to acknowledge the change is itself sufficient to set aside FMCSA's determination.)

First, the agency erred in failing to not address the serious reliance interests in its earlier interpretation. Drivers counted on FMCSA's longstanding prior position to apply for commercial licenses, start businesses, and make life plans. Indeed, noncitizens have built careers as commercial drivers and have long contributed to New York's economy through the essential services they provide—in school transportation, commercial trucking, sanitation, utilities, disaster relief, and other industries that require drivers to hold a CDL. Employers, both private businesses and governments, also depended on FMCSA's prior position to train the next generation of commercial drivers, hire new workers, and invest in equipment like trucks and vital infrastructure projects.

2

Second, FMCSA failed to offer a detailed, reasoned justification that considered policy alternatives, and accordingly, neglected the harms that would flow from its chosen approach. FMCSA's failure to consider these interests and alternatives—or even acknowledge it changed positions—renders its determination arbitrary and capricious. Accordingly, this Court should set aside the determination.

## ARGUMENT

### I. FMCSA's Unacknowledged Change in Position on the Expiration Date Issue was Arbitrary and Capricious.

The Administrative Procedure Act ("APA") requires a reviewing court to "hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). There are "numerous ways in which an agency may act arbitrarily and capriciously." *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 567 (2025). Among the grounds upon which courts set aside agency actions as arbitrary and capricious are unjustifiable changes in position. *Id.* at 569–70.

3

If a court determines that an agency has changed its position, the courts then assesses whether the agency displayed "awareness that it is changing position" and provided "good reasons for the new policy," and showed that it was "cognizant that longstanding policies may have engendered serious reliance interests." *Id.* at 570 (quoting *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

And when a prior policy creates serious reliance interests, as here, the agency must provide a "reasoned explanation" for "disregarding facts and circumstances that underlay or were engendered by the prior policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (quoting *Fox Television*, 556 U.S. at 515–16). This explanation entails "a more detailed justification than what would suffice for a new policy created on a blank slate" and must "consider the alternatives that are within the ambit of the existing policy" the agency now wishes to disavow. *Fox Television*, 556 U.S. at 515; *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020) (cleaned up).

Not taking one of these actions—display awareness of a change, address serious reliance interests, and offer a reasoned explanation for the change that considers policy alternatives—is sufficient for agency

4

action to be arbitrary and capricious. *See Regents*, 591 U.S. at 30; *Encino Motorcars*, 579 U.S. at 221–22. FMCSA's failure to take *any* of these actions renders its final determination arbitrary and capricious in violation of the APA.

### A. FMCSA's New Expiration Date Policy Was a Change from its Prior Position.

To begin, FMCSA "changed existing policy." *White Lion*, 604 U.S. at 569. Such a change occurs, for instance, when an agency "acts inconsistently with an earlier position," "performs a reversal of its former views as to the proper course," or "disavows prior inconsistent agency action as no longer good law." *Id.* at 569–70 (cleaned up).

As Petitioners argue in their brief, the plain text of the relevant regulations, the regulatory history, and the agency's policy and practice all demonstrate that, before 2025, there was no federal requirement that states match license expiration dates with the lawful-presence documentation provided with drivers' CDL applications. *See* Pet. Brief at 27–34. In fact, the regulations only required that states check a driver's lawful presence once—either at initial issuance or, if the driver held a

5

license on July 8, 2011, at the next renewal or reissuance. [3] Thus, the position that FMCSA adopted in 2025—that states are required not only to check lawful-presence documentation at each renewal *and* to match license expiration dates with the lawful-presence documentation provided with drivers' CDL applications—reflects a change in its policy. The agency, in other words, is acting "inconsistently with an earlier position." *White Lion*, 604 U.S. at 569.

If the agency wanted to change its lawful-presence requirement, it needed to go through rulemaking, as it apparently recognized in issuing the IFR and Final Rule. *See Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014) ("A rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy."). But this new rule cannot be retroactively applied to this determination.

---

[3] *See* 76 Fed. Reg. 26,854, 26,861, 26,856 (May 9, 2011) (rulemaking that codified the relevant pre-IFR regulations in 49 CFR 383.73); *see also* 57 Fed. Reg. 17,875, 17,876 (March 13, 2013) ("[Certain subsections in 383.73] require States to check for legal presence and domicile, but provide for an exception stating that this only needs to be done once after July 8, 2011, provided that a notation is made on an individual's record."). This rule made minor clarifications to the 2011 rule and extended the date for state compliance to July 8, 2015.

## B. FMCSA Falsely Denied that it Changed Position.

At a bare minimum, to survive arbitrary and capricious review, FMCSA would have had to acknowledge that it is changing position. "To be sure, the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position." *Fox Television*, 556 U.S. at 515 (citing *United States v. Nixon*, 418 U.S. 683, 696 (1974).

Yet FMCSA refuses to display any awareness that it has changed position. While there are no "magic words" to satisfy the acknowledgment requirement, *Cboe Glob. Markets, Inc. v. Sec. & Exch. Comm'n*, 155 F.4th 704, 719 (D.C. Cir. 2025), here, FMCSA said the opposite. Specifically, rather than acknowledging the existence of the prior policy and its departure from that policy, FMCSA insists that its supposed expiration-matching rule was implicit in its prior regulations. Indeed, its final determination alleges that states' ensuring "the expiration date of the CLP or CDL does not exceed the expiration date stated on the driver's lawful presence documents" "is not a new requirement." FMCSA, Notice of Final Determination of Substantial Noncompliance (Apr. 16, 2026),

7

App'x at A43. But, as explained above, this position is a change from the agency's previous interpretation.[4]

Because FMCSA may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books," *Fox Television*, 556 U.S. at 515, the agency's failure to recognize it was adopting a new interpretation of expiration date requirements renders its determination arbitrary and capricious.

## C.     FMCSA Failed to Consider Serious Reliance Interests.

While FMCSA's refusal to acknowledge the change in position would be sufficient by itself to set aside its determination, that refusal is compounded by its failure to address the serious reliance interests the agency had inculcated.

---

[4] It is telling when New York noted it "would be willing to review any prior guidance or statements from FMCSA or [U.S. Department of Transportation] that specified expiration date requirements in a manner consistent with FMCSA's current view" and asked FMCSA to "provide such materials, if available," FMCSA was not able to provide any materials. *See* New York Response to Preliminary Determination (Jan. 9, 2026), App'x at A23; *see also* New York Response to FMCSA (March 23, 2026), at App'x at A37 (noting FMCSA failed to provide examples of prior guidance or statements that "specified expiration date requirements in a manner consistent with FMCSA's current view").

In changing a position upon which parties may have relied, an agency must perform three tasks: "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33. The Supreme Court emphasized the importance of this requirement in *Department of Homeland Security v. Regents of the University of California*, where it reversed the Department of Homeland Security's ("DHS's") termination of the Deferred Action for Childhood Arrivals ("DACA") program. *Id.* The Court faulted the agency for failing to consider how the rescission might affect DACA recipients, their families, and their communities. *Id.* at 31–32. Under the change-in-position doctrine, the agency must "be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *White Lion*, 604 U.S. at 570 (quoting *Encino Motorcars*, 579 U.S., at 221–222).

This case presents the same problem. For more than a decade, FMCSA consistently interpreted federal law to permit States to issue non-domiciled CLPs and CDLs with expiration dates that did not necessarily correspond to the expiration dates of the holder's legal

9

presence documents. Individuals, businesses, and state and local governments reasonably relied on that settled interpretation in structuring their affairs. FMCSA nevertheless abandoned that position without acknowledging, much less evaluating, the substantial reliance interests it had created.

a. **Drivers' Reliance Interests.**

Across New York (and the country), thousands of drivers have counted on FMCSA's position since at least 2015 that the expiration date of their CLPs and CDLs was not tied to the expiration dates of their legal presence documents.[5] Based on the agency's longstanding position, drivers applied for and renewed their CLPs and CDLs (including undergoing extensive training and testing to demonstrate eligibility for these licenses), embarked on careers and started businesses, and made other life plans, like buying a home and starting a family. When the Department of Homeland Security ignored similar reliance interests to

---

[5] FMCSA finalized changes to the validity dates for all CLPs and CDLs in a rule that became effective on July 8, 2011. 76 Fed. Reg. at 26,861. States needed to come into compliance with this rule by July 8, 2015. 57 Fed. Reg. at 17,882 (March 13, 2013). FMCSA later extended the expiration date of CLPs from six months to up to one year from the date of initial issuance. 83 Fed. Reg. 65,564 (Dec. 21, 2018).

rescind DACA, that oversight led the Supreme Court to set aside its action. *See Regents*, 591 U.S. at 31 ("[S]ince 2012, DACA recipients have 'enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance' on the DACA program.") Ignoring such interests is "arbitrary and capricious." *Fox Television*, 556 U.S. at 515. Yet ignoring these interests is exactly what FMCSA did.

For example, Michael,[6] a Deferred Action for Childhood Arrivals recipient, has worked for the same company for the last six years, transporting waste across New York and other states. Obtaining a non-domiciled CDL changed his life. He used to work in a restaurant, but with a commercial license, he has been able to make enough income to support his two young daughters, one of whom just finished pre-kindergarten. Relying on his license, Michael has plans to purchase a home. Like the DACA recipients in *Regents*, Michael reasonably structured his professional and personal life in reliance on the government's settled policy.

---

[6] Counsel at ALC spoke with each individual noted in this brief at length during the months of June and July 2026. These workers are using pseudonyms to protect their identities.

11

Ali likewise has relied on the policy. After coming to the U.S. as a special immigrant visa holder from Afghanistan and later obtaining asylum, Ali became a commercial driver in 2023 and is now an owner-operator who delivered goods for Amazon in various states, including New York. Relying on his continued ability to maintain his CDL, Ali invested heavily in his business, purchasing three commercial trucks last year with the goal of building a long-term career in the trucking industry.

Stephen, an asylum applicant, has similarly invested in his career as a driver since he received his non-domiciled CDL over four years ago. He has paid thousands of dollars to lease-to-own his truck, which he uses to haul freight like water, groceries, and construction equipment across the U.S., including New York. He is proud to move the food that stocks supermarket shelves and the supplies that build and maintain homes. His work allows him to be, in his words, "a contributing member of this country."

These drivers engendered serious reliance interests in FMCSA's prior position: Michael planned to purchase a home, Stephen became a lease-to-own operator, and Ali became an owner-operator who purchased three trucks last year. When Michael, Ali, and Stephen first obtained

12

their non-REAL ID CDLs and when they went to renew their CDLs, neither the New York Department of Motor Vehicles ("DMV") nor FMCSA gave them any reason to doubt their assigned expiration date. Had they known of any expiration-date requirement at the time, they would have asked the DMV to adjust the expiration date on their CDL accordingly because their licenses mattered that much to them. *Cf. Cleveland v. United States*, 531 U.S. 12, 25 n.4 (2000) ("individuals have constitutionally protected property interests in state-issued licenses essential to pursuing an occupation or livelihood" like a "driver's license").

The consequences of FMCSA's unexplained reversal would "radiate outward" in precisely the manner the Supreme Court found significant in *Regents*. See 591 U.S. at 31. If New York is required to implement FMCSA's new interpretation by canceling affected licenses, almost all affected drivers will lose their commercial driving privileges altogether because they are no longer eligible to obtain non-domiciled CLPs or CDLs under recently adopted federal requirements.[7] The loss of those

---

[7] If New York did not have to cancel or revoke these licenses (which it should not have to do), many of these drivers can still retain their licenses until they expire, even if FMCSA's final rule—which is

13

credentials would, in turn, cost them their livelihoods, as a valid commercial license is a prerequisite for their jobs. For drivers who have spent years building careers in commercial transportation, transitioning to another occupation—particularly one offering comparable wages and opportunities—is neither immediate nor realistic. The result would be the unnecessary and abrupt loss of income on which these drivers depend, impacting their families and their communities.

Against this backdrop, FMCSA needed to assess the serious reliance interests of drivers and weigh these interests against competing policy concerns when it changed its position. *Regents*, 591 U.S. at 33; *see id.* at 24 (With so much at stake, "the Government should turn square corners in dealing with the people."). Instead, it silently substituted its prior view with a conflicting interpretation that unfairly stripped drivers of their livelihoods. This the agency cannot do, and thus, its determination must be set aside.

---

currently being challenged—remains in place. *See* 91 Fed. Reg. at 7,097 (final rule noting FMCSA anticipates non-domiciled CDL holders will "exit the market over approximately five years as their credential comes up for renewal"); *cf. Lujan Rivera v. FMCSA,* No. 26-1032 (D.C. Cir.) (pending challenge to this final rule).

**b. Employers' Reliance Interests.**

FMCSA also did not consider the serious reliance interests of employers, such as New York state, local governments, and businesses that depended on the agency's longstanding position to train and hire drivers who provide essential services to the public.[8]

As Petitioners note, New York's approximately 25,000 non-domiciled licensees comprise roughly 5% of the State's pool of CDL holders. Removing them from the workforce would create immediate disruptions in coverage and service that would impact New Yorkers and the localities that serve them. New York Response to FMCSA (March 23, 2026), at 2. Businesses relied on FMCSA's previous position as well, including Stephen's prior employer—a major trucking and logistics company—who provided training for him to obtain a CDL and owner-operators like Ali who hired drivers with New York non-domiciled CDLs

---

[8] New York state alone can show it had serious reliance interests that FMCSA did not consider, as it will lose more than $73.5 million in highway funds this fiscal year alone because it structured its issuance of commercial licenses based on FMCSA's prior longstanding position. *See* New York Response to FMCSA (March 23, 2026), at 2. These funds are important for the state's infrastructure projects and the employment opportunities that they support.

15

to deliver goods without knowing FMCSA would change its position *sub silentio*.

\*    \*    \*

Because FMCSA was "not writing on a blank slate," it was required to "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns" before changing course. *Regents*, 591 U.S. at 33; *see also Encino Motorcars*, 579 U.S. at 221–22. Like in *Regents*, however, FMCSA, failed to consider how requiring New York to cancel thousands of licenses and take other "corrective actions" would affect drivers, their families, their communities, and other stakeholders. *See Regents* 591 U.S. at 31–32. Rather, it silently abandoned its longstanding interpretation and substituted a conflicting one without addressing the profound consequences for the thousands of drivers who had ordered their lives around the prior policy, not to mention other stakeholders like their employers. This also renders its final determination arbitrary and capricious. *See Regents*, 591 U.S. at 33; *White Lion*, 604 U.S. at 567–68 ("an agency should not mislead regulated entities").

16

## II. FMCSA's Determination is Arbitrary and Capricious for Failing to Consider Alternatives and the Harm from its Chosen Approach.

### A. FMCSA Failed to Consider Alternatives to its Determination.

Because its prior position has "engendered serious reliance interests," FMCSA had to "consider the alternatives that are within the ambit of the [prior] policy," and "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Fox Television*, 556 U.S. at 515; *Regents*, 591 U.S. at 30. Yet FMCSA made no effort to consider policy alternatives. *See* Preliminary Determination, App'x at A3; March 13, 2026 FMCSA response, App'x at A30–31; Final Determination, App'x at A42–44. The omission is even more striking because FMCSA knows how to consider alternatives on the very issue of expiration dates. *See, e.g.*, 73 Fed. Reg. 19,282, 19,288 (Apr. 9, 2008) (FMCSA discussing alternatives it considered to limiting the initial issuance and renewal periods for CLPs and CDLs). And while an agency need not consider "all policy alternatives" in reaching its decision, it must "consider the alternatives that are within the ambit of [its prior] policy." *Regents*, 591 U.S. at 30. FMCSA failed to do so, which alone renders its new interpretation arbitrary and capricious.

17

The agency also ignored its obligation to provide a "reasoned explanation" for "disregarding facts and circumstances that underlay or were engendered by the prior policy." *Encino Motorcars*, 579 U.S. at 222. Indeed, it does not engage with these facts and circumstances at all. The agency did not discuss, for example, why it was unable to provide prior guidance or statements that reflect its new position or why, if there was no change in position, so many states and stakeholders did not act accordingly in the last decade to correct the expiration date of CLPs or CDLs. Drivers, employers, and insurers are heavily invested in maintaining a driver's valid CDL, yet there is no mention of these individuals and entities contacting the DMV to "correct" licenses that did not reflect FMCSA's current view. *Id.* And as discussed above, FMCSA did not properly assess the substantial reliance interests of stakeholders.

Each of these deficiencies render FMCSA's determination arbitrary and capricious, requiring this Court to set it aside.

B.   **FMCSA Failed to Consider the Foreseeable Harms that Would Flow from its Determination, as Opposed to Alternatives.**

FMCSA's determination urges New York to revoke or cancel the CLPs or CDLs of affected drivers, which would result in devastating and foreseeable harm to countless drivers, their families, and the communities and employers they serve.

This harm would take many forms, ranging from financial impacts to emotional or psychological harm. For instance, Ali's entire professional experience has been in the trucking industry, and he invested all his money into the industry, including purchasing three trucks last year to grow his business. To lose his livelihood now would entail both financial and emotional impact, leaving him unable to cover his business expenses and daily necessities to sustain himself and his family. The stress of potentially needing to find another vocation when trucking is all he has known weighs on him every day.

If New York had to revoke Stephen's CDL, it would significantly impact his ability to pay for housing and groceries, especially given the cost of living in the State, and maintain his lease-to own-contract, which requires him to pay for the leased vehicle, insurance, maintenance, and

19

gas and tolls. Losing his CDL would, in turn, affect his ability to support his family, and require him to forgo a livelihood he held with pride.

Should New York be forced to revoke Michael's CDL, he does not know what he will do for work or how he will pay for necessities like his apartment, car insurance, or child support or medicine. Because he has a herniated disk in his back, he cannot easily find another job and certain options—like construction—are off limits. Even if he were to be able to find another job, he doubts it will allow him the flexibility to spend time with his daughters the way he can now. It saddens him that he did everything right—went to driving school, passed the required exams, kept a clean driving record—and still may have to lose his license and means of supporting himself and his children.

These harms "radiate outward" to Michael's young daughters, Stephen and Ali's families, and companies and communities across New York and the country who will have one less qualified driver transporting waste or delivering water, groceries, and supplies. *See Regents*, 591 U.S. at 31.

And should FMCSA decertify New York's entire CDL program because of its improper change in position, even more people would be

20

harmed. These individuals include Sandeep, who inspired his fiancé—and now wife Alina—to also become a commercial driver. Sandeep and Alina drove together as a husband-and-wife team to deliver groceries and other goods for companies like Costco, Walmart, Trader Joe's, and Driscoll's. They planned to purchase a house and start a family, but they would be unable to afford necessities like the very groceries they used to deliver if they both lost their CDLs. Impacted individuals also include Antonio and Paul, utility drivers who ensure residents of New York and other states have gas and electricity. Antonio would be hard-pressed to support his mother, wife, and other family members if he lost his CDL, and the loss of Paul's CDL would be "heartbreaking" because his elderly mother and siblings depend on him for financial support. This harm extends to the State and community members and entities throughout the U.S.

In abruptly changing its position and threatening New York's CDL program, FMCSA ignored these harms. The existence of wide-ranging harm across industries—affecting those who deliver groceries, transport children with special needs, and ensure New Yorkers have gas and electricity (to name a few examples)—is one reason why agencies like

21

FMCSA need to consider reliance interests and reasonable alternatives when they change positions. *Regents*, 591 U.S. at 30–33 (explaining import of this consideration). FMCSA's failure to do so here was arbitrary and capricious. For this reason too, its determination must be set aside.

## CONCLUSION

FMCSA's new interpretation of CLP and CDL expiration date requirements failed to acknowledge the agency was changing positions. It did not address the serious reliance interests of impacted stakeholders. Nor did it offer a detailed, reasoned justification for its determination that considered policy alternatives or the foreseeable harm that would flow. For any of these reasons—and for all these reasons and those identified by Petitioners—its final determination is arbitrary and capricious, and must be set aside.

22

Respectfully submitted,


Dated: July 13, 2026                    */s/ Katherine Zhao*


Katherine Zhao
Joshua Rosenthal
Asian Law Caucus
55 Columbus Ave
San Francisco, CA 94111
Tel: (415) 896-1701
katherinez@asianlawcaucus.org
joshr@asianlawcaucus.org

Munmeeth Kaur Soni
The Sikh Coalition
165 Broadway, 23rd Floor
New York, NY 10006
Tel: (212) 655-3095
munmeeth@sikhcoalition.org


*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify that this Brief of *Amici Curiae* complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because, excluding parts of the document exempted by Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1), it contains 5,453 words.

I further certify this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface with 14-point Century Schoolbook font in Microsoft Word.

Respectfully submitted,

Dated: July 13, 2026

*/s/ Katherine Zhao*
Katherine Zhao
*Counsel for Amici Curiae*

# CERTIFICATE OF SERVICE

I certify that on July 13, 2026, I electronically filed the foregoing document with the Clerk of Court for the United States Court of Appeals for the Second District of New York by using the appellate ACMS system. I certify that the foregoing document is being served on this day to all counsel of record registered to receive a Notice of Electronic Filing generated by ACMS.

Dated: July 13, 2026

           */s/ Katherine Zhao*
           Katherine Zhao
           *Counsel for Amici Curiae*